1  Michael Blomquist
2  dba Michael Scott Properties, Inc.
3  18234 Daves Avenue
4  Los Gatos, CA 95030
5  (408)399-0590
6  (408)399-0590 (FAX)
7  michaelsblomquist@gmail.com
8
9  Plaintiffs
10                **UNITED STATES DISTRICT COURT**
11              **NORTHERN DISTRICT OF CALIFORNIA**
12                    **SAN JOSE DIVISION**

13  MICHAEL BLOMQUIST &              ) Case No.:
14  MICHAEL SCOTT PROPERTIES, INC.   )
15                                   ) COMPLAINT
16              Plaintiffs,          )
17                                   ) DEMAND FOR JURY TRIAL
18  vs.                              )
19                                   )
20  WASHINGTON MUTUAL, a Washington  )
21  corporation; KERRY K. KILLINGER; )
22  JOSEPH W. SAUNDERS;              )
23  COUNTRYWIDE HOME LOANS, INC. a   )
24  Delaware corporation; ANGELO     )
25  MOZILLO; WACHOVIA CORPORATION, a )
26  North Carolina corporation; KEN  )
27  THOMPSON CITIGROUP, a Delaware   )
28  corporation; SANFORD WEILL; CHARLES)
29  PRINCE; GOLDMAN SACHS GROUP, INC., )
30  a Delaware corporation; HENRY    )
31  PAULSON; BEAR STERNS COMPANIES,  )
32  INC., a Delaware corporation;    )
33  JAMES CAYNE; THE MCGRAW HILL     )
34  COMPANY, INC., a Delaware        )
35  corporation; HAROLD MCGRAW III;  )
36  WELLS FARGO & COMPANY, a Delaware )
37  corporation; PATRICIA R. CALLAHAN; )
38  HERBERT M. SANDLER; ROCK HOLDINGS, )
39  INC., a Delaware corporation;    )
40  EXPERIAN CORPORATION, a Delaware )
41  corporation; JAMES E. GILLERAN;  )
42  JOHN M. REICH; JOHN D. HAWKE JR.; )
43  JOHN C. DUGAN; SUSAN SCHMIDT BIES; )
44  DONALD E. POWELL; SHEILA C. BAIR; )
45                                   )
46              Defendants.          )
47  _____)
48
49

1    **Antitrust: Safeguarding Public Welfare**

2    **A Protection of Constitutional Rights**

3

4                 **Venue and Jurisdiction**

5       1.   The violations of law alleged in this Complaint

6    were committed throughout the State of California; in

7    particular the counties of San Mateo and Santa Clara;

8    Plaintiffs' primary counties of business.  Diversity of

9    citizenship, amount in controversy Title U.S.C. 28 § 1332

10   exist and Title U.S.C. 15 § 22 apply.  This Complaint also

11   involves alternative mortgage transactions, which have

12   preempted some state laws Title U.S.C. 12 § 3803. Northern

13   District of California; San Jose division is proximate and

14   proper venue.

15                        **Plaintiffs**

16      2.   Plaintiffs are Michael Scott Properties, Inc.

17   ("MSP") and Michael Blomquist ("MB"); who is the sole owner

18   and president of Michael Scott Properties, Inc.

19   ("MSP")(collectively, "Plaintiffs").   MB has been a

20   licensed mortgage and real estate agent since 1992.

21   Michael Scott Properties, Inc. ("MSP") was licensed with

22   the CA Department of Real Estate ("DRE") from 4/6/2000 –

23   4/30/2007.  MB is completing a book on the housing bubble

24   and its future effects on America and the global economy.

25

1                              **Allegations**

2          3.  After years of a very successful career, MB and

3    MSP witnessed rampant exploitation of consumers, real

4    estate values and market stability through unconscionable,

5    unfair, deceptive and fraudulent ("unlawful") lending and

6    securities activities cited below.  Antitrust violations

7    have emerged from these unlawful restraints as Defendants

8    have proliferated fraud in order to stifle competition and

9    further self-dealings.  The combination of unlawful

10   activities has violated the primary goal of antitrust laws:

11   To "safeguard public welfare" and are illegal per se; in

12   addition price fixing and tying exist.  The magnitude of

13   these antitrust violations is increasing or will increase

14   through the concealment of fraud; Defendants restraint of

15   mortgage brokers' business and Defendants pursuit of

16   entering real estate sales. Q&A; *Keeping Banks out of Real*

17   *Estate*;

18   http://www.realtor.org/rmomag.NSF/pages/Feat3200603?OpenDoc

19   ument.  The Defendants are now accusing the consumers and

20   mortgage brokers for the current lending pandemic when they

21   were the source of funds.

22         4.  Repurchase agreements and inability to properly

23   supervise agents in a marketplace that encourages fraud

24   forced MSP to return licenses to all agents working under

25   MSPs' licenses.  MB has been individually restrained from

1  mortgage and real estate commerce because of legal,

2  fiduciary, ethical, and moral conflicts.  MB has written

3  numerous letters, emails, filed complaints and placed phone

4  calls to many of the Defendants warning of the abuses;

5  including but not limited to (Exhibits A, B & C).  Exhibit

6  A, Comments; *Interagency guidance on Nontraditional*

7  *Mortgage Products*, (2005);

8  http://www.fdic.gov/regulations/laws/federal/2005/05comguid

9  e.html (#20).  Over the years similar lending issues have

10 been reviewed with sub-prime loans.  Despite conflicts of

11 safeguarding public welfare, sub-prime loans have

12 proliferated.  Non-traditional mortgage products have grown

13 exponentially since 2003 and the Agencies have once again

14 failed at their basic duties.  The Agencies Final Guidance

15 and illustrations substantiate their failure.  Final

16 Guidance only revisits existing laws and regulations that

17 have not been enforced. *Federal Financial Regulatory*

18 *Agencies Issue Final Guidance on Nontraditional Mortgage*

19 *Product Risks, (Sept. 2006);*

20 http://www.fdic.gov/news/news/press/2006/pr06086.html

21      5.  Against Plaintiffs' advice and Plaintiffs'

22 unwillingness to commit unlawful acts; Plaintiffs' clients,

23 referrals and prospective clients were enticed to and

24 transacted business with the Defendants.  During the course

25 of business these borrowers were coerced to participate in

1  unlawful acts, omissions and fraudulent statements to

2  purchase over-priced, unaffordable homes through the sale

3  of affordable homes or obtain unaffordable, misleading,

4  cash-out loans to subsidize income.  Stated income loans,

5  Option ARMs, 100% financing and risk layering are the

6  loans/practices in question and defined in paragraphs 32-

7  37.  These products would entice and allow borrowers to

8  finance loans they could not afford.

9       6.  MB is confident that America has never before

10 experienced a remotely similar magnitude of fraud, greed or

11 incompetence.  MB while looking to find replacement income

12 and realizing that the Defendants' activities were unlawful

13 and unsustainable purchased securities which would benefit

14 MB from decreases in some of the Defendants' stocks.  MB

15 realizes he was not forced to buy the securities.  MB

16 alleges that mortgage and securities fraud were the cause

17 of his security losses.  It is further alleged that the

18 Agencies have aided and abetted said violations.

19      7.  After the dot.com, WorldCom and Enron scandals the

20 government promulgated numerous statements, laws and

21 regulations to crack down on fraud/white collar crime.

22 Given the effects of these scandals on the stability of our

23 economy; MB had faith that these laws and regulations would

24 be supervised and enforced.  MB alleges that all prior

25 scandals pale in comparison to the magnitude of these

1  violations.  Similar to the supervisory mergers instituted

2  from the S&L crisis the concealment of said acts have

3  exponentially increased the risk in order to unjustly

4  enrich, over-compensate and/or hide professional failures.

5      8.  Plaintiffs have witnessed the proliferation of

6  sub-prime and non-traditional lending practices proliferate

7  while prudent, established and stress-tested lending

8  guidelines disappeared.  The primary goal of antitrust laws

9  is to safeguard public welfare.  Numerous consumer groups

10 have tried to stop these unethical and unlawful practices,

11 but the only victories have been through additional, over-

12 looked disclosures and Agency guidance that affirms

13 existing laws which have yet to be enforced.  The

14 unconscionable loans, companies and practices have become

15 acquired or emulated by many of the Defendants.

16     9.  Plaintiffs have numerous insiders and

17 whistleblowers willing to testify and substantiate

18 allegations.  The effects of these unlawful practices have

19 dramatically over-leveraged and over-valued real estate,

20 securities and our economy.  Plaintiff alleges the

21 Defendants' acts will not only devastate America, but could

22 eventually bring about the next global depression,

23 especially if these practices are not stopped now.

24     10. Plaintiff brings this action pursuant and not

25 limited to U.S. Const. art. III, § 2; Title U.S.C. 5 § 702

1  *Processing Service Organizations v. Camp,* 397 U.S. 150

2  (1970); Title U.S.C. 15 §§ 1,13,13a,15,16,21,57a(f),77uuu,

3  78b(3),78i, 78j, 78k-1; parallel regulations; and sections

4  17043, 17200, 17203, 17500 of the California Business and

5  Professions Code; sections 1667, 1668, 3294, of the

6  California Civil Code and sections 3353, 22161 and

7  50503(a)(2) of the California Financial Code.  The

8  violations have been growing over the last decade, but

9  proliferated after 2004 and continue to increase

10  exponentially today ("relevant times").  The unlawful

11  lending and security activities violate numerous statutes

12  and provide unreasonable restraints of trade.

13  Overwhelming evidence of fraud within America's banking

14  sector, the most important sector, deserves the stiffest

15  penalties and immediate redress for similarly situated

16  lawful agents and prudent public policy.

17  **Defendants and Related Allegations**

18      11.  Unless otherwise noted all Defendants are

19  registered, have transacted business, underwrote debt, sold

20  debt, rated debt or are required to supervise commerce

21  throughout the United States, the State of California,

22  including the Counties of San Mateo and Santa Clara; the

23  Plaintiffs' primary counties' of business.  It is alleged

24  that numerous Defendants are already insolvent, but the

25  "too big to fail theory" and government support has

1   concealed the facts and unlawful activities.

2       12.  The Defendants listed in this complaint are a

3   small percentage of the potential Defendants participating

4   in the unlawful activities.  Potential Defendants could

5   include other government agencies; analysts and debt rating

6   agencies who carelessly assigned ratings/recommendations;

7   Certified Public Accountants ("CPAs"), auditors, other

8   banks, lenders and all directors participating in the

9   fraud.  Plaintiffs allege that the worst offenders and

10  biggest benefactors of the fraud have been the investment

11  bankers.  Plaintiffs also allege that the point of origin

12  for the unconscionable fraud resides within the Lenders.

13  Fraudulent profits, bonuses and collapsing credit markets

14  provide sufficient motivation and evidence for the rampant

15  crimes.  Reasonable care and attention to numerous warnings

16  should have stopped these unlawful acts years ago.  The

17  Defendants have been exploiting the FDIC and our government

18  to support their unconscionable acts while the FDIC has

19  less than $51 billion in reserves to insure over $4

20  trillion in insured deposits.

21      13.  At all relevant times, Defendant Washington

22  Mutual, a Washington corporation ("WAMU"), was, and is now,

23  a Federal savings association with insured deposits.  As of

24  March 31, 2005 WAMU had total deposits of $183.63 billion;

25  most of which are federally insured.  Providian Financial

1  ("Providian") was acquired by Washington Mutual on October

2  1, 2005.  Providian had deposits of $9.07 billion as of

3  March 31, 2005; most of which were federally insured.

4  Market cap for WAMU as of Augusts 8, 2008 was approximately

5  $32 billion, stockholders' equity of $24.2 billion and

6  goodwill of $9 billion on June 30, 2007.  Goodwill is 37%

7  of stockholders' equity and WAMU's reputation is so bad

8  that they have extreme difficulty selling their Jumbo loans

9  on the secondary market.  All causes of action against

10  Providian Financial will be brought against WAMU; KERRY K.

11  KILLINGER, WAMU CEO; JOHN M. REICH; JOHN D. HAWKE; and

12  JOSEPH W. SAUNDERS.

13       13a. At all relevant times Defendant, Kerry K.

14  Killinger ("KKK"), was, and is now, CEO and Chairman of

15  WAMU.

16       13b. Defendant, JOSEPH W. SAUNDERS ("JWS") was CEO of

17  Providian from November 2001 until October 2005.

18       14.  At all relevant times, Defendant Countrywide Home

19  Loans, Inc., a Delaware corporation (also dba America's

20  Wholesale Lenders); Countrywide Bank, N.A., and its wholly-

21  owned subsidiary ReconTrus Company N.A.(collectively,

22  "Countrywide"), was a National Bank, and is now a Federal

23  savings association.  Countrywide had deposits of $60.57

24  billion as of June 30, 2007; most of which are federally

25  insured.

1    14a. At all relevant times Defendant, ANGELO MOZILLO

2    ("Angelo") was, and is now CEO and Chairman of Countrywide.

3    15.  At all relevant times Defendant, Wachovia

4    Corporation, a North Carolina corporation ("Wachovia") was,

5    and is now, a National Bank.  Wachovia has approximately

6    $328.56 billion dollars in deposits; most of which are

7    federally insured.  Wachovia has been named as a defendant

8    primarily for violations conducted by Golden West Financial

9    (also dba World Savings)("World"), a Federal savings

10   association acquired by Wachovia Corporation on October 1,

11   2006.  World had deposits of $61.5 billion dollars; most of

12   which were federally insured.

13   15a. At all relevant times Defendant, Ken Thompson

14   ("KT") was, and is now CEO and Chairman of Wachovia.

15   15b. At all relevant times until October 1, 2006,

16   Defendant Herbert M. Sandler ("Herb") was CEO and Chairman

17   of World.  Sandler is considered to be the expert authority

18   on option ARM loans.  His fraudulent and misleading

19   statements about option ARM loans have aided and abetted

20   their proliferation.  Although the debt markets are

21   beginning to explode the real problems behind the option

22   ARMs will not be experienced for years.  See below for a

23   link to Sandler's comments on non-traditional lending

24   products.

25   16.  At all relevant times, Defendant Wells Fargo &

1  Company, a Delaware Corporation ("Wells") was, and is now a

2  national bank with insured deposits.  Wells has federal

3  deposits of approximately $290.59 billion dollars as of

4  March 31, 2007, most of which are federally insured.

5      16a. From June 2005 and after, Defendant Patricia R.

6  Callahan ("PRC") was, and is now Executive Vice President

7  of compliance and risk management for Wells.  PRC was

8  previously responsible for systems, operations and finance

9  for the Real Estate Group.

10     17.  At all relevant times, Defendant Citigroup Inc.,

11  a Delaware corporation ("Citigroup") was, and is now, a

12  multibank holding company.  Citigroup has experience in

13  mortgage lending and provided an opinion in the acquisition

14  of Providian by WAMU.  Citigroup has assisted with numerous

15  debt offerings for Providian, WAMU and other mortgage

16  lenders.

17     17a. At all relevant times Defendant, Sanford Weill

18  ("Sandy") was Chairman of Citigroup until April 18, 2006.

19     17b. At all relevant times Defendant, Charles O.

20  Prince III ("Chuck") was, and is the CEO of Citigroup.

21  After April 18, 2006 Chuck became Chairman of Citigroup.

22     18.  At all relevant times, Defendant Goldman Sachs

23  Group, Inc., a Delaware corporation ("Goldman") was, and is

24  now, an investment bank.  Goldman has experience in debt

25  offerings and provided an opinion in the acquisition of

1  Providian by WAMU.  Goldman has assisted with numerous debt

2  offerings for Providian, WAMU and other mortgage lenders.

3      18a. At all relevant times until approximately May 31,

4  2006 Henry M. Paulson ("Hank") was the CEO and Chairman of

5  Goldman Sachs Group, Inc.

6      19.  At all relevant times, Bear Sterns Companies,

7  Inc., a Delaware corporation ("BS") was, and is now, an

8  investment bank.  BS has experience in debt offerings and

9  has assisted with numerous debt offerings for mortgage

10 lenders.

11     19a. At all relevant times James Cayne ("JC") was, and

12 is now the CEO and Chairman of BS.

13     20.  At all relevant times, Defendant The McGraw Hill

14 Company, Inc., a Delaware corporation was, and is now the

15 parent company of Standard and Poors ("S&P").  S&P provides

16 independent credit ratings and market analysis for a

17 variety of products including analysis for option ARMs.

18     20a. At all relevant times, Defendant Harold McGraw

19 III was, and is now the CEO and Chairman of S&P.

20     21.  At all relevant times, Defendant Rock Holdings

21 Inc., a Michigan corporation was, and is now the parent

22 company of Quicken Loans, Inc. ("Quicken").  Quicken

23 provides home loans through extensive internet marketing

24 campaigns.  A majority of the advertising is extremely

25 misleading, particularly option ARMs.

1    22.  After May 2005, Defendant Experian Services

2  Corporation, a Delaware corporation was, and is now the

3  parent company of LowerMyBills.com ("Bills"). Bills is a

4  lead generation/information broker that engages in

5  extremely misleading advertising, particularly option ARMs.

6    23.  As of August 9, 2005, Defendant John M. Reich

7  ("Reich") was, and is now, the director of the Office of

8  Thrift Supervision ("OTS"); a Federal Regulatory Agency

9  with the Mission Statement: "To supervise savings

10  associations and their holding companies in order to

11  maintain their safety and soundness and compliance with

12  borrower laws, and to encourage a competitive industry that

13  meets America's financial services needs".  The OTS

14  replaced the Federal Home Loan Bank Board ("FHLBB") after

15  the FHLBB failed from the S&L crisis.  OTS has stated that

16  its purpose is to ensure that the thrift crisis of the

17  1980s is never repeated.

18    24.  From December 7, 2001 until April 29, 2005, James

19  E. Gilleran ("Gilleran") was the director of the OTS. It is

20  believed that the mission of the OTS was the same during

21  Gilleran's term as stated in paragraph 23.

22    25.  As of August 4, 2005, Defendant John M. Dugan

23  ("Dugan") was, and is now, the director of the Office of

24  the Comptroller of the Currency ("OCC"); a Federal

25  Regulatory Agency. "The OCC's Objectives are predicated on

1  four objectives that support the OCC's mission to ensure a

2  stable and competitive national banking system. The four

3  objectives are: a. To ensure the safety and soundness of

4  the national banking system; b. To foster competition by

5  allowing banks to offer new products and services; c. To

6  improve the efficiency and effectiveness of OCC

7  supervision, including reducing regulatory burden; d. To

8  ensure fair and equal access to financial services for all

9  Americans.

10    26.  From December 8, 1998 until October 13, 2004,

11  Defendant John D. Hawke Jr. ("Hawke") was the director of

12  the OCC. It is believed that the mission of the OCC was the

13  same during Hawke's term as stated in paragraph 25.

14    27. As of December 7, 2001, Defendant Susan Schmidt

15  Bies ("Bies") was, and is now a governor at the Board of

16  Governors of the Federal System ("FED"). The FED was, and

17  is now, a Federal Regulatory Agency established to perform

18  four duties: "a. conducting the nation's monetary policy by

19  influencing the monetary and credit conditions in the

20  economy in pursuit of maximum employment, stable prices,

21  and moderate long-term interest rates; b. supervising and

22  regulating banking institutions to ensure the safety and

23  soundness of the nation's banking and financial system and

24  to protect the credit rights of borrowers; c. maintaining

25  the stability of the financial system and containing

1  systemic risk that may arise in financial markets; d.

2  providing financial services to depository institutions,

3  the U.S. government, and foreign official institutions,

4  including playing a major role in operating the nation's

5  payments system.

6      28.  As of June 26, 2006, Defendant Sheila C. Bair

7  was, and is now Chairman of the Federal Deposit Insurance

8  Corporation ("FDIC").  FDIC was, and is now, a Federal

9  Agency with the Mission Statement.  "The Federal Deposit

10 Insurance Corporation (FDIC) is an independent agency

11 created by the Congress that maintains the stability and

12 public confidence in the nation's financial system by

13 insuring deposits, examining and supervising financial

14 institutions, and managing receiverships".

15     29.  From August 29, 2001 until November 15, 2005

16 Defendant, Donald E. Powell was the Chairman of the FDIC.

17 It is believed that the mission of the FDIC was the same

18 during Powell's term as stated in paragraph 28.

19     30.  Whenever reference is made in this Complaint to

20 any act of any corporate or other business Defendant, that

21 reference shall mean that the corporation, or other

22 business did the acts alleged in this Complaint through its

23 officers, directors, employees, agents and/or

24 representatives while they were acting within the actual or

25 ostensible scope of their authority.

31.  Whenever reference is made in this Complaint to any act of Defendants, such allegation shall mean that each Defendant acted individually and/or jointly with the other Defendants.  WAMU, Countrywide, Wachovia, Wells and Quicken shall be referred to collectively as "Lenders". Citigroup, Goldman and BS shall be referred to collectively as "Bankers".  KKK, JWS, Angelo, KT, Herb, PRC, Sandy, Chuck, Hank and JC shall be referred to collectively as "Executives".  Bills and S&P at this time will individually remain, Bills and S&P.  The Directors or Chairman at the OTS, OCC, FED, and FDIC, shall be referred to collectively as "Agencies".  The term "Defendants" wherever used in this Complaint shall mean all named defendants.  Additional definitions and statements are listed below.

**Definitions and Related Allegations**

32.  **Stated income loan or no income verification ("NIV") (prior times)** refers to loan guidelines where the borrower is not required to provide income documentation. NIV guidelines prior to relevant times required borrowers to be self-employed, have excellent credit and document 20% equity for refinances or proof of liquid funds representing a 20% down-payment for home purchases.  Self-employment was verified by 2 most recent, consecutive years of business licenses or letter from borrower's certified public accountant verifying self-employment for 2 most recent,

1  consecutive years.  NIV loans prior to relevant times were

2  considerably less risky than relevant times NIV loans.

3      33.  **NIV (relevant times)** Loans with NIV guidelines

4  are extended to wage earners who receive W-2s.  W-2s

5  provide easy income verification and require limited

6  paperwork in order to determine a borrower's ability to re-

7  pay loans.  Allowing borrowers with W-2 incomes to use NIV

8  guidelines has encouraged and resulted in rampant fraud.

9  **Recent studies have found that 90% of all loans with NIV**

10 **guidelines have inflated incomes.  60% of NIV loans have**

11 **inflated incomes by 50% or more.**  The Plaintiffs believe

12 these numbers are more alarming in the Plaintiffs' primary

13 counties of business, which are some of the most expensive,

14 leveraged and volatile areas within the United States.  The

15 Defendants have knowingly allowed and encouraged this fraud

16 to proliferate.  The Internal Revenue Service ("IRS") has

17 provided during all relevant times fast and easy

18 verification of borrowers' incomes (4506), but this service

19 is rarely used.

20     34.  **Option ARM** is an adjustable rate loan with

21 optional monthly loan payments.  Imagine financing a home

22 with a credit card.  Option ARMs are often underwritten

23 with NIV guidelines.  The loan payments can be any amount

24 as long as the monthly minimum payment is provided.

25 Lenders will usually provide dollar amounts for the

1  minimum, interest only, 30 year fixed and 15 year fixed

2  payments.  Initial, minimum monthly payments are calculated

3  with 3 factors: loan balance, 30 year amortization and a

4  starting/discount interest rate which is often 1-1.5%.

5  Although the payments will remain fixed for one year, the

6  discount rate is often fixed for only one month.  Herbert

7  Sanders the founder and CEO of World Savings is considered

8  to be the option ARM industry expert.  Despite Sander's

9  lengthy track record with option ARMs he too was critical

10 of the current deep payment discounts and diluted

11 underwriting standards as evidenced by his comments on non-

12 traditional lending products:

13 http://www.fdic.gov/regulations/laws/federal/2005/05comguid

14 e.html #47.  In the face of competition, unsafe and unsound

15 lending Sanders/World was willing to ignore his own expert

16 advice and World continued to offer option ARMs with deep

17 payment discounts outside his recommendations and legal

18 boundaries (17043 CA B&P).  Sanders also went on to state

19 that option ARMs were properly stressed tested, but NIV

20 guidelines, high loan to values ("LTVs") and deep discount

21 payments were not prevalent during the times of stress in

22 1994.  Interestingly, Sander's written support for the

23 option ARM was provided only weeks before the proposed and

24 future acquisition of World by Wachovia.

25       35.  **Option ARM example:** A standard, misleading option

1  ARM worksheet from WAMU is attached as (Exhibit D).  The

2  margin of 2.050% is rarely ever provided.  Margins are

3  usually 2.65% or higher.  You will notice the loan amount

4  is $1,160,000.  The minimum payment is $3,072.20.  Interest

5  only is $4,341.90 and the difference between the two is

6  $1,269.69 (negative amortization).  This worksheet was

7  produced and distributed at a time when interest rates were

8  at historic lows (4.554% as shown).  Today fully indexed

9  rates ("FIR") with normal margins are much closer to 7.7%

10 resulting in considerably more negative amortization.  The

11 worksheet was generated on 6/10/2003.  After 4 years

12 minimum payments would have stepped up to $3,817 resulting

13 in negative amortization of $3,046 per month which is added

14 to the loan balance.  This is a very optimistic outlook

15 given the extremely low margin utilized in this scenario.

16 The traditional 30 year fixed loan payment was based on an

17 interest rate of 6% or $6,954.79, which is more than double

18 the minimum payment.  Some studies have shown that 90% of

19 all option ARM borrowers make only the minimum payments.

20 These loans are extremely unfair, deceptive, misleading and

21 fraudulent.  Loan performance has documented that 88% of

22 all Option ARM loans originated in CA are originated with

23 NIV guidelines.

24    36.  **100% financing & income tax liabilities:** Lenders

25 provide financing for 100% of the home's purchase price.

1   Often times an additional 3% (103%) can be provided towards

2   closing costs through a clause in the purchase contract.

3   100% financing usually consists of an 80% first and a 20%

4   2nd mortgage.  The consequences of defaulting or foreclosure

5   with 100% financing is not properly disclosed.  Example: A

6   borrower buys a $500,000 home with 100% financing.  The

7   price drops 10% ($50,000).  The uncollected interest,

8   foreclosure costs, marketing and sales costs could add up

9   to another 10% for a total loss of $100,000.  The lender is

10  allowed to deduct the $100,000 from their taxes.  The

11  borrower could be assessed a gain or ordinary income (1099)

12  on the $100,000.  Most likely the 100% borrower had very

13  little money before purchasing the home and could then face

14  a huge tax liability.

15      37.  **Risk layering** is the combination of NIV loans,

16  option ARMs or 100% financing.  These products on their own

17  can be misleading, unsafe and unsound for both the borrower

18  and the financial institution.  Together risk layering is

19  similar to combining bleach and ammonia.  Plaintiff has

20  been writing and calling the Agencies and others for years

21  about these terrible products (Exhibits A, B & C).  Risk

22  layering has provided loans to hundreds of thousands, if

23  not millions of borrowers who are not qualified to maintain

24  monthly payments.  This unsafe and unsound practice has

25  lead to restraints in trade and greatly over-valued real

1  estate and stock prices.  Executives have been greatly

2  over-compensated for NOT conducting business in a safe and

3  sound manner.

4      38.  **Repurchase agreement** is an agreement that is

5  generally set for a period of time and requires the

6  seller/originator including Plaintiffs to repurchase

7  loan(s) that experience an early payment default ("EPD") or

8  has been fraudulently originated.  Fraud includes over-

9  stating of income.  A repurchase agreement can be a

10  separate agreement or a clause in an agreement.

11  Additional clauses or agreements require the repayment of

12  commissions for a loan(s) that was refinanced within a set

13  period of time; to provide relief to the investor and or

14  Lender.  Until recently, reported default rates within

15  relevant times have been low.  Plaintiffs allege that the

16  low default rates have been attributed, but not limited to

17  concealment of fraud, financial reporting shenanigans, and

18  unsafe and unsound lending. Lenders have extended

19  additional credit to defaulting homeowners in order to

20  expire repurchase agreements with secondary market

21  investors, delay delinquency reporting for financials and

22  sell problem loans.

23      39.  **Short sale (prior times)** is a type of sale where

24  the Lender will take less than they are owed in order to

25  mitigate the loss for both the Lender and the borrower.

1  Prior to relevant times Lenders were much more willing to

2  accept short sales with no strings attached.  Losses

3  immediately made it to the Lenders' financials and timely

4  reporting of crucial information would stop unsafe and

5  unsound extensions of credit.  In *Henry v. Lehman*

6  *Commercial, Inc.*, 04-55396 (9th cir. 12/8/2006) available

7  at http://www.ca9.uscourts.gov/, Lehman was charged and

8  liability was imposed for aiding and abetting First

9  Alliance in their fraudulent lending schemes.  Defendants

10  have been fraudulently concealing lending schemes by

11  encouraging, ratifying, endorsing or permitting continued

12  extensions of credit, fraud, and unsafe and unsound

13  lending.

14      40.  **Short Sale (relevant times)** Lenders are more

15  selective and strict in their decisions to mitigate losses.

16  As previously stated option ARM borrowers are usually able

17  to maintain minimum monthly payments, but property taxes

18  and insurance often become delinquent.  These delinquencies

19  are a default to the existing loan agreements, but are not

20  reported to credit bureaus.  Instead of mitigating future

21  losses Lenders will often try to sell the delinquent loan

22  to investors while the borrower is still current on loan

23  payments.  Delinquent borrowers with loans other than

24  option ARM loans are often refinanced into option ARM loans

25  to delay defaults and further Defendants' enrichment.  Some

1 Lenders such as WAMU are extending equity lines and credit

2 cards to delinquent home owners.  Instead of mitigating

3 losses, Lenders are exacerbating losses by their

4 unconscionable short sale requirements.  The current

5 requirements of a short sale are: a. provide income

6 documentation proving they can not afford the home, despite

7 using NIV guidelines at origination; b. borrower is

8 required to sign unlawful, extortionate promissory notes in

9 the amount of the loan pay-off deficiency.  This

10 requirement was not in the borrower's original loan

11 agreement (to the lenders defense neither was accepting a

12 short-sale).  Either way the executives received their

13 bonuses; c. borrowers are required to sign a 1099 for the

14 amount of the Lender's loss.  Borrowers are much better off

15 with foreclosure than signing the promissory note and

16 providing incriminatory income documentation.  Under Title

17 U.S.C. 18 § 1344 the borrower has committed fraud by

18 overstating their incomes.  Any complaints for redress by

19 the borrower will be brought with unclean hands.

20     41.  **An appraisal** is commonly defined as a valuation

21 or an approximation of value by impartial, properly

22 qualified persons.  The process of determining the value of

23 an asset or liability, which entails expert opinion rather

24 than express commercial transactions.  If the opinion of

25 value is to be based on non-market financing or financing

1 with unusual conditions or incentives, the terms of such

2 financing must be clearly identified and the appraiser's

3 opinion of their contributions to or negative influence on

4 value must be developed by analysis of relevant market

5 data.  The lack of adequate attention to unsafe and unsound

6 lending standards and loan products has temporarily and

7 artificially inflated appraisals.  Although NIV guidelines,

8 option ARMs and 100% financing have been around for

9 decades, the structures of these loans and guidelines are

10 completely different to their predecessors.  In addition,

11 the risk layering of these extremely risky products was

12 never done before.  Residential appraisals are based on

13 sales comparison methods and can be easily inflated from

14 unsustainable demand via unusual financing.

15      42.  **Payment Shock** is a term used to describe a

16 dramatic increase in monthly payments.  If a borrower is

17 looking to purchase a home that will require $5,000 a month

18 in principal, interest, taxes and insurance ("PITI") and

19 his/her rent is currently $2,000 per month this could be

20 considered payment shock.  When a borrower with an option

21 ARM loan reaches the 5th year anniversary and his/her loan

22 is recast into a 25 year amortized loan this will be a huge

23 payment shock.

24      43.  **Administrative Procedure Act:**  Plaintiffs have

25 been writing, filing complaints and commenting on advanced

1  notices of proposed rulemaking ("ANPRs") for years.

2  Plaintiffs' activities have been directed to the Agencies,

3  respective Ombudsmen and legislators regarding the unsafe

4  and unsound lending standards including misleading option

5  ARMs, fraudulent NIVs, fraudulent concealment of existing

6  delinquencies and antitrust issues.  Despite the Plaintiffs

7  efforts unsafe and unsound lending has increased

8  exponentially.  Timely judicial review is imperative.

9                    **Summary of Allegations**

10     44.  At all relevant times, each Defendant has either

11  committed the acts, caused others to commit the acts,

12  ratified the commission of the acts, endorsed or permitted

13  others to commit the acts alleged in this Complaint and has

14  made, caused, ratified, or permitted others to commit the

15  acts alleged in this Complaint.

16     45.  Rampant fraud, unconscionable acts, misleading

17  loan products, false/misleading statements, unsafe and

18  unsound lending and other unlawful acts have all restrained

19  trade for brokers working within the boundaries of the law

20  and fiduciary duties.  Plaintiffs have approximately one

21  hundred past clients and/or prospects willing to support

22  Plaintiffs' claims.  Plaintiffs are concerned that the same

23  Lenders who have reaped the unlawful profits are now

24  positioning themselves to benefit from the collapse of the

25  housing market.

1          **DEFENDANTS' BUSINESS PRACTICES & LOAN PROGRAMS**

2          46.  In the ordinary course of business, the Lenders

3     have originated and funded real estate secured loans with

4     borrowers in the United States of American, State of

5     California, counties of Santa Clara and San Mateo.  These

6     real estate secured loans were made through or at the

7     Lenders' branches.

8          **A.   Representations Regarding Loans:**  The Lenders

9     induced borrowers into obtaining loans they could not

10    afford by stating "prices are going up; you need to buy

11    now".  NIV guidelines and misleading statements such as

12    "everyone is (inflating their incomes) doing it" encouraged

13    borrowers to participate in the fraud.  Advertising stating

14    that: "Interest rates have dropped" are the opposite of

15    market times; "Save 50% on your payments" are extremely

16    deceiving.  Misleading loan programs with unsustainably low

17    payments (option ARMs) falsely comforted home owners into

18    borrowing more than they could afford.  The American Dream

19    of Homeownership had borrowers so overwhelmed that

20    excessive loan fees, inflated housing prices, and payment

21    shock were completely over-looked.  The Agencies, S&P and

22    Bankers ratified the commission of the acts, endorsed or

23    permitted others to commit the acts alleged in this

24    paragraph.

25         **B.   Representations Regarding Future Refinancing:**  As

1  part of an effort to induce borrowers to accept unfavorable

2  loan terms, such as a negative amortization or

3  unaffordable, stated income loans, sales representatives

4  for the Lenders told borrowers that they could refinance in

5  a few months and would be able to obtain more favorable

6  terms as their homes appreciated.  These statements were

7  untrue or misleading because the Lenders were unlikely to

8  provide a refinance under the terms represented by their

9  sales representatives.  Additionally, any borrowers who did

10  refinance would likely incur a substantial prepayment

11  penalty, thus limiting their ability to obtain a more

12  favorable loan.

13      **C.    Default Consequences:**  Disclosures regarding

14  possible significant capital gains liabilities as a result

15  of Lender's and borrower's loss are non-existent or

16  inadequate.  The Lenders and Agencies have failed to

17  properly warn borrowers of this potential, substantial

18  expense.  The majority of borrowers are unaware of this

19  risk.

20      **D.    Lender's commissions:**  Lenders induced their

21  sales representatives to sell adjustable rate loans by

22  paying higher commissions for the sale of an adjustable

23  rather than a fixed rate loan. Option ARM loans often

24  received the most lucrative commissions.  Prepayment

25  penalties which lock borrowers into these loans were

1  awarded additional compensation for the Lenders and loan

2  agents.

3      **E.    Prepayment Penalties:**  The Lenders misled

4  borrowers about the presence and terms of prepayment

5  penalties on loans offered by the Lenders, and about

6  whether prepayment penalties could be waived for borrowers

7  who refinanced their loans.  Lenders will often include

8  prepayment penalties in loan losses that are reported to

9  the IRS and are possibly charged to the borrower.  Lenders

10  will often include pre-payment penalties in short sale

11  (promissory notes).

12      **F.    Inflated Appraisals:**  The Lenders engaged in

13  fraud, deceptive and/or misleading acts which resulted in

14  Lenders obtaining inflated appraisals that were

15  substantially in excess of the market value.  The Agencies,

16  S&P and Bankers ratified the commission of the acts,

17  endorsed or permitted others to commit the acts alleged in

18  this paragraph.

19      **G.    Inflated Income:**  The Lenders engaged in acts and

20  practices which resulted in fraud, fabricated and/or

21  inflated income information for borrowers.  The Agencies,

22  S&P and Bankers ratified the commission of the acts,

23  endorsed or permitted others to commit the acts alleged in

24  this paragraph by selling this untested debt to

25  unsuspecting investors.

1    **H.    Disparaging Federal Disclosures:**  The Lenders

2    engaged in acts and practices that encouraged borrowers to

3    ignore the Truth in Lending Act (TILA, 15 U.S.C. §§ 1601 *et*

4    *seq.*) and Real Estate and Settlement Procedures Act (RESPA,

5    12 U.S.C. §§ 2601 *et seq.* ) disclosures (including the Good

6    Faith Estimate), misrepresented that these disclosures were

7    not representative of the actual loan terms the borrowers

8    would receive, or otherwise disparaged the accuracy and

9    relevance of the required federal disclosures.

10                **FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS**

11        **(UDAP; false or deceptive statements that restrain trade**

12                    **and creates unfair competition)**

13    **FOR INJUCTIVE RELIEF, RESTITUTION (INTEREST), PUNITIVE,**

14    **TREBLE DAMAGES AND ATTORNEY FEES**

15        47.  The Plaintiffs reallege and incorporate by

16    reference all paragraphs above, as though fully set forth

17    in this cause of action.

18        48.  At all relevant times, sections 1667 of the

19    California Civil Code; sections 3353, 22161 and 50503(a)(2)

20    of the California Financial Code; sections 17200 and 17500

21    of the California Business and Professions Code, Title

22    U.S.C. 15 §§ 1, 52, 57a(f), Title U.S.C. 18 §§ 1341,

23    1343,1344,1348,1349,1350(b) made it unlawful to make or

24    disseminate false, misleading, unfair or deceptive

25    statements regarding loans; particularly when statements

1  could be used to restrain commerce and injure or destroy

2  competitors operating within the law.  The public deserves

3  access to service providers who operate within the law and

4  uphold fiduciary responsibilities.

5      49.  The Lenders have violated and continue to violate

6  laws listed in paragraph 48 by advertising, publishing,

7  distributing, broadcasting, causing or permitting to be

8  advertised, published, distributed, or broadcast, untrue or

9  misleading statements with the intent to induce mortgage

10  transactions or purchase related mortgage securities.  Such

11  false, misleading, unfair or deceptive statements include

12  but are not limited to the statements described in

13  paragraph 46 above.

14      50.  All Defendants knew, or by the exercise of

15  reasonable care should have known, that the false,

16  misleading, unfair or deceptive statements would restrain

17  trade for business entities not willing to engage in

18  unlawful activities.  All Defendants have made, encouraged,

19  caused, ratified, or permitted others to make untrue or

20  misleading statements that could restrain trade.  These

21  ongoing and egregious acts warrant punitive damages.

22          **SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**

23          **(unsafe and unsound lending that restrains trade and**

24                  **creates unfair competition)**

25

1    **FOR INJUCTIVE RELIEF, RESTITUTION (INTEREST), PUNITIVE,**

2    **TREBLE DAMAGES AND ATTORNEY FEES**

3    51.  The Plaintiffs reallege and incorporate by

4    reference all paragraphs above, as though fully set forth

5    in this cause of action.

6    52.  At all relevant times, sections 1667, 1668, 1920(a),

7    of the California Civil Code; sections and 50503(a)(2) of

8    the California Financial Code; sections 17043, 17071, 17200, of

9    the California Business and Professions Code; Title U.S.C.

10   12 §§ 1828, 1828a(a)(1)(b), Title U.S.C. 15 §§ 1, 52,

11   57a(f), Title U.S.C. 18 §§ 371, 1005, 1007, 1014, 1341,

12   1343, 1344, 1348, 1349, 1350(b), 12CFR560.101, 12CFR365.2,

13   12CFR34.D, and 12CFR208.C made it unlawful to conduct real

14   estate lending in an unsafe and unsound manner;

15   particularly when such violations could be used to restrain

16   commerce and injure or destroy competitors operating within

17   the law.  If Lenders were operating in a free market,

18   Lenders with unsafe and unsound lending would fail.  The

19   agencies have aided and abetted these unlawful activities

20   in order to conceal their own professional failures.  A

21   conspiracy has existed from the point of loan origination

22   by fraudulent statements made by borrower and Lenders'

23   agents all the way through to securitizations on Wall

24   Street.

1    53.  The Defendants at all relevant times have

2    violated and continue to violate laws listed in paragraph

3    44 by originating, selling, endorsing, causing, ratifying

4    or permitting loans without minimum standards for net

5    worth, cash flow, and debt service coverage of the borrower

6    or underlying property; unclear loan to value limits; lack

7    of monitoring real estate lending policies; lack of prudent

8    real estate appraisals and other issues listed within the

9    Agencies' real estate lending standards and within the

10   Lenders' corporate standards.  Continued violations have

11   restrained trade, increased risk and concealed the original

12   violation.

13   54.  All Defendants knew, or by the exercise of

14   reasonable care should have known, that unsafe and unsound

15   lending would restrain trade for business entities not

16   willing to participate in unlawful activities and erode

17   appraisal standards.  All Defendants have made, encouraged,

18   caused, ratified, or permitted others to conduct unsafe and

19   unsound lending that could restrain trade.  The lack of

20   fiduciary duty has led the lending and real estate

21   industries to commit unconscionable acts.  These ongoing

22   and egregious acts warrant punitive damages.

23   **THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS**

24   **(selling products below cost to restrain trade and create**

25   **unfair competition)**

1    **FOR INJUCTIVE RELIEF, RESTITUTION (INTEREST), PUNITIVE,**

2    **TREBLE DAMAGES AND ATTORNEY FEES**

3    55.  The Plaintiffs reallege and incorporate by

4    reference all paragraphs above, as though fully set forth

5    in this cause of action.

6    56.  At all relevant times, Title U.S.C.15 §§ 1, 13a;

7    section 17043, 17071 of the California Business and

8    Professions Code; 1667, 1920(a) of the California Civil

9    Code made it unlawful to sell a product at less than cost;

10    particularly when such violations could be used to restrain

11    commerce and injure or destroy competitors operating within

12    the law.

13    57.  The Defendants at all relevant times have

14    violated and continue to violate laws listed in paragraph

15    48 by originating, selling, endorsing, causing, ratifying

16    or permitting loans or mortgage securities to be sold below

17    cost.

18    58.  All Defendants knew, or by the exercise of

19    reasonable care should have known, that selling loans below

20    cost would restrain trade for business entities not willing

21    to participate in unlawful activities.  Special financing

22    incentives by selling loans below cost erode appraisal

23    standards.  In addition to violating laws listed in

24    paragraph 56, laws in paragraph 48 and 52 have been

25    violated by selling loans below cost.  A concentrated use

1   and fraudulent reporting of option ARM interest income by

2   Lenders has specifically led to securities violations

3   listed in the sixth cause of action.  The lack of fiduciary

4   duty has led the lending and real estate industries to

5   commit unconscionable acts.   These ongoing and egregious

6   acts warrant punitive damages.

7               **FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

8            **(fraud and conspiracy that restrains trade and creates**

9                          **unfair competition)**

10      **FOR INJUCTIVE RELIEF, RESTITUTION (INTEREST), PUNITIVE,**

11                **TREBLE DAMAGES AND ATTORNEY FEES**

12      59.  The Plaintiffs reallege and incorporate by

13   reference all paragraphs above, as though fully set forth

14   in this cause of action.

15      60.  At all relevant times, Title 18 §§ 371,1001,1005,

16   1007, 1014, 1341, 1343,1344,1348,1349,1350(b) and sections

17   1667, 1668, 1920(a), 3294 of California Civil Code made it

18   unlawful to conspire or participate in fraud.

19      61.  All Defendants knew, or by the exercise of

20   reasonable care should have known, that fraud and

21   conspiracy to commit fraud is unlawful and would restrain

22   trade for business entities not willing to participate in

23   unlawful activities.  All Defendants knew or should have

24   known that their participation in alleged violations listed

25   in paragraph 60 could aid and abet Lenders with fraudulent

1    security transactions.  All Defendants have made,

2    encouraged, caused, ratified, or permitted others to commit

3    fraud or conspire to commit fraud.  A conspiracy has

4    existed from the point of loan origination by fraudulent

5    statements made by borrower and Lenders' agents all the way

6    through to Wall Street.  The current use of NIV guidelines

7    is at the very least aiding and abetting fraud.  The

8    omission or concealment of these guidelines in financials

9    is also fraud.  These ongoing and egregious acts warrant

10   punitive damages.

11            **FIFTH CAUSE OF ACTION AGAINST AGENCIES**

12               **(administrative procedure act)**

13                    **FOR INJUCTIVE RELIEF**

14        62.  The Plaintiffs reallege and incorporate by

15   reference all paragraphs above, as though fully set forth

16   in this cause of action.

17        63.  At all relevant times, Agencies have neglected to

18   perform their basic duties to supervise lending and banking

19   institutions in order to ensure stability, safety and

20   soundness within the financial markets.  Plaintiffs satisfy

21   case or controversy test of U.S. Const. art. III, § 2;

22   allegations that the Lenders' unsafe and unsound lending

23   causes Plaintiffs' economic injury.  Plaintiffs are

24   arguably within the zone of interests to be protected or

25   regulated by the statute and Plaintiffs are aggrieved under

1  Title U.S.C. 5 § 702, Title U.S.C. 15 § 781, Title U.S.C.

2  18 § 1001, Title U.S.C. 28 § 1361, Title U.S.C. 42 § 1986.

3  Data Processing Service v. Camp 397 U.S. 150.

4      64.  Agencies knew, or by the exercise of reasonable

5  care should have known, that the structure and risk

6  layering of current lending products and guidelines have

7  dramatically altered historic risk models, especially when

8  combined with historically low interest rates.  Agencies

9  knew, or by the exercise of reasonable care should have

10  known that inadequate supervision would restrain trade for

11  business entities not willing to participate in unlawful

12  activities.  Agencies have made, encouraged, caused,

13  ratified, or permitted others to conduct unlawful

14  activities and conceal unlawful activities.

15      65.  Agencies have encouraged, caused, ratified or

16  permitted others to fraudulently conceal their unlawful

17  activities by allowing federally insured deposit

18  institutions to merge or be acquired.  The merger of

19  WAMU/Providian will exacerbate future losses to the FDIC as

20  WAMU rapidly approaches or is already insolvent.  It has

21  been well documented and proven that the supervisory

22  mergers from the Savings and Loan crisis exacerbated the

23  losses to taxpayers.  If we are to have a free market

24  system investors who essentially aid and abed

25  unconscionable lending practices should not be protected

1  because the FDIC does not want to pay insurance claims.

2  Unconscionable companies like Providian should be allowed

3  to fail and should not receive FDIC insured status.

4  Deposits, receivables and debt could be handled in

5  bankruptcy instead allowing companies to continue unsafe

6  and unsound practices of the acquired/insolvent company.

7  <u>**SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**</u>

8  <u>**(fraudulent tranasaction of domestic securities; restraint**</u>

9  <u>**of trade and unfair competition)**</u>

10  **FOR RESTITUTION (INTEREST), PUNITIVE, TREBLE DAMAGES AND**

11  **ATTORNEY FEES**

12      66.  The Plaintiffs reallege and incorporate by

13  reference all paragraphs above, as though fully set forth

14  in this cause of action.

15      67.  At all relevant times Defendants, have engaged,

16  participated, aided or abetted fraudulent securities

17  transactions; in particular the OTS's over-sight of the

18  WAMU and Providian merger.  Defendants knew or should have

19  known by the exercise of reasonable care that security

20  violations have occurred and are occurring as a result of a

21  violation or combination of violations identified in the

22  First through Fifth causes of action.  Security violations

23  include but are not limited to Title U.S.C. 15 §§ 77w,

24  78b(3), 78i, 78j, 78k-1, 78L, 78o-6, 77uuu.  The continued

25  violations of these laws have continued to restrain trade

1  by providing loans to borrowers who can not afford said

2  loans.  Prior damage to MB through security losses were a

3  result of the violations listed in the first through sixth

4  causes of action.  Security losses involve and are not

5  limited to Providian, Washington Mutual and Countrywide.

6  These ongoing and egregious acts warrant punitive damages

7  and immediate redress.

8                    **PRAYER FOR RELIEF**

9  WHEREFORE, Plaintiffs pray for judgment as follows:

10     1.   Pursuant to sections 17202, 17203 and 17535 of

11  the California Business and Professions Code, Title 5 §

12  702, Title 15 §§ 1,24,26,53, Title 18 § 1345, for an order

13  that Defendants and their direct and indirect subsidiaries,

14  affiliates, officers, directors, employees, agents, related

15  entities, successors, and assigns, and any and all other

16  persons who act in concert or participate with Defendants,

17  be permanently restrained and enjoined from making,

18  disseminating, or causing to be made or disseminated any

19  misleading, untrue and/or deceptive statements in violation

20  of Antitrust laws, Unfair Competition Laws, Banking Laws,

21  Security Laws or Consumer Protection Laws as alleged in the

22  First through Sixth Causes of Action to this Complaint.

23  Plaintiffs request for an injunction to protect against

24  restraint of trade and to ensure prudent public policy.

25  Borrowers/consumers have also been damaged by the acts of

1  the Defendants and are unable to obtain redress under the

2  unclean hands doctrine.

3      2.   Pursuant to Title 5 § 702, Title 15 §§ 1, 13 15

4  and sections 17070, 17082 and 17202 of the California

5  Business and Professions Code; sections 3287 and 3294 of

6  the California Civil Code, for an order that Defendants and

7  their direct and indirect subsidiaries, affiliates,

8  officers, directors, employees, agents, related entities,

9  successors, and assigns, and any and all other persons who

10  act under, by, through, or on behalf of Defendants, be

11  permanently restrained and enjoined from selling products

12  below cost in order to injure or destroy competition.

13  Defendants shall pay Plaintiffs restitution including

14  interest, exemplary and treble damages in an amount to be

15  determined by the court.

16      3.  Defendants' executives shall be disgorged by all

17  unlawful profits in the amounts to be determined by the

18  court.  Award will be placed with a conservator to help

19  displaced homeowners and families locate and secure

20  shelter.

21      4.  Defendants shall pay $10 million to a conservator

22  appointed by the court in order to fund Plaintiffs' non-

23  profit organization, ("NPO").  NPO will help defaulting

24  homeowners ("homeowners") and troubled lenders sell their

25  homes via deeply discounted commissions through all

1  agents/offices willing to participate in new model, provide

2  web-based counseling for the homeowners' traumatic

3  experience and help homeowners secure new housing for their

4  families.  Defendants will be required upon borrower's

5  default to send a letter informing borrowers of different

6  mitigation remedies, including NPO.  Lenders will not be

7  allowed to demand promissory notes or income documentation

8  for all defaulting homeowners who received loans during

9  relevant times.  The sociological issues as a result of the

10 financial devastation could become a huge issue on its own.

11 The court will provide equitable annual salary for MB.

12    5.  For an order that Plaintiffs be awarded its cost

13 of suit, including but not limited to all costs of

14 investigation.

15    6.  All homebuyers and homeowners will not be held

16 liable for any capital gains as a result of the Lender's

17 loss on loans originated during relevant times.  Lenders

18 will not be eligible to deduct losses and hold homeowners

19 solely responsible for their limited participation in the

20 fraud.  Homeowners ratified one or minimal acts of fraud

21 whereby the Defendants participated in millions of acts of

22 fraud.  The impacts to the Treasury/IRS will be immediate

23 through Lender's loss deductions.  Borrowers may never be

24 able to pay back losses.

1      7.  All Agencies to immediately demote or remove

2  Defendants' Executives, directors or chairpersons from

3  current positions where the courts have ruled said

4  Defendants have neglected their most basic duties to ensure

5  safety and soundness.  Compensation packages to be reviewed

6  and adjusted accordingly.  Overwhelming evidence of massive

7  cover-ups and/or incompetence would likely continue without

8  promulgation of this paragraph.

9      8.  All additional relief to which the Plaintiffs are

10  are entitled.

11               Dated this 9th day of August, 2007

12               S/Michael Blomquist  (efile original signature on file)

13               Michael Blomquist

14               Pro Se

15

16

17               DEMAND FOR JURY TRIAL

18

19

20

21

22

23

24

25

 

HOME | DEPOSIT INSURANCE | CONSUMER PROTECTION | INDUSTRY ANALYSIS | REGULATION & EXAMINATIONS | ASSET SALES | NEWS & EVENTS | ABOUT FDIC

Home > Regulation & Examinations > Laws & Regulations >FDIC Federal Register Citations

# FDIC Federal Register Citations

## Comments

Interagency Guidance on Nontraditional Mortgage Products.
Published - 12/29/05 -- Comment Period Extended to 03/29/06.

| Submitted by |
|---|
| 01. Manufacturers Bank, Los Angeles, CA, Steven L. Strange |
| 02. American Financial Services Association, Robert McKew - PDF (PDF Help) |
| 03. America's Community Bankers, Janet Frank |
| 04. Consumer Bankers Association, Arlington, VA, Steve Zeisel - PDF 916k |
| 05. American Bankers Association, Washington, DC, Paul Smith - PDF 107k |
| 06. Consumer Mortgage Coalition, Anne C. Canfield - PDF |
| 07. HSBC North America Holdings, Prospect Heights, IL, Martha Pampel - PDF 786k |
| 08. Mortgage Bankers Association, Washington, DC, Kurt Pfotenhauer - PDF |
| 09. Independent Community Bankers of America, Ann Grochala - PDF 82k |
| 10. Clearing House Association, LLC, Norman R. Nelson |
| 11. Housing Policy Council, Financial Services Roundtable, Washington, DC, John H. Dalton - PDF |
| 12. Bramble Savings Bank, Milford, OH, James Wm. Gronefeld |
| 13. Conference of State Bank Supervisors, Washington, DC, Neil Milner - PDF |
| 14. Cornhusker Bank, Lincoln, NE, Alice M. Dittman |
| 15. North Carolina Bankers Association, Raleigh, NC, Nathan R. Batts - PDF 55k |
| 16. AmSouth Bank, Birmingham, AL, Michael J. Willoughby - PDF 236k |
| 17. State Financial Regulators Roundtable, Barbara Kent - PDF 90k |
| 18. Alliance FSB, Hinsdale, IL, Lawrence H. Chlum - PDF 159k |
| 19. National Community Reinvestment Coalition, John Taylor - PDF |
| 20. Michael S. Blomquist - PDF 113k |
| 21. Delaware Community Reinvestment Action Council, Inc., Wilmington, DE, Rashmi Rangan - PDF |
| 22. America's Community Bankers, Diane Casey-Landry 77k |
| 23. American Bankers Association, Paul A. Smith - PDF 981k |
| 24. Consumer Mortgage Coalition, Washington, DC, Anne C. Canfield - PDF 81k |
| 25. Steven C. Sharpe |
| 26. Edgemont Neighborhood Coalition, Inc., Dayton, OH, Stanley A. Hirtle |

Exhibit A 1 of 8

| |
|---|
| 27. Chevy Chase Bank, Bethesda, MD, Thomas H. McCormick - PDF |
| 28. Florida Bankers Association, Alex Sanchez - PDF 186k |
| 29. Consumer Federation of America, Washington, DC, Allen Fishbein - PDF 71k |
| 30. American Financial Services Association, Washington, DC, Robert McKew - PDF 80k |
| 31. The Clearing House, LLC, Jeffrey P. Neubert - PDF 145k |
| 32. HSBC North America Holdings, Prospect Heights, IL, David D. Gibbons - PDF 4602k |
| 33. Housing Policy Council of the Financial Services Roundtable, John H. Dalton - PDF 65k |
| 34. Merrill Lynch & Co., George T. Morrison - PDF 192k |
| 35. JPMorgan Chase Bank, NA, Thomas L. Wind - PDF 287k |
| 36. Guaranty Bank, Austin, TX, Jack Falconi - PDF 112k |
| 37. California Reinvestment Coalition, Kevin Stein - PDF 104k |
| 38. Independent Community Bankers, Washington, DC, Ann M. Grochala - PDF 134k |
| 39. Lehman Brothers Bank, FSB, Joseph Polizzotto - PDF 191k |
| 40. Massachusetts Bankers Association, Boston, MA, Jon K. Skarim - PDF |
| 41. Capital One Financial Corporation, McLean, VA, Christopher T Curtis - PDF 112k |
| 42. Appraisal Institute, American Society of Appraisers, & American Society of Farm Managers & Rural Appraisers |
| 43. Mortgage Bankers Association, Washington, DC, Kurt Pfotenhauer - PDF 105k |
| 44. Charles Schwab Bank, N.A., Reno, NV, Richard F. Kennyr - PDF 394k |
| 45. Mortgage Insurance Companies of America, Washington, DC, Suzanne C. Hutchinson - PDF 898k |
| 46. Branch Banking and Trust Co., Wilson, NC, Mark D. Vaughn - PDF |
| 47. World Savings, Oakland, CA, Hebert M. Sandler |
| 48. Center for Responsible Lending, Deborah Goldstein - PDF 177k |
| 49. Fifth Third Bank, Cincinnati, OH, Cindy Manzetti - PDF 220k |
| 50. Bond Market Association, Washington, DC, John R. Vogt - PDF 288k |
| 51. Merrill Lynch, Jacksonville, FL, George T. Morrison - PDF 158k |

Last Updated 05/03/2006

regs@fdic.gov

Exhibit A 2 of 8

March 3, 2006

Re: Proposed Guidance- Interagency Guidance on Nontraditional Mortgage Products 70 FR 77249 (December 29, 2005)

To whom it may concern,

After years of writing local representatives and banking regulators I am pleased that you have finally decided to address the risk layering and terrible declines in lending standards. I hope we can someday learn to address similar issues before they become a pandemic. Stated income guidelines have always been suspect, but due to recent declines in standards are now best defined as fraudulent. Option ARM loans are ticking time bombs and extremely misleading. The American Dream of homeownership should not have been exploited. Millions of borrowers, investors and the banking industry will be devastated when these loans begin to recast.

Future loan loss projections based on prior loan loss history will not provide accurate forecasts. The historical data does not reflect the existing risk layering, inadequate underwriting criteria, rapid appreciation, historically low rates or proliferation of option arms.

**Option ARM originations**

2002 4% of all originations
2003 10% of all originations
2004 27% of all originations
2005 37% of all originations

I have yet to find data on stated income loan originations, but 100% financing for purchases is in excess of 25%. The biggest issue I have with this data is that it is national. The percentages of option ARM originations in California and other bubble markets are considerably higher. I have heard estimates of 75% or more in some areas of California. The additional risk to lenders who are concentrated in the bubble markets is worrisome.

A specific request for comment on the analysis of option ARM borrowers' repayment capacity at final maturity is ridiculous, that task is impossible. Interest rates, home prices, negative amortization, local, national and global economic stability/prices are all unknown variables.

There has been a perfect storm building in the financial and real estate market for years. The amount of foreign owned debt is at record highs and the catalysts for keeping our interest rates low is beginning to change. Japan will begin raising rates, housing appreciation has stopped and the consumer is finally beginning to tire. I don't like to be so negative, but we need to be realistic. Doesn't anyone remember all the surplus projections from 1999?

I have heard numerous comments from lending executives regarding the healthy track records of option ARMs and negatively amortized loans. I find these statements extremely misleading at best. Obviously, the level of market exposure is unprecedented. Home prices, appreciation, DTI and LTVs have never been higher as reduced or no documentation guidelines have become the underwriting standard. Loans that can have minimum payments which are 40% of traditional payments should have excellent credit ratings, but even under current payment caps that is not the case. In addition, the components of prior option arms or negatively amortized loans are completely different now.

During their 2005 earnings call, Countrywide, America's biggest mortgage lender changed option ARM default reporting from 60 days to 90 days. It took an analyst's question to address the

Exhibit A 3 of 8

change.  The 90 day delinquencies did not include 60 day or 30 day delinquencies.  The increases in 90 day delinquencies were up 500% year over year even though 7.5% payment caps were in place.  A 7.5% payment cap is ridiculously low considering the low start rates and high amounts of negative amortization.

Reported accumulation of negative amortization is up 7500% and loans with negative amortization are up 42,300%.  These are very alarming statistics and the manipulation of default reporting should be equally alarming.  The agencies willingness to rely upon proper controls from the lenders is about like the fox watching the chicken coop.  It is time for a little more "hands on" in regards to financial regulation.

http://about.countrywide.com/presentations/docs/4Q05%20Conference%20Call%20Slides%20FINAL.pdf
(page 18)

The footnotes on the page above are also very misleading and could provide much more damning information.  Countrywide is now charging 3.125 pts to originate an option arm loan.  This is a dramatic shift from par or 1% origination fees previously charged by CFC and the par pricing that still exists in the industry.  The terrible demand for this product in the secondary markets has already had a huge impact on the value of lenders' portfolios and the true risks are unknown and incalculable.   Neither the agencies nor the analysts have warned investors about these material facts.  The value of the option arm lenders' portfolios have already been hit hard, but the investor is unaware.

I have seen lenders approve buyers when over 100% of their GROSS income was required just to service the minimum payments on an option ARM.  Needless to say these approvals were under stated (inflated) income guidelines.  Let it be noted that the borrower did originally provide their income documents, but was told they were not needed.  When the borrower questioned about the new income, he was told that this was acceptable and everyone was doing it.

It is well documented that option arm start rates are dangerously too low.  Fully indexed rates have increased over 350 basis points in the last 18 months.  Negative amortization has and will continue to increase at a faster pace as this spread increases.

I realize comments are to be directed towards non-traditional mortgage products, but since we are talking about risk layering, banking M&A and trading activity should also be addressed.  We are clearly in uncharted waters with regards to lending standards and loan products.  Future M&A activity should not be allowed until realistic payment histories are established for the current risk.  In the next two years record volumes of option ARMs will begin to recast.  In many cases loan payments could triple from original minimum payment requirements, even if the Fed stops raising rates.  In addition to loan loss risks are the risks from the banks' trading activity.  Trading activity in derivatives has accounted for huge percentages of banking profits and losses.

The recent acquisition of Providian Financial by Washington Mutual without public hearing is one for reference.  This merger allowed additional risk layering within one of the largest mortgage companies in the United States.  Increased minimum credit card payments, huge levels of short-term debt and a customer base of primarily sub-prime borrowers will prove to be extremely problematic for Washington Mutual.  The combination of a sub-prime credit card company with an aggressive option ARM lender at the peak of a credit cycle should have been looked at closer.  Sub-prime lending is becoming more prevalent.  Recent epic failures from rampant M&A in the telecom and energy sectors should have been an adequate warning.  Small corporate failures should be preferable to large failures, especially when increasing demands are continually placed upon our society: Baby boomer retirement, Medicare, Iraq, Katrina, etc.

Exhibit A 4 of 8

**Home Loan Debt (in trillions)**

| Year | End of Year | % Increase from prior period | Fed Funds prior 4 year average |
|---|---|---|---|
| 1985 | $1.45 | | |
| 1989 | $2.27 | 57% | 7.56% |
| 1993 | $3.01 | 33% | 5.08% |
| 1997 | $3.78 | 20% | 5.20% |
| 2001 | $5.29 | 40% | 5.11% |
| 2005 | $8.82 | 67% | 1.84% |
| 1985-2005 | | 600% | |

Home loan debt is up over 600% from the last real estate peak and the average Fed funds rates are down almost 600 basis points. The lower interest rates and nontraditional products have temporarily helped service this large amount of debt, but the inflection point is rapidly approaching. The prospects do not look favorable, especially as wages have remained stagnant and downsizing is gaining speed.

The majority of this increased debt is due to increased demand for securitized assets. The demand was created by a lucrative carry trade and profits from oil producing nations. This data tells volumes for recent banking profits, home prices and future risks. The increased use of securitizations has not been properly tested under stress.

The secondary markets are now seeing a dramatic decrease in demand for securitizations, especially option ARMs. All of the option ARM originators are now retaining more of the option ARM products in their portfolios and the marketing efforts are not slowing. Risks are growing exponentially. I would estimate that 80% or more of lending advertising is targeting the option ARM product, marketing needs to be stopped until performance can be established!

**Risk layering from favorable market conditions**

Beyond the layering of risk from stated/no documentation guidelines, nontraditional products and leverage is the layering of favorable market conditions: Incredibly low interest rates, rapid appreciation, recent demand for securitizations, perception of real estate price stability/speculation, $500,000/$250,000 capital gain tax exemptions and low CORE inflation. To exclude homeownership costs, food and energy from inflation is just another game of "smoke and mirrors". Globalization has kept core inflation low and the dollar is now dependant upon high oil prices and higher interest rates.

**Option ARMs, Stated Income & Low defaults**

The current option arms are completely different than prior negatively amortized loans. LTVs and potential for negative amortization were much lower. Caps were previously based on interest rates versus payments. A 2% increase per year to the interest rate would be a much more substantial increase than a 7.5% payment cap, thus reducing negative amortization, compounding interest and payment shock. High levels of appreciation and reduced credit standards have made it easy for troubled borrowers to find access to more debt paying capital. The declines in lending standards have also allowed "bigger fools" to play their part. Delinquencies under prior guidelines were experienced earlier and LTVs were lower, which allowed lenders to mitigate loss. Current option ARMs have higher LTVs, lower start rates and more negative amortization. At the time the loan is recast it is very likely that the initial payment will triple and this will place a whole new meaning on payment shock. There is no comparison with current/prior negatively amortized products and market conditions!

Exhibit A 5 of 8

**Stated/no documentation guidelines**

Stated income guidelines previously required that you were self-employed, had excellent credit, 6 months of stated income in reserves and an LTV of 75-80% or lower.  Now, stated income guidelines can be for 100% financing, marginal credit and wage earners.  In addition, the reliance of FICO scores is very over-rated.  FICO scores are great at predicting the past, but not the future, especially with additional debt loads and payment shocks.  Earning and saving potential is a better barometer for future risk.  Factual income and savings documentation should be used to quantify future risks not FICOs.

**Excessive executive compensation and expansion**

The acceptance of excessive compensation has provided incentives for executives to stretch prudent lending guidelines.  Shareholders and executives became accustomed to the huge lending volumes and profits of the 2003 refinance boom.  Instead of being prepared for the eventual slow down or market saturation, most lenders began a race to the bottom.  Huge branch expansions were underway hoping to win market share.  As loan volume dried up, the promotion of non-traditional, exotic, extremely risky lending products took off.  Qualification standards were literally thrown out the window because the "carry trade" brought many buyers into the secondary markets.  The securitizations of most of these loans have recourse and it may be years before we know the consequences of this irrational exuberance.  Demand for these products has slowed and now both the borrowers and lenders are more leveraged and exposed than ever before.  Additional branch expansions may result in a continued "carry trade" effect.  Investors will transfer from real estate secured assets to FDIC insured assets.  The increased deposits will force lenders to make additional risky loans or experience inverted/negative margins.  Branch expansions should be limited until the effects of the slowing credit boom, slowing housing market, carry trade and nontraditional products have been quantified.  We are now facing issues much larger than just the risk layering of nontraditional mortgage products.

We can not continue to allow these bubbles to be created under the guise of "laissez faire" and later place blame on greed or corruption.  Who among us would be able to withstand the performance pressures or lure of excessive wealth?  I know if I was in such a powerful position I would prefer to have more regulation over my decisions and especially that of my subordinates.

**1990 Real Estate Bubble / Securitizations / S&L Crisis / Irrational exuberance**

I have been a real estate and mortgage broker for 14 years and have witnessed the aftermath of the 1990 real estate bubble/crash and S&L crisis.  The size of the 1980's real estate bubble is miniscule compared to the current bubble.   The 1980s bubble was created with more strict guidelines and much higher interest rates, but still resulted in much insolvency.   Stated income loans, securitizations and 100% financing was relatively non-existent.  Relative to income, home prices were much more affordable then compared to now.

The FBI and others have documented that loan loss rates are understated, especially within securitized loans.  If a holder of a securitized asset wants or needs to sell that asset they will obviously get a much better price for tranches with good performance.  Is the true performance stated or factual?

At the beginning of 1985 Fed funds were approximately 8%.  By the end of 1986 we reached approximately 6% which helped fuel the 1980s housing boom.  By the peak of this real estate cycle, rates approached 10% in 1989.  Obviously, we had much more room to stimulate the economy than we currently possess.  After Fed funds hit historically low levels in 1993 of 3% the real estate market and economy was still sputtering.  It was not until around 1996 when the internet boom spurred economic activity.  I would argue that it was the internet economy and increased productivity versus monetary policy that was able to finally lift us out of the 1991

recession and real estate crisis.   Although unknown, it is very unlikely we will see another boom like the 1990s.  We have seen increased productivity since 2001, but most of the economic activity has been debt related to housing and the carry trade.  After 1999 everyone was ready and willing to create another bubble.

**Proposal**

Home price and economic stability should be a goal of all agencies.  We have been bouncing from bubble to bubble for decades and the global environment has dramatically changed.  At some point all of our increased leverage will come back to haunt us.  We continue to hide our financial problems: The elimination of the dollar-gold standard, proliferation of securitizations and now the option ARM/non-traditional lending guidelines.  This statement may sound too aggressive, but if we analyze the increased use of the option ARM, stated income guidelines, home appreciation, equity extraction, consumer spending and recent GDP growth there is a direct correlation.  We continue to find ways to over-leverage our incomes while forecasting the most optimistic future scenarios.  The recent stock market bubble is an excellent example. If our government and economic scholars can not exhibit spending restraint or accurate income forecasts how can we expect the average American homeowner to do so.

There are lenders that have recently increased start rates by approximately 25 basis points from 1% to 1.25% or 1.375%, but this does little to curtail negative amortization and payment shocks.  Especially, since lenders have also increased their margins by an equal or greater amount.  These same lenders have also increased their qualification rates, but most of the lenders are still using stated income guidelines.  This appears to be the same old lip service and manipulation.

I would propose to immediately reduce stated income LTVs to 75% or less.  No doc loans should be limited to 70% LTVs.  Relative to incomes many of the most expensive-populated areas are already 20-40% over-valued, so this is a conservative reduction.  Stated or no doc loans should only be used for self-employed or borrowers with a high net worth.  High net worth could be defined as 20% of the proposed loan amount in liquid reserves.

Given that interest rates and option ARM performance are unknowns the agencies should strive to reduce potential payment shocks and defaults.  Current option ARM payments could easily triple once the loans are recast and defaults will obviously rise.  If the agencies feel option ARMs still have a place in the market for "savvy" borrowers why not increase the start rate to a fully indexed rate or 5% which ever is greater.  These loans could still possess negative amortization, but the payment shock will be greatly reduced.  I believe interest only loans are an adequate alternative for the savvy borrower.

Interest rate cycles change and the current environment favors 30 year fixed programs to reduce interest expense.  If investors and homeowners are looking to save on cash flow perhaps they can not afford the home or should look elsewhere for savings.

First time home buyers with 3-10% down-payments should qualify with full documentation loans on 30 year fixed loans (interest only is acceptable).  DTI ratios of 40/45 provided compensating factors (job security, increased income potential, excellent credit, etc). The current difference between a 3, 5, 7, 10 and a 30 year fixed loan is minimal.  No one is able to accurately predict future interest rates, but it is known that we are still at historically low levels.   More than anyone first time homebuyers need stability.

**Other issues**

1)  Credit card lending should also be looked at closer.  Introductory interest rate offers and the new minimum payments are setting up borrowers for huge payment shocks.  Income qualifications should be used for credit lines above $5,000.

2)  The agencies should report the findings/reform from the nontraditional mortgage product comments to the IRS.  I would hope that tighter lending guidelines will be enforced and thus additional risks to the real estate market would be realized.  The proposed elimination or reduction of mortgage interest deductions and property tax deductions could layer additional risks to the real estate market.

3)  It is obvious that many lenders have not performed adequate control or monitoring of their products.   They should not be allowed to engage in real estate commerce outside of finance.

4)  The FDIC should change its policy to support M&A activity where one company is insolvent. This could easily prolong the inevitable failure and greatly increase its magnitude.

Sincerely,


Michael S. Blomquist
408-399-0590 ph

DIANNE FEINSTEIN
CALIFORNIA

COMMITTEE ON APPROPRIATIONS
COMMITTEE ON ENERGY AND NATURAL RESOURCES
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND ADMINISTRATION
SELECT COMMITTEE ON INTELLIGENCE

## United States Senate

WASHINGTON, DC 20510–0504

http://feinstein.senate.gov

September 1, 2005

Mr. Michael Blomquist
18234 Daves Avenue
Monte Sereno, California  95030

Dear Mr. Blomquist:

Thank you for contacting me to convey your concerns about rising home prices.  I appreciate the time you took to write and welcome the opportunity to respond.

I share your concerns about rising home prices and what appears to be increasing speculation in real estate.  I realize that the Federal government must be mindful of how lending standards impact Americans.  Like you, I am concerned about the growing number of negatively amortized home loans as well as interest-only mortgages, which are especially popular in the areas of California where home prices are the highest.  Chairman of the Federal Reserve, Alan Greenspan, articulated his apprehension in testimony before the Joint Economic Committee in June.  According to Chairman Greenspan, low-interest mortgage rates are contributing to "froth" in some local markets and "exotic" loans such as interest-only loans are distressing.  Please know that I am monitoring this situation closely and will be sure to keep your thoughts in mind should legislation related to this issue come to the Senate floor.

Again, thank you for your letter.  It is especially helpful to hear your views on this subject.  If you have further questions or comments, please feel free to contact my Washington, D.C. staff at (202) 224-3841.  Best regards.

Sincerely,

Dianne Feinstein
United States Senator

DF:ar:js

**Exhibit B**



BOARD OF GOVERNORS
OF THE
FEDERAL RESERVE SYSTEM
WASHINGTON, D. C. 20551

DIVISION OF CONSUMER
AND COMMUNITY AFFAIRS

September 20, 2005

Michael Scott Properties
18234 Daves Avenue
Los Gatos, CA 95030

Attn:  Mr. Michael Blomquist

Dear Mr. Blomquist:

Thank you for your letter of August 4, 2005, in which you raised a number of issues concerning mergers, a potential housing bubble, and mortgage lending products.  The Federal Reserve is currently gathering information related to a number of residential mortgage lending products, and will take your comments into consideration as we continue to study this matter.

Sincerely yours,

Suzanne G. Killian

Suzanne G. Killian
Assistant Director

Exhibit C

# Option ARM Worksheet



| Product Information | | |
|---|---|---|
| 1 mo MTA | $ | 1,160,000 |
| 0 points | LTV | 80 % |
| 40 Yr Term | | |

| Index, Margin, and Fully Indexed Rate | | |
|---|---|---|
| 12-mo MTA | | 2.504 |
| Margin | + | 2.050 |
| **Fully Indexed Rate** (FIR) | = | **4.554** % |
| Life Cap | | 9.950 % |

**$4,103**
Year 5

**$3,817**
Year 4

**$3,550**
Year 3

**$3,303**
Year 2

**$3,072**
Year 1

*5 year payment cap scenario based on Minimum Monthly Payment*

| Calculate MAX monthly w/ payment cap | | | |
|---|---|---|---|
| Year | Calculation | | Max Pymt |
| 1 | Payment Option 1 >> | | 3,072.20 |
| 2 | 3072.20 x 1.075 | = $ | 3,302.62 |
| 3 | 3302.62 x 1.075 | = $ | 3,550.32 |
| 4 | 3550.32 x 1.075 | = $ | 3,816.59 |
| 5 | 3816.59 x 1.075 | = $ | 4,102.83 |

\* Not to exceed payment based upon lifecap \*

| Payment Options and How to Calculate | | |
|---|---|---|
| 1. Minimum Monthly Payment    (start rate = 1.25 %) | = | 3,072.20 |
| 2. Interest Only (Loan Amt x FIR 4.554% / 365 x 30) | = | 4,341.90    1269.69 |
| 3. Principal & Interest 30 or 40 yr (use FIR 4.554%) | = | 5,255.26 |
| 4. Principal & Interest 15 yr (use FIR 4.554%) | = | 8,905.97 |

Deferred Interest may occur when Minimum Payment is exercised and Interest Only option is larger
(Deferred Interest = Interest Only - Minimum Payment)

| Compare to preferred FRM 30 | | |
|---|---|---|
| FRM Rate | | 6.000 |
| Monthly Payment | $ | 6954.79 |
| Option 3 Payment | | |
| Difference | $ | 1699.52 |
| Option 1 Payment | | |
| Difference | $ | 3882.58 |

Exhibit D