**e-filed 10/17/07 after manual file 9/10/07**

Michael Blomquist
18234 Daves Avenue
Los Gatos, CA 95030
(408)399-0590
(408)399-0590 (FAX)
michaelsblomquist@yahoo.com
Plaintiffs
Pro Se

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| MICHAEL BLOMQUIST | ) Case No.:C07-04108 HRL |
| Plaintiff, | ) **AMENDED COMPLAINT:** |
| | ) ADMINISTRATIVE PROCEDURE |
| vs. | ) ACT, ANTITRUST, SECURITIES |
| | ) FRAUD, UNFAIR COMPETITION |
| WASHINGTON MUTUAL, a Washington | ) |
| corporation; KERRY K. KILLINGER; | ) **DEMAND FOR JURY TRIAL** |
| JOSEPH W. SAUNDERS; | ) |
| COUNTRYWIDE HOME LOANS, INC. a | ) |
| Delaware corporation; ANGELO | ) |
| MOZILLO; WACHOVIA CORPORATION, a | ) |
| North Carolina corporation; KEN | ) |
| THOMPSON; CITIGROUP, a Delaware | ) |
| corporation; SANFORD WEILL; CHARLES | ) |
| PRINCE; GOLDMAN SACHS GROUP, INC., | ) |
| a Delaware corporation; HENRY | ) |
| PAULSON; BEAR STERNS COMPANIES, | ) |
| INC., a Delaware corporation; | ) |
| JAMES CAYNE; THE MCGRAW HILL | ) |
| COMPANY, INC., a Delaware | ) |
| corporation; HAROLD MCGRAW III; | ) |
| WELLS FARGO & COMPANY, a Delaware | ) |
| corporation; PATRICIA R. CALLAHAN; | ) |
| HERBERT M. SANDLER; ROCK HOLDINGS, | ) |
| INC., a Delaware corporation; | ) |
| EXPERIAN CORPORATION, a Delaware | ) |
| corporation; FIMALAC, INC., a | ) |
| Delaware corporation; MOODYS | ) |
| CORPORATION, a Delaware corporation | ) |
| JAMES E. GILLERAN; | ) |
| JOHN M. REICH; JOHN D. HAWKE JR.; | ) |
| JOHN C. DUGAN; SUSAN SCHMIDT BIES; | ) |
| DONALD E. POWELL; SHEILA C. BAIR; | ) |
| Defendants. | ) |

1    **Antitrust: Safeguarding Public Welfare**

2        **A Protection of Constitutional Rights**

3

4

5                    **Venue and Jurisdiction**

6        1.   The violations of law alleged in this Complaint

7    were committed throughout the State of California; in

8    particular the counties of San Mateo and Santa Clara;

9    Plaintiffs' primary counties of business.  Diversity of

10   citizenship, amount in controversy Title U.S.C. 28 § 1332

11   exist and Title U.S.C. 15 § 22 apply.  This Complaint also

12   involves alternative mortgage transactions, which have

13   preempted some state laws Title U.S.C. 12 § 3803. Northern

14   District of California; San Jose division is proximate and

15   proper venue.

16                          **Plaintiffs**

17       2.   Plaintiff is Michael Blomquist ("MB"); who is the

18   sole owner and president of Michael Scott Properties, Inc.

19   MB has been a licensed mortgage and real estate agent since

20   1992.  Michael Scott Properties, Inc. ("MSP") was licensed

21   with the CA Department of Real Estate ("DRE") from 4/6/2000

22   – 4/30/2007.  MB is completing a book on the housing bubble

23   and its future effects on America and the global economy.

24

25

26

**Allegations**

3.  After years of a very successful career, MB witnessed rampant exploitation of consumers, real estate values and market stability through unconscionable, unfair, deceptive and fraudulent ("unlawful") lending and securities activities cited below.  Antitrust violations have emerged from these unlawful restraints as Defendants have proliferated fraud in order to stifle competition and further self-dealings.  The combination of unlawful activities has violated the primary goal of antitrust laws: To "safeguard public welfare" and are illegal per se; in addition price fixing and tying exist.  The magnitude of these antitrust violations is increasing or will increase through the concealment of fraud; Defendants restraint of mortgage brokers' business and Defendants pursuit of entering real estate sales. Q&A; *Keeping Banks out of Real Estate*; http://www.realtor.org/rmomag.NSF/pages/ Feat3200603?OpenDocument.  The Defendants are now accusing the consumers and mortgage brokers for the current lending pandemic when they were the source of funds.

4.  Repurchase agreements and inability to properly supervise agents in a marketplace that encourages fraud forced MB to return licenses to all agents working under MSPs' licenses.  MB has been individually restrained from mortgage and real estate commerce because of legal, fiduciary, ethical, and moral conflicts.  MB has written

1  numerous letters, emails, filed complaints and placed phone

2  calls to many of the Defendants warning of the abuses;

3  including but not limited to (Exhibits A, B & C).  Exhibit

4  A, Comments; *Interagency guidance on Nontraditional*

5  *Mortgage Products*, (2005);

6  http://www.fdic.gov/regulations/laws/federal/2005/05comguid

7  e.html (#20).  Over the years similar lending issues have

8  been reviewed with sub-prime loans.  Despite conflicts of

9  safeguarding public welfare, sub-prime loans have

10 proliferated.  Non-traditional mortgage products have grown

11 exponentially since 2003 and the Agencies have once again

12 failed at their basic duties.  The Agencies Final Guidance

13 and illustrations substantiate their failure.  Final

14 Guidance only revisits existing laws and regulations that

15 have not been enforced. *Federal Financial Regulatory*

16 *Agencies Issue Final Guidance on Nontraditional Mortgage*

17 *Product Risks, (Sept. 2006);*

18 http://www.fdic.gov/news/news/press/2006/pr06086.html

19     5.  Against Plaintiffs' advice and Plaintiffs'

20 unwillingness to commit unlawful acts; Plaintiffs' clients,

21 referrals and prospective clients were enticed to and

22 transacted business with the Defendants.  During the course

23 of business these borrowers were coerced to participate in

24 unlawful acts, omissions and fraudulent statements to

25 purchase over-priced, unaffordable homes through the sale

26 of affordable homes or obtain unaffordable, misleading,

1  cash-out loans to subsidize income.  Stated income loans,

2  Option ARMs, 100% financing and risk layering are the

3  loans/practices in question and defined in paragraphs 32-

4  37.  These products would entice and allow borrowers to

5  finance loans they could not afford.

6      6.  MB is confident that America has never before

7  experienced a remotely similar magnitude of fraud, greed or

8  incompetence.  MB while looking to find replacement income

9  and realizing that the Defendants' activities were unlawful

10  and unsustainable purchased securities which would benefit

11  MB from decreases in some of the Defendants' stocks.  MB

12  realizes he was not forced to buy the securities.  MB

13  alleges that mortgage and securities fraud were the cause

14  of his security losses.  It is further alleged that the

15  Agencies have aided and abetted said violations.

16      7.  After the S&L Crisis, dot.com, WorldCom and Enron

17  scandals the government promulgated numerous statements,

18  laws and regulations to crack down on fraud/white collar

19  crime.  Given the effects of these scandals on the

20  stability of our economy; MB had faith that these laws and

21  regulations would be supervised and enforced.  MB alleges

22  that all prior scandals pale in comparison to the magnitude

23  of these violations.  Similar to the supervisory mergers

24  instituted from the S&L crisis the concealment of said acts

25  have exponentially increased the risk in order to unjustly

26  enrich, over-compensate and/or hide professional failures.

1       8.  Plaintiffs have witnessed the proliferation of

2 sub-prime and non-traditional lending practices proliferate

3 while prudent, established and stress-tested lending

4 guidelines disappeared.  The primary goal of antitrust laws

5 is to safeguard public welfare.  Numerous consumer groups

6 have tried to stop these unethical and unlawful practices,

7 but the only victories have been through additional, over-

8 looked disclosures and Agency guidance that affirms

9 existing laws which have yet to be enforced.  The

10 unconscionable loans, companies and practices have become

11 acquired or emulated by many of the Defendants.

12       9.  Plaintiffs have numerous insiders and

13 whistleblowers willing to testify and substantiate

14 allegations.  The effects of these unlawful practices have

15 dramatically over-leveraged and over-valued real estate,

16 securities and our economy.  Plaintiff alleges the

17 Defendants' acts will not only devastate America, but could

18 eventually bring about the next global depression,

19 especially if these practices are not stopped now.

20       10. Plaintiff brings this action pursuant and not

21 limited to U.S. Const. art. III, § 2; Title U.S.C. 5 § 702

22 *Processing Service Organizations v. Camp,* 397 U.S. 150

23 (1970); Title U.S.C. 15 §§ 1,13,13a,15,16,21,57a(f),77uuu,

24 78b(3),78i, 78j, 78k-1; parallel regulations; and sections

25 17043, 17200, 17203, 17500 of the California Business and

26 Professions Code; sections 1667, 1668, 3294, of the

1  California Civil Code and sections 3353, 22161 and

2  50503(a)(2) of the California Financial Code.  The

3  violations have been growing over the last decade, but

4  proliferated after 2004 and continue to increase

5  exponentially today ("relevant times").  The unlawful

6  lending and security activities violate numerous statutes

7  and provide unreasonable restraints of trade.

8  Overwhelming evidence of fraud within America's banking

9  sector, the most important sector, deserves the stiffest

10 penalties and immediate redress for similarly situated

11 lawful agents and prudent public policy.

12              **Defendants and Related Allegations**

13       11.  Unless otherwise noted all Defendants are

14 registered, have transacted business, underwrote debt, sold

15 debt, rated debt or are required to supervise commerce

16 throughout the United States, the State of California,

17 including the Counties of San Mateo and Santa Clara; the

18 Plaintiffs' primary counties' of business.  It is alleged

19 that numerous Defendants are already insolvent, but the

20 "too big to fail theory" and government support has

21 concealed the facts and unlawful activities.

22       12.  The Defendants listed in this complaint are a

23 small percentage of the potential Defendants participating

24 in the unlawful activities.  Potential Defendants could

25 include other government agencies; analysts and debt rating

26 agencies who carelessly assigned ratings/recommendations;

1  Certified Public Accountants ("CPAs"), auditors, other

2  banks, lenders and all directors participating in the

3  fraud.  Plaintiffs allege that the worst offenders and

4  biggest benefactors of the fraud have been the investment

5  bankers.  Plaintiffs also allege that the point of origin

6  for the unconscionable fraud resides within the Lenders.

7  Fraudulent profits, bonuses and collapsing credit markets

8  provide sufficient motivation and evidence for the rampant

9  crimes.  Reasonable care and attention to numerous warnings

10  should have stopped these unlawful acts years ago.  The

11  Defendants have been exploiting the FDIC and our government

12  to support their unconscionable acts while the FDIC has

13  less than $51 billion in reserves to insure over $4

14  trillion in insured deposits.

15      13.  At all relevant times, Defendant Washington

16  Mutual, a Washington corporation ("WAMU"), was, and is now,

17  a Federal savings association with insured deposits.  As of

18  March 31, 2005 WAMU had total deposits of $183.63 billion;

19  most of which are federally insured.  Providian Financial

20  ("Providian") was acquired by Washington Mutual on October

21  1, 2005.  Providian had deposits of $9.07 billion as of

22  March 31, 2005; most of which were federally insured.

23  Market cap for WAMU as of Augusts 8, 2008 was approximately

24  $32 billion, stockholders' equity of $24.2 billion and

25  goodwill of $9 billion on June 30, 2007.  Goodwill is 37%

26  of stockholders' equity and WAMU's reputation is so bad

1  that they have extreme difficulty selling their Jumbo loans

2  on the secondary market.  All causes of action against

3  Providian Financial will be brought against WAMU; KERRY K.

4  KILLINGER, WAMU CEO; JOHN M. REICH; JOHN D. HAWKE; and

5  JOSEPH W. SAUNDERS.

6      13a. At all relevant times Defendant, Kerry K.

7  Killinger ("KKK"), was, and is now, CEO and Chairman of

8  WAMU.

9      13b. Defendant, JOSEPH W. SAUNDERS ("JWS") was CEO of

10  Providian from November 2001 until October 2005.

11      14.  At all relevant times, Defendant Countrywide Home

12  Loans, Inc., a Delaware corporation (also dba America's

13  Wholesale Lenders); Countrywide Bank, N.A., and its wholly-

14  owned subsidiary ReconTrus Company N.A.(collectively,

15  "Countrywide"), was a National Bank, and is now a Federal

16  savings association.  Countrywide had deposits of $60.57

17  billion as of June 30, 2007; most of which are federally

18  insured.

19      14a. At all relevant times Defendant, ANGELO MOZILLO

20  ("Angelo") was, and is now CEO and Chairman of Countrywide.

21      15.  At all relevant times Defendant, Wachovia

22  Corporation, a North Carolina corporation ("Wachovia") was,

23  and is now, a National Bank.  Wachovia has approximately

24  $328.56 billion dollars in deposits; most of which are

25  federally insured.  Wachovia has been named as a defendant

26  primarily for violations conducted by Golden West Financial

1  (also dba World Savings)("World"), a Federal savings

2  association acquired by Wachovia Corporation on October 1,

3  2006.  World had deposits of $61.5 billion dollars; most of

4  which were federally insured.

5      15a. At all relevant times Defendant, Ken Thompson

6  ("KT") was, and is now CEO and Chairman of Wachovia.

7      15b. At all relevant times until October 1, 2006,

8  Defendant Herbert M. Sandler ("Herb") was CEO and Chairman

9  of World.  Sandler is considered to be the expert authority

10  on option ARM loans.  His fraudulent and misleading

11  statements about option ARM loans have aided and abetted

12  their proliferation.  Although the debt markets are

13  beginning to explode the real problems behind the option

14  ARMs will not be experienced for years.  See below for a

15  link to Sandler's comments on non-traditional lending

16  products.

17      16.  At all relevant times, Defendant Wells Fargo &

18  Company, a Delaware Corporation ("Wells") was, and is now a

19  national bank with insured deposits.  Wells has federal

20  deposits of approximately $290.59 billion dollars as of

21  March 31, 2007, most of which are federally insured.

22      16a. From June 2005 and after, Defendant Patricia R.

23  Callahan ("PRC") was, and is now Executive Vice President

24  of compliance and risk management for Wells.  PRC was

25  previously responsible for systems, operations and finance

26  for the Real Estate Group.

1     17.  At all relevant times, Defendant Citigroup Inc.,

2 a Delaware corporation ("Citigroup") was, and is now, a

3 multibank holding company.  Citigroup has experience in

4 mortgage lending and provided an opinion in the acquisition

5 of Providian by WAMU.  Citigroup has assisted with numerous

6 debt offerings for Providian, WAMU and other mortgage

7 lenders.

8     17a. At all relevant times Defendant, Sanford Weill

9 ("Sandy") was Chairman of Citigroup until April 18, 2006.

10     17b. At all relevant times Defendant, Charles O.

11 Prince III ("Chuck") was, and is the CEO of Citigroup.

12 After April 18, 2006 Chuck became Chairman of Citigroup.

13     18.  At all relevant times, Defendant Goldman Sachs

14 Group, Inc., a Delaware corporation ("Goldman") was, and is

15 now, an investment bank.  Goldman has experience in debt

16 offerings and provided an opinion in the acquisition of

17 Providian by WAMU.  Goldman has assisted with numerous debt

18 offerings for Providian, WAMU and other mortgage lenders.

19     18a. At all relevant times until approximately May 31,

20 2006 Henry M. Paulson ("Hank") was the CEO and Chairman of

21 Goldman Sachs Group, Inc.

22     19.  At all relevant times, Bear Sterns Companies,

23 Inc., a Delaware corporation ("BS") was, and is now, an

24 investment bank.  BS has experience in debt offerings and

25 has assisted with numerous debt offerings for mortgage

26 lenders.

1    19a. At all relevant times James Cayne ("JC") was, and

2    is now the CEO and Chairman of BS.

3    20.  At all relevant times, Defendant The McGraw Hill

4    Company, Inc., a Delaware corporation was, and is now the

5    parent company of Standard and Poors ("S&P").  S&P provides

6    independent credit ratings and market analysis for a

7    variety of products including analysis for option ARMs and

8    loans with no income verification guidelines ("NIV").

9    20a. At all relevant times, Defendant Harold McGraw

10   III was, and is now the CEO and Chairman of S&P.

11   21.  At all relevant times, Defendant Rock Holdings

12   Inc., a Michigan corporation was, and is now the parent

13   company of Quicken Loans, Inc. ("Quicken").  Quicken

14   provides home loans through extensive internet marketing

15   campaigns.  A majority of the advertising is extremely

16   misleading, particularly option ARMs.

17   22.  After May 2005, Defendant Experian Services

18   Corporation, a Delaware corporation was, and is now the

19   parent company of LowerMyBills.com ("Bills"). Bills is a

20   lead generation/information broker that engages in

21   extremely misleading advertising, particularly option ARMs.

22   23.  At all relevant times, Defendant Fimalac, Inc., a

23   Delaware corporation was, and is now the parent company of

24   Fitch Ratings ("Fitch").  Fitch provides independent credit

25   ratings and market analysis for a variety of products

26   including analysis for option ARMs and loans with no income

1  verification guidelines ("NIV").

2      24.  At all relevant times, Defendant Moody's

3  corporation, a Delaware corporation was, and is now the

4  parent company of Moody's Group ("Moodys").  Moodys

5  provides independent credit ratings and market analysis for

6  a variety of products including analysis for option ARMs

7  and loans with no income verification guidelines ("NIV").

8      25.  As of August 9, 2005, Defendant John M. Reich

9  ("Reich") was, and is now, the director of the Office of

10 Thrift Supervision ("OTS"); a Federal Regulatory Agency

11 with the Mission Statement: "To supervise savings

12 associations and their holding companies in order to

13 maintain their safety and soundness and compliance with

14 borrower laws, and to encourage a competitive industry that

15 meets America's financial services needs".  The OTS

16 replaced the Federal Home Loan Bank Board ("FHLBB") after

17 the FHLBB failed from the S&L crisis.  OTS has stated that

18 its purpose is to ensure that the thrift crisis of the

19 1980s is never repeated.

20     26.  From December 7, 2001 until April 29, 2005, James

21 E. Gilleran ("Gilleran") was the director of the OTS. It is

22 believed that the mission of the OTS was the same during

23 Gilleran's term as stated in paragraph 23.

24     27.  As of August 4, 2005, Defendant John M. Dugan

25 ("Dugan") was, and is now, the director of the Office of

26 the Comptroller of the Currency ("OCC"); a Federal

1  Regulatory Agency. "The OCC's Objectives are predicated on

2  four objectives that support the OCC's mission to ensure a

3  stable and competitive national banking system. The four

4  objectives are: a. To ensure the safety and soundness of

5  the national banking system; b. To foster competition by

6  allowing banks to offer new products and services; c. To

7  improve the efficiency and effectiveness of OCC

8  supervision, including reducing regulatory burden; d. To

9  ensure fair and equal access to financial services for all

10 Americans.

11      28.  From December 8, 1998 until October 13, 2004,

12 Defendant John D. Hawke Jr. ("Hawke") was the director of

13 the OCC. It is believed that the mission of the OCC was the

14 same during Hawke's term as stated in paragraph 25.

15      29. As of December 7, 2001, Defendant Susan Schmidt

16 Bies ("Bies") was, and is now a governor at the Board of

17 Governors of the Federal System ("FED").  The FED was, and

18 is now, a Federal Regulatory Agency established to perform

19 four duties: "a. conducting the nation's monetary policy by

20 influencing the monetary and credit conditions in the

21 economy in pursuit of maximum employment, stable prices,

22 and moderate long-term interest rates; b. supervising and

23 regulating banking institutions to ensure the safety and

24 soundness of the nation's banking and financial system and

25 to protect the credit rights of borrowers; c. maintaining

26 the stability of the financial system and containing

1   systemic risk that may arise in financial markets; d.

2   providing financial services to depository institutions,

3   the U.S. government, and foreign official institutions,

4   including playing a major role in operating the nation's

5   payments system.

6        30.  As of June 26, 2006, Defendant Sheila C. Bair

7   was, and is now Chairman of the Federal Deposit Insurance

8   Corporation ("FDIC").  FDIC was, and is now, a Federal

9   Agency with the Mission Statement.  "The Federal Deposit

10  Insurance Corporation (FDIC) is an independent agency

11  created by the Congress that maintains the stability and

12  public confidence in the nation's financial system by

13  insuring deposits, examining and supervising financial

14  institutions, and managing receiverships".

15       31.  From August 29, 2001 until November 15, 2005

16  Defendant, Donald E. Powell was the Chairman of the FDIC.

17  It is believed that the mission of the FDIC was the same

18  during Powell's term as stated in paragraph 28.

19       32.  Whenever reference is made in this Complaint to

20  any act of any corporate or other business Defendant, that

21  reference shall mean that the corporation, or other

22  business did the acts alleged in this Complaint through its

23  officers, directors, employees, agents and/or

24  representatives while they were acting within the actual or

25  ostensible scope of their authority.

26

1      33.   Whenever reference is made in this Complaint to

2  any act of Defendants, such allegation shall mean that each

3  Defendant acted individually and/or jointly with the other

4  Defendants.  WAMU, Countrywide, Wachovia, Wells and Quicken

5  shall be referred to collectively as "Lenders".

6  Citigroup, Goldman and BS shall be referred to collectively

7  as "Bankers".  KKK, JWS, Angelo, KT, Herb, PRC, Sandy,

8  Chuck, Hank and JC shall be referred to collectively as

9  "Executives".  S&P, Fitch & Moodys shall be referred to

10  collectively as ("Ratings").  Bills and Quicken at this

11  time will individually remain, Bills and Quicken.  The

12  Directors or Chairman at the OTS, OCC, FED, and FDIC, shall

13  be referred to collectively as "Agencies".  The term

14  "Defendants" wherever used in this Complaint shall mean all

15  named defendants.  Additional definitions and statements

16  are listed below.

17              **Definitions and Related Allegations**

18      34.  **Stated income loan or no income verification**

19  **("NIV") (prior times)** refers to loan guidelines where the

20  borrower is not required to provide income documentation.

21  NIV guidelines prior to relevant times required borrowers

22  to be self-employed, have excellent credit and document 20%

23  equity for refinances or proof of liquid funds representing

24  a 20% down-payment for home purchases.  Self-employment was

25  verified by 2 most recent, consecutive years of business

26

1    licenses or letter from borrower's certified public

2    accountant verifying self-employment for 2 most recent,

3    consecutive years.  NIV loans prior to relevant times were

4    considerably less risky than relevant times NIV loans.

5        35.  **NIV (relevant times)** Loans with NIV guidelines

6    are extended to wage earners who receive W-2s.  W-2s

7    provide easy income verification and require limited

8    paperwork in order to determine a borrower's ability to re-

9    pay loans.  Allowing borrowers with W-2 incomes to use NIV

10   guidelines has encouraged and resulted in rampant fraud.

11   **Recent studies have found that 90% of all loans with NIV**

12   **guidelines have inflated incomes.  60% of NIV loans have**

13   **inflated incomes by 50% or more.**  The Plaintiffs believe

14   these numbers are more alarming in the Plaintiffs' primary

15   counties of business, which are some of the most expensive,

16   leveraged and volatile areas within the United States.  The

17   Defendants have knowingly allowed and encouraged this fraud

18   to proliferate.  The Internal Revenue Service ("IRS") has

19   provided during all relevant times fast and easy

20   verification of borrowers' incomes (4506), but this service

21   is rarely used.

22       36.  **Option ARM** is an adjustable rate loan with

23   optional monthly loan payments.  Imagine financing a home

24   with a credit card.  Option ARMs are often underwritten

25   with NIV guidelines.  The loan payments can be any amount

26   as long as the monthly minimum payment is provided.

1  Lenders will usually provide dollar amounts for the

2  minimum, interest only, 30 year fixed and 15 year fixed

3  payments.  Initial, minimum monthly payments are calculated

4  with 3 factors: loan balance, 30 year amortization and a

5  starting/discount interest rate which is often 1-1.5%.

6  Although the payments will remain fixed for one year, the

7  discount rate is often fixed for only one month.  Herbert

8  Sanders the founder and CEO of World Savings is considered

9  to be the option ARM industry expert.  Despite Sander's

10 lengthy track record with option ARMs he too was critical

11 of the current deep payment discounts and diluted

12 underwriting standards as evidenced by his comments on non-

13 traditional lending products:

14 http://www.fdic.gov/regulations/laws/federal/2005/05comguid

15 e.html #47.  In the face of competition, unsafe and unsound

16 lending Sanders/World was willing to ignore his own expert

17 advice and World continued to offer option ARMs with deep

18 payment discounts outside his recommendations and legal

19 boundaries (17043 CA B&P).  Sanders also went on to state

20 that option ARMs were properly stressed tested, but NIV

21 guidelines, high loan to values ("LTVs") and deep discount

22 payments were not prevalent during the times of stress in

23 1994.  Interestingly, Sander's written support for the

24 option ARM was provided only weeks before the proposed and

25 future acquisition of World by Wachovia.

26      37.  **Option ARM example:** A standard, misleading option

1  ARM worksheet from WAMU is attached as (Exhibit D).  The

2  margin of 2.050% is rarely ever provided.  Margins are

3  usually 2.65% or higher.  You will notice the loan amount

4  is $1,160,000.  The minimum payment is $3,072.20.  Interest

5  only is $4,341.90 and the difference between the two is

6  $1,269.69 (negative amortization).  This worksheet was

7  produced and distributed at a time when interest rates were

8  at historic lows (4.554% as shown).  Today fully indexed

9  rates ("FIR") with normal margins are much closer to 7.7%

10  resulting in considerably more negative amortization.  The

11  worksheet was generated on 6/10/2003.  After 4 years

12  minimum payments would have stepped up to $3,817 resulting

13  in negative amortization of $3,046 per month which is added

14  to the loan balance.  This is a very optimistic outlook

15  given the extremely low margin utilized in this scenario.

16  The traditional 30 year fixed loan payment was based on an

17  interest rate of 6% or $6,954.79, which is more than double

18  the minimum payment.  Some studies have shown that 90% of

19  all option ARM borrowers make only the minimum payments.

20  These loans are extremely unfair, deceptive, misleading and

21  fraudulent.  Loan performance has documented that 88% of

22  all Option ARM loans originated in CA are originated with

23  NIV guidelines.

24     38.  **100% financing & income tax liabilities:** Lenders

25  provide financing for 100% of the home's purchase price.

26  Often times an additional 3% (103%) can be provided towards

1  closing costs through a clause in the purchase contract.

2  100% financing usually consists of an 80% first and a 20%

3  2nd mortgage.  The consequences of defaulting or foreclosure

4  with 100% financing is not properly disclosed.  Example: A

5  borrower buys a $500,000 home with 100% financing.  The

6  price drops 10% ($50,000).  The uncollected interest,

7  foreclosure costs, marketing and sales costs could add up

8  to another 10% for a total loss of $100,000.  The lender is

9  allowed to deduct the $100,000 from their taxes.  The

10 borrower could be assessed a gain or ordinary income (1099)

11 on the $100,000.  Most likely the 100% borrower had very

12 little money before purchasing the home and could then face

13 a huge tax liability. Very few borrowers are aware of this

14 potential, significant liability.

15     39.  **Risk layering** is the combination of NIV loans,

16 option ARMs or 100% financing.  These products on their own

17 can be misleading, unsafe and unsound for both the borrower

18 and the financial institution.  Together risk layering is

19 similar to combining bleach and ammonia.  Plaintiff has

20 been writing and calling the Agencies and others for years

21 about these terrible products (Exhibits A, B & C).  Risk

22 layering has provided loans to hundreds of thousands, if

23 not millions of borrowers who are not qualified to maintain

24 monthly payments.  This unsafe and unsound practice has

25 lead to restraints in trade and greatly over-valued real

26 estate and stock prices.  Executives have been greatly

1  over-compensated for NOT conducting business in a safe and

2  sound manner.

3      40.  **Repurchase agreement** is an agreement that is

4  generally set for a period of time and requires the

5  seller/originator including Plaintiffs to repurchase

6  loan(s) that experience an early payment default ("EPD") or

7  has been fraudulently originated.  Fraud includes over-

8  stating of income.  A repurchase agreement can be a

9  separate agreement or a clause in an agreement.

10 Additional clauses or agreements require the repayment of

11 commissions for a loan(s) that was refinanced within a set

12 period of time; to provide relief to the investor and or

13 Lender.  Until recently, reported default rates within

14 relevant times have been low.  Plaintiffs allege that the

15 low default rates have been attributed, but not limited to

16 concealment of fraud, financial reporting shenanigans, and

17 unsafe and unsound lending. Lenders have extended

18 additional credit to defaulting homeowners in order to

19 expire repurchase agreements with secondary market

20 investors, delay delinquency reporting for financials and

21 sell problem loans.

22     41.  **Short sale (prior times)** is a type of sale where

23 the Lender will take less than they are owed in order to

24 mitigate the loss for both the Lender and the borrower.

25 Prior to relevant times Lenders were much more willing to

26 accept short sales with no strings attached.  Losses

1  immediately made it to the Lenders' financials and timely

2  reporting of crucial information would stop unsafe and

3  unsound extensions of credit.  In *Henry v. Lehman*

4  *Commercial, Inc.*, 04-55396 (9th cir. 12/8/2006) available

5  at http://www.ca9.uscourts.gov/, Lehman was charged and

6  liability was imposed for aiding and abetting First

7  Alliance in their fraudulent lending schemes.  Defendants

8  have been fraudulently concealing lending schemes by

9  encouraging, ratifying, endorsing or permitting continued

10  extensions of credit, fraud, and unsafe and unsound

11  lending.

12     42.  **Short Sale (relevant times)** Lenders are more

13  selective and strict in their decisions to mitigate losses.

14  As previously stated option ARM borrowers are usually able

15  to maintain minimum monthly payments, but property taxes

16  and insurance often become delinquent.  These delinquencies

17  are a default to the existing loan agreements, but are not

18  reported to credit bureaus.  Instead of mitigating future

19  losses Lenders will often try to sell the delinquent loan

20  to investors while the borrower is still current on loan

21  payments.  Delinquent borrowers with loans other than

22  option ARM loans are often refinanced into option ARM loans

23  to delay defaults and further Defendants' enrichment.  Some

24  Lenders such as WAMU are extending equity lines and credit

25  cards to delinquent home owners.  Instead of mitigating

26  losses, Lenders are exacerbating losses by their

1  unconscionable short sale requirements.  The current

2  requirements of a short sale are: a. provide income

3  documentation proving they can not afford the home, despite

4  using NIV guidelines at origination; b. borrower is

5  required to sign unlawful, extortionate promissory notes in

6  the amount of the loan pay-off deficiency.  This

7  requirement was not in the borrower's original loan

8  agreement (to the lenders defense neither was accepting a

9  short-sale).  Either way the executives received their

10  bonuses; c. borrowers are required to sign a 1099 for the

11  amount of the Lender's loss.  Borrowers are much better off

12  with foreclosure than signing the promissory note and

13  providing incriminatory income documentation.  Under Title

14  U.S.C. 18 § 1344 the borrower has committed fraud by

15  overstating their incomes.  Any complaints for redress by

16  the borrower will be brought with unclean hands.

17     43.  **An appraisal** is commonly defined as a valuation

18  or an approximation of value by impartial, properly

19  qualified persons.  The process of determining the value of

20  an asset or liability, which entails expert opinion rather

21  than express commercial transactions.  If the opinion of

22  value is to be based on non-market financing or financing

23  with unusual conditions or incentives, the terms of such

24  financing must be clearly identified and the appraiser's

25  opinion of their contributions to or negative influence on

26  value must be developed by analysis of relevant market

1  data.  The lack of adequate attention to unsafe and unsound

2  lending standards and loan products has temporarily and

3  artificially inflated appraisals.  Although NIV guidelines,

4  option ARMs and 100% financing have been around for

5  decades, the structures of these loans and guidelines are

6  completely different to their predecessors.  In addition,

7  the risk layering of these extremely risky products was

8  never done before.  Residential appraisals are based on

9  sales comparison methods and can be easily inflated from

10 unsustainable demand via unusual financing.  See Exhibit O

11 for a petition signed by over 10,000 appraisers for their

12 concerns about these products in the appraisal process.

13     44.  **Payment Shock** is a term used to describe a

14 dramatic increase in monthly payments.  If a borrower is

15 looking to purchase a home that will require $5,000 a month

16 in principal, interest, taxes and insurance ("PITI") and

17 his/her rent is currently $2,000 per month this could be

18 considered payment shock.  When a borrower with an option

19 ARM loan reaches the 5th year anniversary and his/her loan

20 is recast into a 25 year amortized loan this will be a huge

21 payment shock.

22     45.  **Administrative Procedure Act:**  Plaintiffs have

23 been writing, filing complaints and commenting on advanced

24 notices of proposed rulemaking ("ANPRs") for years.

25 Plaintiffs' activities have been directed to the Agencies,

26 respective Ombudsmen and legislators regarding the unsafe

1  and unsound lending standards including misleading option

2  ARMs, fraudulent NIVs, fraudulent concealment of existing

3  delinquencies and antitrust issues.  Despite the Plaintiffs

4  efforts unsafe and unsound lending has increased

5  exponentially.  Timely judicial review is imperative.

6                    **Summary of Allegations**

7      46.  At all relevant times, each Defendant has either

8  committed the acts, caused others to commit the acts,

9  ratified the commission of the acts, endorsed or permitted

10 others to commit the acts alleged in this Complaint and has

11 made, caused, ratified, or permitted others to commit the

12 acts alleged in this Complaint.

13     47.  Rampant fraud, unconscionable acts, misleading

14 loan products, false/misleading statements, unsafe and

15 unsound lending and other unlawful acts have all restrained

16 trade for brokers working within the boundaries of the law

17 and fiduciary duties.  Plaintiffs have approximately one

18 hundred past clients and/or prospects willing to support

19 Plaintiffs' claims.  Plaintiffs are concerned that the same

20 Lenders who have reaped the unlawful profits are now

21 positioning themselves to benefit from the collapse of the

22 housing market.

23     **DEFENDANTS' BUSINESS PRACTICES & LOAN PROGRAMS**

24     48.  In the ordinary course of business, the Lenders

25 have originated and funded real estate secured loans with

26 borrowers in the United States of American, State of

1   California, counties of Santa Clara and San Mateo.  These

2   real estate secured loans were made through or at the

3   Lenders' branches.

4       **A.    Representations Regarding Loans:**  The Lenders

5   induced borrowers into obtaining loans they could not

6   afford by stating "prices are going up; you need to buy

7   now".  NIV guidelines and misleading statements such as

8   "everyone is (inflating their incomes) doing it" encouraged

9   borrowers to participate in the fraud.  Advertising stating

10  that: "Interest rates have dropped" are the opposite of

11  market times; "Save 50% on your payments" are extremely

12  deceiving.  Misleading loan programs with unsustainably low

13  payments (option ARMs) falsely comforted home owners into

14  borrowing more than they could afford.  The American Dream

15  of Homeownership had borrowers so overwhelmed that

16  excessive loan fees, inflated housing prices, and payment

17  shock were completely over-looked.  The Agencies, Ratings

18  and Bankers ratified the commission of the acts, endorsed

19  or permitted others to commit the acts alleged in this

20  paragraph.

21      **B.    Representations Regarding Future Refinancing:**  As

22  part of an effort to induce borrowers to accept unfavorable

23  loan terms, such as a negative amortization or

24  unaffordable, stated income loans, sales representatives

25  for the Lenders told borrowers that they could refinance in

26  a few months and would be able to obtain more favorable

1  terms as their homes appreciated.  These statements were

2  untrue or misleading because the Lenders were unlikely to

3  provide a refinance under the terms represented by their

4  sales representatives.  Additionally, any borrowers who did

5  refinance would likely incur a substantial prepayment

6  penalty, thus limiting their ability to obtain a more

7  favorable loan.

8      **C.    Default Consequences:**  Disclosures regarding

9  possible significant capital gains liabilities as a result

10  of Lender's and borrower's loss are non-existent or

11  inadequate.  The Lenders and Agencies have failed to

12  properly warn borrowers of this potential, substantial

13  expense.  The majority of borrowers are unaware of this

14  risk.

15      **D.    Lender's commissions:**  Lenders induced their

16  sales representatives to sell adjustable rate loans by

17  paying higher commissions for the sale of an adjustable

18  rather than a fixed rate loan. Option ARM loans often

19  received the most lucrative commissions.  Prepayment

20  penalties which lock borrowers into these loans were

21  awarded additional compensation for the Lenders and loan

22  agents.

23      **E.    Prepayment Penalties:**  The Lenders misled

24  borrowers about the presence and terms of prepayment

25  penalties on loans offered by the Lenders, and about

26  whether prepayment penalties could be waived for borrowers

1  who refinanced their loans.  Lenders will often include

2  prepayment penalties in loan losses that are reported to

3  the IRS and are possibly charged to the borrower.  Lenders

4  will often include pre-payment penalties in short sale

5  (promissory notes).

6      **F.    Inflated Appraisals:**  The Lenders engaged in

7  fraud, deceptive and/or misleading acts which resulted in

8  Lenders obtaining inflated appraisals that were

9  substantially in excess of the market value.  The Agencies,

10  Ratings and Bankers ratified the commission of the acts,

11  endorsed or permitted others to commit the acts alleged in

12  this paragraph.

13      **G.    Inflated Income:**  The Lenders engaged in acts and

14  practices which resulted in fraud, fabricated and/or

15  inflated income information for borrowers.  The Agencies,

16  Ratings and Bankers ratified the commission of the acts,

17  endorsed or permitted others to commit the acts alleged in

18  this paragraph by selling this untested debt to

19  unsuspecting investors.

20      **H.    Disparaging Federal Disclosures:**  The Lenders

21  engaged in acts and practices that encouraged borrowers to

22  ignore the Truth in Lending Act (TILA, 15 U.S.C. §§ 1601 *et*

23  *seq*.) and Real Estate and Settlement Procedures Act (RESPA,

24  12 U.S.C. §§ 2601 *et seq*. ) disclosures (including the Good

25  Faith Estimate), misrepresented that these disclosures were

26  not representative of the actual loan terms the borrowers

1   would receive, or otherwise disparaged the accuracy and

2   relevance of the required federal disclosures.

3            **FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS**

4        **(UDAP; false or deceptive statements that restrain trade**

5                  **and creates unfair competition)**

6   **FOR INJUCTIVE RELIEF, RESTITUTION (INTEREST), PUNITIVE,**

7   **TREBLE DAMAGES AND ATTORNEY FEES**

8        49.  The Plaintiffs reallege and incorporate by

9   reference all paragraphs above, as though fully set forth

10  in this cause of action.

11       50.  At all relevant times, sections 1667 of the

12  California Civil Code; sections 3353, 22161 and 50503(a)(2)

13  of the California Financial Code; sections 17200 and 17500

14  of the California Business and Professions Code, Title

15  U.S.C. 15 §§ 1, 52, 57a(f), Title U.S.C. 18 §§ 1341,

16  1343,1344,1348,1349,1350(b) made it unlawful to make or

17  disseminate false, misleading, unfair or deceptive

18  statements regarding loans; particularly when statements

19  could be used to restrain commerce and injure or destroy

20  competitors operating within the law.  The public deserves

21  access to service providers who operate within the law and

22  uphold fiduciary responsibilities.

23       51.  The Lenders have violated and continue to violate

24  laws listed in paragraph 50 by advertising, publishing,

25  distributing, broadcasting, causing or permitting to be

26  advertised, published, distributed, or broadcast, untrue or

1  misleading statements with the intent to induce mortgage

2  transactions or purchase related mortgage securities.  Such

3  false, misleading, unfair or deceptive statements include

4  but are not limited to the statements described in

5  paragraph 48 above.

6      52.  All Defendants knew, or by the exercise of

7  reasonable care should have known, that the false,

8  misleading, unfair or deceptive statements would restrain

9  trade for business entities not willing to engage in

10  unlawful activities.  All Defendants have made, encouraged,

11  caused, ratified, or permitted others to make untrue or

12  misleading statements that could restrain trade.  These

13  ongoing and egregious acts warrant punitive damages.

14         **SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS**

15         **(unsafe and unsound lending that restrains trade and**

16                    **creates unfair competition)**

17

18     **FOR INJUCTIVE RELIEF, RESTITUTION (INTEREST), PUNITIVE,**

19                **TREBLE DAMAGES AND ATTORNEY FEES**

20      53.  The Plaintiffs reallege and incorporate by

21  reference all paragraphs above, as though fully set forth

22  in this cause of action.

23      54.  At all relevant times, sections 1667, 1668, 1920(a),

24  of the California Civil Code; sections and 50503(a)(2) of

25  the California Financial Code; sections 17043, 17071, 17200, of

26  the California Business and Professions Code; Title U.S.C.

1      , 1828a(a)(1)(b), Title U.S.C. 15 §§ 1, 52,

2    57a(f), Title U.S.C. 18 §§ 371, 1005, 1007, 1014, 1341,

3    1343, 1344, 1348, 1349, 1350(b), 12CFR560.101, 12CFR365.2,

4    12CFR34.D, and 12CFR208.C made it unlawful to conduct real

5    estate lending in an unsafe and unsound manner;

6    particularly when such violations could be used to restrain

7    commerce and injure or destroy competitors operating within

8    the law.  If Lenders were operating in a free market,

9    Lenders with unsafe and unsound lending would fail.  The

10   agencies have aided and abetted these unlawful activities

11   in order to conceal their own professional failures.  A

12   conspiracy has existed from the point of loan origination

13   by fraudulent statements made by borrower and Lenders'

14   agents all the way through to securitizations on Wall

15   Street.

16        55.  The Defendants at all relevant times have

17   violated and continue to violate laws listed in paragraph

18   48 by originating, selling, endorsing, causing, ratifying

19   or permitting loans without minimum standards for net

20   worth, cash flow, and debt service coverage of the borrower

21   or underlying property; unclear loan to value limits; lack

22   of monitoring real estate lending policies; lack of prudent

23   real estate appraisals and other issues listed within the

24   Agencies' real estate lending standards and within the

25   Lenders' corporate standards.  Continued violations have

26

1  restrained trade, increased risk and concealed the original

2  violation.

3  56. All Defendants knew, or by the exercise of

4  reasonable care should have known, that unsafe and unsound

5  lending would restrain trade for business entities not

6  willing to participate in unlawful activities and erode

7  appraisal standards. All Defendants have made, encouraged,

8  caused, ratified, or permitted others to conduct unsafe and

9  unsound lending that could restrain trade. The lack of

10  fiduciary duty has led the lending and real estate

11  industries to commit unconscionable acts. These ongoing

12  and egregious acts warrant punitive damages.

13  **THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS**

14  **(selling products below cost to restrain trade and create**

15  **unfair competition)**

16  **FOR INJUCTIVE RELIEF, RESTITUTION (INTEREST), PUNITIVE,**

17  **TREBLE DAMAGES AND ATTORNEY FEES**

18  57. The Plaintiffs reallege and incorporate by

19  reference all paragraphs above, as though fully set forth

20  in this cause of action.

21  58. At all relevant times, Title U.S.C.15 §§ 1, 13a;

22  section 17043, 17071 of the California Business and

23  Professions Code; 1667, 1920(a) of the California Civil

24  Code made it unlawful to sell a product at less than cost;

25  particularly when such violations could be used to restrain

26  commerce and injure or destroy competitors operating within

1 the law.

2    59.  The Defendants at all relevant times have

3 violated and continue to violate laws listed in paragraph

4 48 by originating, selling, endorsing, causing, ratifying

5 or permitting loans or mortgage securities to be sold below

6 cost.

7    60.  All Defendants knew, or by the exercise of

8 reasonable care should have known, that selling loans below

9 cost would restrain trade for business entities not willing

10 to participate in unlawful activities.  Special financing

11 incentives by selling loans below cost erode appraisal

12 standards.  In addition to violating laws listed in

13 paragraph 58, laws in paragraph 50 and 54 have been

14 violated by selling loans below cost.  A concentrated use

15 and fraudulent reporting of option ARM interest income by

16 Lenders has specifically led to securities violations

17 listed in the sixth cause of action.  The lack of fiduciary

18 duty has led the lending and real estate industries to

19 commit unconscionable acts.   These ongoing and egregious

20 acts warrant punitive damages.

21    **FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

22    **(fraud and conspiracy that restrains trade and creates**

23    **unfair competition)**

24    **FOR INJUCTIVE RELIEF, RESTITUTION (INTEREST), PUNITIVE,**

25    **TREBLE DAMAGES AND ATTORNEY FEES**

26

1    61.  The Plaintiffs reallege and incorporate by

2    reference all paragraphs above, as though fully set forth

3    in this cause of action.

4    62.  At all relevant times, Title 18 §§ 371, 1001, 1005,

5    1007, 1014, 1341, 1343, 1344, 1348, 1349, 1350(b) and sections

6    1667, 1668, 1920(a), 3294 of California Civil Code made it

7    unlawful to conspire or participate in fraud.

8    63.  All Defendants knew, or by the exercise of

9    reasonable care should have known, that fraud and

10   conspiracy to commit fraud is unlawful and would restrain

11   trade for business entities not willing to participate in

12   unlawful activities.  All Defendants knew or should have

13   known that their participation in alleged violations listed

14   in paragraph 62 could aid and abet Lenders with fraudulent

15   security transactions.  All Defendants have made,

16   encouraged, caused, ratified, or permitted others to commit

17   fraud or conspire to commit fraud.  A conspiracy has

18   existed from the point of loan origination by fraudulent

19   statements made by borrower and Lenders' agents all the way

20   through to Wall Street.  The current use of NIV guidelines

21   is at the very least aiding and abetting fraud.  The

22   omission or concealment of these guidelines in financials

23   is also fraud.  These ongoing and egregious acts warrant

24   punitive damages.

25

26

1    **FIFTH CAUSE OF ACTION AGAINST AGENCIES**

2    **(administrative procedure act)**

3    **FOR INJUCTIVE RELIEF**

4    64.  The Plaintiffs reallege and incorporate by

5    reference all paragraphs above, as though fully set forth

6    in this cause of action.

7    65.  At all relevant times, Agencies have neglected to

8    perform their basic duties to supervise lending and banking

9    institutions in order to ensure stability, safety and

10   soundness within the financial markets.  Plaintiffs satisfy

11   case or controversy test of U.S. Const. art. III, § 2;

12   allegations that the Lenders' unsafe and unsound lending

13   causes Plaintiffs' economic injury.  Plaintiffs are

14   arguably within the zone of interests to be protected or

15   regulated by the statute and Plaintiffs are aggrieved under

16   Title U.S.C. 5 § 702, Title U.S.C. 15 § 78l, Title U.S.C.

17   18 § 1001, Title U.S.C. 28 § 1361, Title U.S.C. 42 § 1986.

18   Data Processing Service v. Camp 397 U.S. 150.

19   66.  Agencies knew, or by the exercise of reasonable

20   care should have known, that the structure and risk

21   layering of current lending products and guidelines have

22   dramatically altered historic risk models, especially when

23   combined with historically low interest rates.  Agencies

24   knew, or by the exercise of reasonable care should have

25   known that inadequate supervision would restrain trade for

26   business entities not willing to participate in unlawful

1  activities.  Agencies have made, encouraged, caused,

2  ratified, or permitted others to conduct unlawful

3  activities and conceal unlawful activities.

4      67.  Agencies have encouraged, caused, ratified or

5  permitted others to fraudulently conceal their unlawful

6  activities by allowing federally insured deposit

7  institutions to merge or be acquired.  The merger of

8  WAMU/Providian will exacerbate future losses to the FDIC as

9  WAMU rapidly approaches or is already insolvent.  It has

10 been well documented and proven that the supervisory

11 mergers from the Savings and Loan crisis exacerbated the

12 losses to taxpayers.  If we are to have a free market

13 system investors who essentially aid and abed

14 unconscionable lending practices should not be protected

15 because the FDIC does not want to pay insurance claims.

16 Unconscionable companies like Providian should be allowed

17 to fail and should not receive FDIC insured status.

18 Deposits, receivables and debt could be handled in

19 bankruptcy instead allowing companies to continue unsafe

20 and unsound practices of the acquired/insolvent company.

21       **SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

22   **(fraudulent tranasaction of domestic securities; restraint**

23              **of trade and unfair competition)**

24   **FOR RESTITUTION (INTEREST), PUNITIVE, TREBLE DAMAGES AND**

25                      **ATTORNEY FEES**

1    68.  The Plaintiffs reallege and incorporate by

2  reference all paragraphs above, as though fully set forth

3  in this cause of action.

4    69.  At all relevant times Defendants, have engaged,

5  participated, aided or abetted fraudulent securities

6  transactions; in particular the OTS's over-sight of the

7  WAMU and Providian merger.  Defendants knew or should have

8  known by the exercise of reasonable care that security

9  violations have occurred and are occurring as a result of a

10  violation or combination of violations identified in the

11  First through Fifth causes of action.  Security violations

12  include but are not limited to Title U.S.C. 15 §§ 77w,

13  78b(3), 78i, 78j, 78k-1, 78L, 78o-6, 77uuu.  The continued

14  violations of these laws have continued to restrain trade

15  by providing loans to borrowers who can not afford said

16  loans.  Prior damage to MB through security losses were a

17  result of the violations listed in the first through sixth

18  causes of action.  Security losses involve and are not

19  limited to Providian, Washington Mutual and Countrywide.

20  These ongoing and egregious acts warrant punitive damages

21  and immediate redress.

22                    **PRAYER FOR RELIEF**

23  WHEREFORE, Plaintiffs pray for judgment as follows:

24    1.  Pursuant to sections 17202, 17203 and 17535 of

25  the California Business and Professions Code, Title 5 §

26  702, Title 15 §§ 1,24,26,53, Title 18 § 1345, for an order

1  that Defendants and their direct and indirect subsidiaries,

2  affiliates, officers, directors, employees, agents, related

3  entities, successors, and assigns, and any and all other

4  persons who act in concert or participate with Defendants,

5  be permanently restrained and enjoined from making,

6  disseminating, or causing to be made or disseminated any

7  misleading, untrue and/or deceptive statements in violation

8  of Antitrust laws, Unfair Competition Laws, Banking Laws,

9  Security Laws or Consumer Protection Laws as alleged in the

10 First through Sixth Causes of Action to this Complaint.

11 Plaintiffs request for an injunction to protect against

12 restraint of trade and to ensure prudent public policy.

13 Borrowers/consumers have also been damaged by the acts of

14 the Defendants and are unable to obtain redress under the

15 unclean hands doctrine.

16      2.    Pursuant to Title 5 § 702, Title 15 §§ 1, 13 15

17 and sections 17070, 17082 and 17202 of the California

18 Business and Professions Code; sections 3287 and 3294 of

19 the California Civil Code, for an order that Defendants and

20 their direct and indirect subsidiaries, affiliates,

21 officers, directors, employees, agents, related entities,

22 successors, and assigns, and any and all other persons who

23 act under, by, through, or on behalf of Defendants, be

24 permanently restrained and enjoined from selling products

25 below cost in order to injure or destroy competition.

26 Defendants shall pay Plaintiffs restitution including

1  interest, exemplary and treble damages in an amount to be

2  determined by the court.

3      3.  Defendants' executives shall be disgorged by all

4  unlawful profits in the amounts to be determined by the

5  court.  Award will be placed with a conservator to help

6  displaced homeowners and families locate and secure

7  shelter.

8      4.  Defendants shall pay $10 million to a conservator

9  appointed by the court in order to fund Plaintiffs' non-

10 profit organization, ("NPO").  NPO will help defaulting

11 homeowners ("homeowners") and troubled lenders sell their

12 homes via deeply discounted commissions through all

13 agents/offices willing to participate in new model, provide

14 web-based counseling for the homeowners' traumatic

15 experience and help homeowners secure new housing for their

16 families.  Defendants will be required upon borrower's

17 default to send a letter informing borrowers of different

18 mitigation remedies, including NPO.  Lenders will not be

19 allowed to demand promissory notes or income documentation

20 for all defaulting homeowners who received loans during

21 relevant times.  The troubling social issues as a result of

22 the financial devastation could become a huge issue on its

23 own.  The court will provide equitable annual salary for

24 MB.

25     5.  For an order that Plaintiffs be awarded its cost

26 of suit, including but not limited to all costs of

1  investigation.

2       6.   All homebuyers and homeowners will not be held

3  liable for any gains as a result of the Lender's loss on

4  loans originated during relevant times.  Lenders will not

5  hold homeowners solely responsible for their limited

6  participation in the fraud.  Homeowners ratified one or

7  minimal acts of fraud whereby the Defendants participated

8  in millions of acts of fraud.  The impacts to the

9  Treasury/IRS will be immediate through Lender's loss

10  deductions.

11       7.   All Agencies to immediately demote or remove

12  Defendants' Executives, directors or chairpersons from

13  current positions where the courts have ruled said

14  Defendants have neglected their most basic duties to ensure

15  safety and soundness.  Compensation packages to be reviewed

16  and adjusted accordingly.  Overwhelming evidence of massive

17  cover-ups and/or incompetence would likely continue without

18  promulgation of this paragraph.

19       8.   All additional relief to which the Plaintiffs are

20  are entitled.

21                    Dated this 10th day of September, 2007

22                    s/Michael Blomquist  **efile 10/17/07**

23                    Michael Blomquist

24                    Pro Se

25  **Plaintiff Demands a Jury Trial**

26

 

**FEDERAL DEPOSIT INSURANCE CORPORATION**

| HOME | DEPOSIT INSURANCE | CONSUMER PROTECTION | INDUSTRY ANALYSIS | REGULATION & EXAMINATIONS | ASSET SALES | NEWS & EVENTS | ABOUT FDIC |

Home > Regulation & Examinations > Laws & Regulations >FDIC Federal Register Citations

# FDIC Federal Register Citations

## Comments

Interagency Guidance on Nontraditional Mortgage Products.
Published - 12/29/05 -- Comment Period Extended to 03/29/06.

| Submitted by |
|---|
| 01. Manufacturers Bank, Los Angeles, CA, Steven L. Strange |
| 02. American Financial Services Association, Robert McKew - PDF (PDF Help) |
| 03. America's Community Bankers, Janet Frank |
| 04. Consumer Bankers Association, Arlington, VA, Steve Zeisel - PDF 916k |
| 05. American Bankers Association, Washington, DC, Paul Smith - PDF 107k |
| 06. Consumer Mortgage Coalition, Anne C. Canfield - PDF |
| 07. HSBC North America Holdings, Prospect Heights, IL, Martha Pampel - PDF 786k |
| 08. Mortgage Bankers Association, Washington, DC, Kurt Pfotenhauer - PDF |
| 09. Independent Community Bankers of America, Ann Grochala - PDF 82k |
| 10. Clearing House Association, LLC, Norman R. Nelson |
| 11. Housing Policy Council, Financial Services Roundtable, Washington, DC, John H. Dalton - PDF |
| 12. Bramble Savings Bank, Milford, OH, James Wm. Gronefeld |
| 13. Conference of State Bank Supervisors, Washington, DC, Neil Milner - PDF |
| 14. Cornhusker Bank, Lincoln, NE, Alice M. Dittman |
| 15. North Carolina Bankers Association, Raleigh, NC, Nathan R. Batts - PDF 55k |
| 16. AmSouth Bank, Birmingham, AL, Michael J. Willoughby - PDF 236k |
| 17. State Financial Regulators Roundtable, Barbara Kent - PDF 90k |
| 18. Alliance FSB, Hinsdale, IL, Lawrence H. Chlum - PDF 159k |
| 19. National Community Reinvestment Coalition, John Taylor - PDF |
| 20. Michael S. Blomquist - PDF 113k |
| 21. Delaware Community Reinvestment Action Council, Inc., Wilmington, DE, Rashmi Rangan - PDF |
| 22. America's Community Bankers, Diane Casey-Landry 77k |
| 23. American Bankers Association, Paul A. Smith - PDF 981k |
| 24. Consumer Mortgage Coalition, Washington, DC, Anne C. Canfield - PDF 81k |
| 25. Steven C. Sharpe |
| 26. Edgemont Neighborhood Coalition, Inc., Dayton, OH, Stanley A. Hirtle |

Exhibit A 1 of 8

27. Chevy Chase Bank, Bethesda, MD, Thomas H. McCormick - PDF

28. Florida Bankers Association, Alex Sanchez - PDF 186k

29. Consumer Federation of America, Washington, DC, Allen Fishbein - PDF 71k

30. American Financial Services Association, Washington, DC, Robert McKew - PDF 80k

31. The Clearing House, LLC, Jeffrey P. Neubert - PDF 145k

32. HSBC North America Holdings, Prospect Heights, IL, David D. Gibbons - PDF 4602k

33. Housing Policy Council of the Financial Services Roundtable, John H. Dalton - PDF 65k

34. Merrill Lynch & Co., George T. Morrison - PDF 192k

35. JPMorgan Chase Bank, NA, Thomas L. Wind - PDF 287k

36. Guaranty Bank, Austin, TX, Jack Falconi - PDF 112k

37. California Reinvestment Coalition, Kevin Stein - PDF 104k

38. Independent Community Bankers, Washington, DC, Ann M. Grochala - PDF 134k

39. Lehman Brothers Bank, FSB, Joseph Polizzotto - PDF 191k

40. Massachusetts Bankers Association, Boston, MA, Jon K. Skarim - PDF

41. Capital One Financial Corporation, McLean, VA, Christopher T Curtis - PDF 112k

42. Appraisal Institute, American Society of Appraisers, & American Society of Farm Managers & Rural Appraisers

43. Mortgage Bankers Association, Washington, DC, Kurt Pfotenhauer - PDF 105k

44. Charles Schwab Bank, N.A., Reno, NV, Richard F. Kennyr - PDF 394k

45. Mortgage Insurance Companies of America, Washington, DC, Suzanne C. Hutchinson - PDF 898k

46. Branch Banking and Trust Co., Wilson, NC, Mark D. Vaughn - PDF

47. World Savings, Oakland, CA, Hebert M. Sandler

48. Center for Responsible Lending, Deborah Goldstein - PDF 177k

49. Fifth Third Bank, Cincinnati, OH, Cindy Manzetti - PDF 220k

50. Bond Market Association, Washington, DC, John R. Vogt - PDF 288k

51. Merrill Lynch, Jacksonville, FL, George T. Morrison - PDF 158k

Last Updated 05/03/2006                                                    regs@fdic.gov

**Home   Contact Us   Search   Help   SiteMap   Forms**
**Freedom of Information Act (FOIA) Service Center   Website Policies   USA.gov**

Exhibit A 2 of 8

March 3, 2006

Re: Proposed Guidance- Interagency Guidance on Nontraditional Mortgage Products 70 FR 77249 (December 29, 2005)

To whom it may concern,

After years of writing local representatives and banking regulators I am pleased that you have finally decided to address the risk layering and terrible declines in lending standards. I hope we can someday learn to address similar issues before they become a pandemic. Stated income guidelines have always been suspect, but due to recent declines in standards are now best defined as fraudulent. Option ARM loans are ticking time bombs and extremely misleading. The American Dream of homeownership should not have been exploited. Millions of borrowers, investors and the banking industry will be devastated when these loans begin to recast.

Future loan loss projections based on prior loan loss history will not provide accurate forecasts. The historical data does not reflect the existing risk layering, inadequate underwriting criteria, rapid appreciation, historically low rates or proliferation of option arms.

**Option ARM originations**

2002 4% of all originations
2003 10% of all originations
2004 27% of all originations
2005 37% of all originations

I have yet to find data on stated income loan originations, but 100% financing for purchases is in excess of 25%. The biggest issue I have with this data is that it is national. The percentages of option ARM originations in California and other bubble markets are considerably higher. I have heard estimates of 75% or more in some areas of California. The additional risk to lenders who are concentrated in the bubble markets is worrisome.

A specific request for comment on the analysis of option ARM borrowers' repayment capacity at final maturity is ridiculous, that task is impossible. Interest rates, home prices, negative amortization, local, national and global economic stability/prices are all unknown variables.

There has been a perfect storm building in the financial and real estate market for years. The amount of foreign owned debt is at record highs and the catalysts for keeping our interest rates low is beginning to change. Japan will begin raising rates, housing appreciation has stopped and the consumer is finally beginning to tire. I don't like to be so negative, but we need to be realistic. Doesn't anyone remember all the surplus projections from 1999?

I have heard numerous comments from lending executives regarding the healthy track records of option ARMs and negatively amortized loans. I find these statements extremely misleading at best. Obviously, the level of market exposure is unprecedented. Home prices, appreciation, DTI and LTVs have never been higher as reduced or no documentation guidelines have become the underwriting standard. Loans that can have minimum payments which are 40% of traditional payments should have excellent credit ratings, but even under current payment caps that is not the case. In addition, the components of prior option arms or negatively amortized loans are completely different now.

During their 2005 earnings call, Countrywide, America's biggest mortgage lender changed option ARM default reporting from 60 days to 90 days. It took an analyst's question to address the

Exhibit A 3 of 8

change.  The 90 day delinquencies did not include 60 day or 30 day delinquencies.  The increases in 90 day delinquencies were up 500% year over year even though 7.5% payment caps were in place.  A 7.5% payment cap is ridiculously low considering the low start rates and high amounts of negative amortization.

Reported accumulation of negative amortization is up 7500% and loans with negative amortization are up 42,300%.  These are very alarming statistics and the manipulation of default reporting should be equally alarming.  The agencies willingness to rely upon proper controls from the lenders is about like the fox watching the chicken coop.  It is time for a little more "hands on" in regards to financial regulation.

http://about.countrywide.com/presentations/docs/4Q05%20Conference%20Call%20Slides%20FINAL.pdf
(page 18)

The footnotes on the page above are also very misleading and could provide much more damning information.  Countrywide is now charging 3.125 pts to originate an option arm loan.  This is a dramatic shift from par or 1% origination fees previously charged by CFC and the par pricing that still exists in the industry.  The terrible demand for this product in the secondary markets has already had a huge impact on the value of lenders' portfolios and the true risks are unknown and incalculable.   Neither the agencies nor the analysts have warned investors about these material facts.  The value of the option arm lenders' portfolios have already been hit hard, but the investor is unaware.

I have seen lenders approve buyers when over 100% of their GROSS income was required just to service the minimum payments on an option ARM.  Needless to say these approvals were under stated (inflated) income guidelines.  Let it be noted that the borrower did originally provide their income documents, but was told they were not needed.  When the borrower questioned about the new income, he was told that this was acceptable and everyone was doing it.

It is well documented that option arm start rates are dangerously too low.  Fully indexed rates have increased over 350 basis points in the last 18 months.  Negative amortization has and will continue to increase at a faster pace as this spread increases.

I realize comments are to be directed towards non-traditional mortgage products, but since we are talking about risk layering, banking M&A and trading activity should also be addressed.  We are clearly in uncharted waters with regards to lending standards and loan products.  Future M&A activity should not be allowed until realistic payment histories are established for the current risk.  In the next two years record volumes of option ARMs will begin to recast.  In many cases loan payments could triple from original minimum payment requirements, even if the Fed stops raising rates.  In addition to loan loss risks are the risks from the banks' trading activity.  Trading activity in derivatives has accounted for huge percentages of banking profits and losses.

The recent acquisition of Providian Financial by Washington Mutual without public hearing is one for reference.  This merger allowed additional risk layering within one of the largest mortgage companies in the United States.  Increased minimum credit card payments, huge levels of short-term debt and a customer base of primarily sub-prime borrowers will prove to be extremely problematic for Washington Mutual.  The combination of a sub-prime credit card company with an aggressive option ARM lender at the peak of a credit cycle should have been looked at closer.  Sub-prime lending is becoming more prevalent.  Recent epic failures from rampant M&A in the telecom and energy sectors should have been an adequate warning.  Small corporate failures should be preferable to large failures, especially when increasing demands are continually placed upon our society: Baby boomer retirement, Medicare, Iraq, Katrina, etc.

Exhibit A 4 of 8

**Home Loan Debt (in trillions)**

| Year | End of Year | % Increase from prior period | Fed Funds prior 4 year average |
|------|-------------|------------------------------|--------------------------------|
| 1985 | $1.45 | | |
| 1989 | $2.27 | 57% | 7.56% |
| 1993 | $3.01 | 33% | 5.08% |
| 1997 | $3.78 | 20% | 5.20% |
| 2001 | $5.29 | 40% | 5.11% |
| 2005 | $8.82 | 67% | 1.84% |
| 1985-2005 | | 600% | |

Home loan debt is up over 600% from the last real estate peak and the average Fed funds rates are down almost 600 basis points. The lower interest rates and nontraditional products have temporarily helped service this large amount of debt, but the inflection point is rapidly approaching. The prospects do not look favorable, especially as wages have remained stagnant and downsizing is gaining speed.

The majority of this increased debt is due to increased demand for securitized assets. The demand was created by a lucrative carry trade and profits from oil producing nations. This data tells volumes for recent banking profits, home prices and future risks. The increased use of securitizations has not been properly tested under stress.

The secondary markets are now seeing a dramatic decrease in demand for securitizations, especially option ARMs. All of the option ARM originators are now retaining more of the option ARM products in their portfolios and the marketing efforts are not slowing. Risks are growing exponentially. I would estimate that 80% or more of lending advertising is targeting the option ARM product, marketing needs to be stopped until performance can be established!

**Risk layering from favorable market conditions**

Beyond the layering of risk from stated/no documentation guidelines, nontraditional products and leverage is the layering of favorable market conditions: Incredibly low interest rates, rapid appreciation, recent demand for securitizations, perception of real estate price stability/speculation, $500,000/$250,000 capital gain tax exemptions and low CORE inflation. To exclude homeownership costs, food and energy from inflation is just another game of "smoke and mirrors". Globalization has kept core inflation low and the dollar is now dependant upon high oil prices and higher interest rates.

**Option ARMs, Stated Income & Low defaults**

The current option arms are completely different than prior negatively amortized loans. LTVs and potential for negative amortization were much lower. Caps were previously based on interest rates versus payments. A 2% increase per year to the interest rate would be a much more substantial increase than a 7.5% payment cap, thus reducing negative amortization, compounding interest and payment shock. High levels of appreciation and reduced credit standards have made it easy for troubled borrowers to find access to more debt paying capital. The declines in lending standards have also allowed "bigger fools" to play their part. Delinquencies under prior guidelines were experienced earlier and LTVs were lower, which allowed lenders to mitigate loss. Current option ARMs have higher LTVs, lower start rates and more negative amortization. At the time the loan is recast it is very likely that the initial payment will triple and this will place a whole new meaning on payment shock. There is no comparison with current/prior negatively amortized products and market conditions!

Exhibit A 5 of 8

**Stated/no documentation guidelines**

Stated income guidelines previously required that you were self-employed, had excellent credit, 6 months of stated income in reserves and an LTV of 75-80% or lower.  Now, stated income guidelines can be for 100% financing, marginal credit and wage earners.  In addition, the reliance of FICO scores is very over-rated.  FICO scores are great at predicting the past, but not the future, especially with additional debt loads and payment shocks.  Earning and saving potential is a better barometer for future risk.  Factual income and savings documentation should be used to quantify future risks not FICOs.

**Excessive executive compensation and expansion**

The acceptance of excessive compensation has provided incentives for executives to stretch prudent lending guidelines.  Shareholders and executives became accustomed to the huge lending volumes and profits of the 2003 refinance boom.  Instead of being prepared for the eventual slow down or market saturation, most lenders began a race to the bottom.  Huge branch expansions were underway hoping to win market share.  As loan volume dried up, the promotion of non-traditional, exotic, extremely risky lending products took off.  Qualification standards were literally thrown out the window because the "carry trade" brought many buyers into the secondary markets.  The securitizations of most of these loans have recourse and it may be years before we know the consequences of this irrational exuberance.  Demand for these products has slowed and now both the borrowers and lenders are more leveraged and exposed than ever before.  Additional branch expansions may result in a continued "carry trade" effect.  Investors will transfer from real estate secured assets to FDIC insured assets.  The increased deposits will force lenders to make additional risky loans or experience inverted/negative margins.  Branch expansions should be limited until the effects of the slowing credit boom, slowing housing market, carry trade and nontraditional products have been quantified.  We are now facing issues much larger than just the risk layering of nontraditional mortgage products.

We can not continue to allow these bubbles to be created under the guise of "laissez faire" and later place blame on greed or corruption.  Who among us would be able to withstand the performance pressures or lure of excessive wealth?  I know if I was in such a powerful position I would prefer to have more regulation over my decisions and especially that of my subordinates.

**1990 Real Estate Bubble / Securitizations / S&L Crisis / Irrational exuberance**

I have been a real estate and mortgage broker for 14 years and have witnessed the aftermath of the 1990 real estate bubble/crash and S&L crisis.  The size of the 1980's real estate bubble is miniscule compared to the current bubble.   The 1980s bubble was created with more strict guidelines and much higher interest rates, but still resulted in much insolvency.   Stated income loans, securitizations and 100% financing was relatively non-existent.  Relative to income, home prices were much more affordable then compared to now.

The FBI and others have documented that loan loss rates are understated, especially within securitized loans.  If a holder of a securitized asset wants or needs to sell that asset they will obviously get a much better price for tranches with good performance.  Is the true performance stated or factual?

At the beginning of 1985 Fed funds were approximately 8%.  By the end of 1986 we reached approximately 6% which helped fuel the 1980s housing boom.  By the peak of this real estate cycle, rates approached 10% in 1989.  Obviously, we had much more room to stimulate the economy than we currently possess.  After Fed funds hit historically low levels in 1993 of 3% the real estate market and economy was still sputtering.  It was not until around 1996 when the internet boom spurred economic activity.  I would argue that it was the internet economy and increased productivity versus monetary policy that was able to finally lift us out of the 1991

recession and real estate crisis.   Although unknown, it is very unlikely we will see another boom like the 1990s.  We have seen increased productivity since 2001, but most of the economic activity has been debt related to housing and the carry trade.  After 1999 everyone was ready and willing to create another bubble.

**Proposal**

Home price and economic stability should be a goal of all agencies.  We have been bouncing from bubble to bubble for decades and the global environment has dramatically changed.  At some point all of our increased leverage will come back to haunt us.  We continue to hide our financial problems: The elimination of the dollar-gold standard, proliferation of securitizations and now the option ARM/non-traditional lending guidelines.  This statement may sound too aggressive, but if we analyze the increased use of the option ARM, stated income guidelines, home appreciation, equity extraction, consumer spending and recent GDP growth there is a direct correlation.  We continue to find ways to over-leverage our incomes while forecasting the most optimistic future scenarios.  The recent stock market bubble is an excellent example. If our government and economic scholars can not exhibit spending restraint or accurate income forecasts how can we expect the average American homeowner to do so.

There are lenders that have recently increased start rates by approximately 25 basis points from 1% to 1.25% or 1.375%, but this does little to curtail negative amortization and payment shocks.  Especially, since lenders have also increased their margins by an equal or greater amount.  These same lenders have also increased their qualification rates, but most of the lenders are still using stated income guidelines.  This appears to be the same old lip service and manipulation.

I would propose to immediately reduce stated income LTVs to 75% or less.  No doc loans should be limited to 70% LTVs.  Relative to incomes many of the most expensive-populated areas are already 20-40% over-valued, so this is a conservative reduction.  Stated or no doc loans should only be used for self-employed or borrowers with a high net worth.  High net worth could be defined as 20% of the proposed loan amount in liquid reserves.

Given that interest rates and option ARM performance are unknowns the agencies should strive to reduce potential payment shocks and defaults.  Current option ARM payments could easily triple once the loans are recast and defaults will obviously rise.  If the agencies feel option ARMs still have a place in the market for "savvy" borrowers why not increase the start rate to a fully indexed rate or 5% which ever is greater.  These loans could still possess negative amortization, but the payment shock will be greatly reduced.  I believe interest only loans are an adequate alternative for the savvy borrower.

Interest rate cycles change and the current environment favors 30 year fixed programs to reduce interest expense.  If investors and homeowners are looking to save on cash flow perhaps they can not afford the home or should look elsewhere for savings.

First time home buyers with 3-10% down-payments should qualify with full documentation loans on 30 year fixed loans (interest only is acceptable).  DTI ratios of 40/45 provided compensating factors (job security, increased income potential, excellent credit, etc). The current difference between a 3, 5, 7, 10 and a 30 year fixed loan is minimal.  No one is able to accurately predict future interest rates, but it is known that we are still at historically low levels.   More than anyone first time homebuyers need stability.

**Other issues**

1) Credit card lending should also be looked at closer. Introductory interest rate offers and the new minimum payments are setting up borrowers for huge payment shocks. Income qualifications should be used for credit lines above $5,000.

2) The agencies should report the findings/reform from the nontraditional mortgage product comments to the IRS. I would hope that tighter lending guidelines will be enforced and thus additional risks to the real estate market would be realized. The proposed elimination or reduction of mortgage interest deductions and property tax deductions could layer additional risks to the real estate market.

3) It is obvious that many lenders have not performed adequate control or monitoring of their products. They should not be allowed to engage in real estate commerce outside of finance.

4) The FDIC should change its policy to support M&A activity where one company is insolvent. This could easily prolong the inevitable failure and greatly increase its magnitude.

Sincerely,


Michael S. Blomquist
408-399-0590 ph

DIANNE FEINSTEIN
CALIFORNIA

COMMITTEE ON APPROPRIATIONS
COMMITTEE ON ENERGY AND NATURAL RESOURCES
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND ADMINISTRATION
SELECT COMMITTEE ON INTELLIGENCE

# United States Senate

WASHINGTON, DC 20510–0504

http://feinstein.senate.gov

September 1, 2005

Mr. Michael Blomquist
18234 Daves Avenue
Monte Sereno, California  95030

Dear Mr. Blomquist:

Thank you for contacting me to convey your concerns about rising home prices.  I appreciate the time you took to write and welcome the opportunity to respond.

I share your concerns about rising home prices and what appears to be increasing speculation in real estate.  I realize that the Federal government must be mindful of how lending standards impact Americans.  Like you, I am concerned about the growing number of negatively amortized home loans as well as interest-only mortgages, which are especially popular in the areas of California where home prices are the highest.  Chairman of the Federal Reserve, Alan Greenspan, articulated his apprehension in testimony before the Joint Economic Committee in June.  According to Chairman Greenspan, low-interest mortgage rates are contributing to "froth" in some local markets and "exotic" loans such as interest-only loans are distressing.  Please know that I am monitoring this situation closely and will be sure to keep your thoughts in mind should legislation related to this issue come to the Senate floor.

Again, thank you for your letter.  It is especially helpful to hear your views on this subject.  If you have further questions or comments, please feel free to contact my Washington, D.C. staff at (202) 224-3841.  Best regards.

Sincerely,

Dianne Feinstein
United States Senator

DF:ar:js

**Exhibit B**



BOARD OF GOVERNORS
OF THE
**FEDERAL RESERVE SYSTEM**
WASHINGTON, D. C. 20551

DIVISION OF CONSUMER
AND COMMUNITY AFFAIRS

September 20, 2005

Michael Scott Properties
18234 Daves Avenue
Los Gatos, CA 95030

Attn:  Mr. Michael Blomquist

Dear Mr. Blomquist:

Thank you for your letter of August 4, 2005, in which you raised a number of issues concerning mergers, a potential housing bubble, and mortgage lending products.  The Federal Reserve is currently gathering information related to a number of residential mortgage lending products, and will take your comments into consideration as we continue to study this matter.

Sincerely yours,

Suzanne G. Killian

Suzanne G. Killian
Assistant Director

Exhibit C

# * WAMU

# Option ARM Worksheet



* 12-mo MTA as of 7/2007 and 6/2003

* Margins can go above 3.050
3.050 is more realistic than 2.050; depends upon credit and commissions paid

**Product Information**

| 1 mo MTA | | $ 1,160,000 |
|---|---|---|
| 0 points | LTV | 80 % |
| 40 Yr Term | | |

**Index, Margin, and Fully Indexed Rate**

| | | |
|---|---|---|
| 12-mo MTA | *4.983 | 2.504 |
| Margin | 3.050 | 2.050 |
| **Fully Indexed Rate** (FIR) | 8.033 | 4.554 % |
| Life Cap | | 9.950 % |

* Interest rates are extremely volatile now. Lower rates are available. Borrowers and market stability are much better off with lower fixed rate mortgage (FRM)

7.5% or lower vs 8.033%

**Calculate MAX monthly w/ payment cap**

| Year | Calculation | Max Pymt |
|---|---|---|
| 1 | Payment Option 1 >> | 3,072.20 |
| 2 | 3072.20 x 1.075 = $ | 3,302.62 |
| 3 | 3302.62 x 1.075 = $ | 3,550.32 |
| 4 | 3550.32 x 1.075 = $ | 3,816.59 |
| 5 | 3816.59 x 1.075 = $ | 4,102.83 |

* Not to exceed payment based upon lifecap *

$4,103 Year 5

$3,817 Year 4

$3,550 Year 3

$3,303 Year 2

$3,072 Year 1

*5 year payment cap scenario based on Minimum Monthly Payment*

* Despite huge increases in interest rates the start rates and payments have remained the same (1 - 1.5%). As Herbert Sandler (World Savings), had noted; start rates typically adjust with interest rates. Unfair, deceptive advertising and competition has kept start rates dangerously low.

* Negative Amortization (added to loan balance)

**Compare to preferred FRM 30**

| | | |
|---|---|---|
| FRM Rate | | 6.000 |
| Monthly Payment | $ | 6954.79 |
| Option 3 Payment | | |
| Difference | $ | 1699.52 |
| Option 1 Payment | | |
| Difference | $ | 3882.58 |

* 7.5
8110.89

(427.48)

(2994.77)

**Payment Options and How to Calculate**

| | |
|---|---|
| 1. Minimum Monthly Payment    (start rate = 1.25 %) = | 3,072.20 |
| 2. Interest Only (Loan Amt x FIR 4.554% / 365 x 30) = | 4,341.90   1269.69 |
|   * 8.033 | * 4,586.66 |
| 3. Principal & Interest 30 or 40 yr (use FIR 4.554%)   * 8,538.37 = | 7,658.86   5,255.26 |
| 4. Principal & Interest 15 yr (use FIR 4.554%)   * 11,105.66 = | 8,905.97 |

Deferred Interest may occur when Minimum Payment is exercised and Interest Only option is larger
(Deferred Interest = Interest Only - Minimum Payment)

* Click Page for hyperlink to Herbert Sandler's comments

OptionARM-Worksheet-**20030610**.xls



**(Exhibit D)
1 of 1 page**

**Table 1: Evolution-Alt-A Collateral**    Sources: Loan Performance, UBS

| Orig Year | TotOrig | ARM Pct | Neg Am | IO % | Innov Pct | AM 40yr | DTI | Stated LTV | CLTV | Silent 2 | L'V Over 80 | FICO Score | FICO Below 700 |
|-----------|---------|---------|--------|------|-----------|---------|-----|-----------|------|----------|-------------|------------|----------------|
| 1998 | 23969.1 | 0.7 | 0 | 0.1 | 0.1 | 0 | 31.1 | 74.4 | 74.5 | 0.1 | 17.1 | 711 | 41 |
| 1999 | 15125.5 | 6.3 | 0 | 0.7 | 0.7 | 0 | 27.6 | 77.5 | 77.5 | 0.1 | 27.5 | 696 | 54.2 |
| 2000 | 14157.1 | 12.7 | 1.1 | 1.1 | 2.2 | 0 | 34.7 | 80.1 | 80.2 | 0.2 | 37.1 | 697 | 52.4 |
| 2001 | 32103.3 | 20 | 0 | 3.9 | 3.9 | 0 | 34.9 | 77.4 | 77.7 | 1.4 | 30.2 | 703 | 47.5 |
| 2002 | 52475 | 28 | 0.4 + | 7.7 = | 8 | 0 | 35.4 | 76.2 | 76.5 | 2.4 | 27.4 | 708 | 43.1 |
| 2003 | 93216.6 10x | 33.9 | 1.7 | 19.6 | 21.3 | 0.1 | 34.4 | 73.1 | 74.9 | 12.4 | 28.5 | 711 | 41.6 |
| 2004 | 195035.6 | 68.6 | 10.2 | 46.4 | 56.6 | 0.5 | 35.5 | 74.9 | 79.5 | 28.5 | 38.6 | 708 | 44.1 |
| 2005 | 341457.7 | 69.6 | 34.2 | 38.5 | 72.7 | 2.7 | 36.2 | 73.9 | 79 | 32.4 | 35.9 | 713 | 41.2 |
| 2006 | 203311.1 | 69.5 | 42.2 | 35.8 | 78 | 10.8 | 37.8 | 74.5 | 80.5 | 38.7 | 41.6 | 708 | 46 |

weighted avg coupon

| Orig Year | Loan Size | Orig WAC | Margin | Penalty | PMI Pct | Purchase | CashOut | Non-Owner | Low Doc | No Doc | CA Pct | Non Conform | 60+Day Delinq |
|-----------|-----------|----------|--------|---------|---------|----------|---------|-----------|---------|--------|--------|-------------|---------------|
| 1998 | 154 | 7.89 | 3.2 | 5.6 | 13.5 | 44.9 | 28.6 | 21.2 | 57 | 0.8 | 41.2 | 41.1 | 3.63 |
| 1999 | 151 | 8.28 | 3.6 | 15.9 | 25 | 51.9 | 28.4 | 21.7 | 53.1 | 4.8 | 32.6 | 35.9 | 4.82 |
| 2000 | 185 | 9.18 | 3.4 | 20.9 | 37.1 | 68.1 | 20.6 | 16.4 | 56 | 4.2 | 35.2 | 51.7 | 5.63 |
| 2001 | 255 | 7.88 | 2.9 | 21.2 | 29.3 | 50.4 | 30.8 | 11 | 58.3 | 6.5 | 41.5 | 68 | 7.01 |
| 2002 | 244 | 7.07 | 2.8 | 29.9 | 21.6 | 47.4 | 29.8 | 15.3 | 55.9 | 7.9 | 41.6 | 58 | 4.99 |
| 2003 | 229 | 5.99 | 2.7 | 28.8 | 14.3 | 39.4 | 33.5 | 21.4 | 58.1 | 7.6 | 43.1 | 45.8 | 1.96 |
| 2004 | 244 | 5.33 | 2.8 | 35.3 | 11.5 | 54 | 30.1 | 20.6 | 59.2 | 6.4 | 42.5 | 43.5 | 2.73 |
| 2005 | 288 | 4.48 | 2.9 | 43 | 6.2 | 49.4 | 37.1 | 19.4 | 68.4 | 3.9 | 43.3 | 49.8 | 2.21 |
| 2006 | 312 | 4.8 | 3.1 | 51.5 | 5 | 45.8 | 38.5 | 17.6 | 79.8 | 3.7 | 43 | 45 | 1.67 |

Low loan sizes and high delinquencies.
Incomes have remained flat.
ARMs UP

Sources: LoanPerformance, UBS

**2006 Alt-A Collateral (by product type)**

| Product | CurrBal | Loan Size | DTI | Stated LTV | Silent2 | CLTV | LTV>80 | FICO Score | Low Doc | CA % | Purchase | 60+ Day Delinq |
|---------|---------|-----------|-----|-----------|---------|------|--------|------------|---------|------|----------|----------------|
| FRM | 35,195 | 220 | 39 | 72 | 28 | 77 | 34 | 708 | 74 | 21 | 47 | 1.14 |
| FRM IO | 21,549 | 277 | 39 | 75 | 46 | 83 | 49 | 711 | 73 | 27 | 57 | 1.73 |
| ARM | 5,742 | 262 | 38 | 74 | 46 | 83 | 48 | 707 | 71 | 26 | 59 | 3.53 |
| ARM IO | 42,270 | 337 | 38 | 76 | 57 | 86 | 57 | 709 | 76 | 42 | 65 | 3.16 |
| Option ARM | 77,336 | 396 | 37 | 75 | 32 | 78 | 33 | 707 | 88 | 60 | 30 | 0.87 |

Current Balance, Loan Size and Risk are double other loan products

88% of originations are low doc (NIV) debt to income (DTI) is most likely fraudulent

Delinquencies are highest for ARMs, triple the fixed rate mortgages (FRM) in some cases.

Loan to Value (LTV) is as believable as (NIV)

Interest/Only (IO) loans have higher delinquencies than amortized loans.

Low delinquency for option ARM is attributed to deceptively low payment structure. When option ARMs recast, usually after 5 years the payments can triple. (Exhibit E)

Many borrowers use these products as affordability loans, not because they are financially savy.

1 of 1 page



### First American Title Company

**Exhibit F**
**(1 of 1 page)**

### Seller's Estimated Settlement Statement

**Property:** Home was purchased 12 / 2004 for $617,000. The only improvements were exterior paint after the new loans were in place. Lenders previously had seasoning requirements where by new appraisal to assess loan to value limitations required either event:

1) Owner to maintain payments for 1 year before a new/higher appraised value could be used for loan qualifcations. (this provided safe and sound guidelines in a rapidly appreciating market; borrowers were limited on "no/little money down cash back loans")

**Buyer:**
**Address:**

2) Documented improvements to increase value from original purchase price/appraisal.

**Seller:**
**Address:**

**File No:**
**Officer:**
**New Loan No:**
**Settlement Date:**
**Disbursement Date:** 05/31/2007
**Print Date:** 4/23/2007, 1:24 PM

| Charge Description | Seller Charge | Seller Credit |
|---|---|---|
| **Consideration:** | | |
| Total Consideration | | 700,000.00 |
| | | |
| **Prorations:** | | |
| County Tax 05/31/07 to 07/01/07 @$7819.72/yr | | 664.14 |
| **Commission:** | Original loan balance was $568,000 on September 2005. This is a refinance loan from the original purchase loan on 12/04. The loan balance has grown by $27,720. As rates and | |
| Commission Paid at Settlement | compounding interest continue to rise so will the loan balance. 21,000.00 | |
| Commission Paid at Settlement | Current deferred interest / negative amortization is $2,193.71. 21,000.00 | |
| **Payoff Loan(s):** | This amount is more than double the borrowers minimum payment of $1,963.92. | |
| Lender: | (Exhibit G) | |
| Principal Balance - ESTIMATED  - | 595,720.00 | 595,720 |
| Interest on Payoff Loan - ESTIMATED 04/01/07 to 05/31/07 @7.500000% - | 7,466.90 | |
| Statement/Forwarding Fee - ESTIMATED  - | 30.00 | |
| Reconveyance Fee - ESTIMATED  - | 45.00 | |
| Recording Fee - ESTIMATED  - | 21.00 | |
| Lender: Washington Mutual | | |
| Principal Balance - ESTIMATED  - Washington Mutual | 96,000.00 | |
| Interest on Payoff Loan - ESTIMATED 04/01/07 to 05/31/07 @11.000000% - Washington Mutual | 1,764.82 | |
| Statement/Forwarding Fee - ESTIMATED  - Washington Mutual | 30.00 | |
| Reconveyance Fee - ESTIMATED  - Washington Mutual | 45.00 | |
| Recording Fee - ESTIMATED  - Washington Mutual | 21.00 | |
| **Title/Escrow Charges to:** | Traditionally lenders would not have funded a second/equity line behind a first loan with negative amortization, especially such a large and leveraged second/equity line. | |
| Escrow Fee - First American Title Company | 930.00 | |
| Eagle Owners Policy - First American Title Company | Plaintiff alleges that the lenders have concealed the original loan fraud by providing additional financing to distressed 1,736.00 | |
| Wire Transfer Fee - First American Title Company | borrowers. Additional financing keeps the first loan current 30.00 | |
| Document Preparation - First American Title Company | while repurchase agreement expires. Executive bonuses 50.00 | |
| Overnight Mail Service - First American Title Company | have been maintained and/or increased by loan fraud. 55.00 | |
| Notary/Signing Fee - First American Title Company | A per se tying violation. Borrowers are restrained 40.00 | |
| County Documentary Transfer Tax - First American Title Company | from seeking other financing when other lenders 770.00 | |
| City Documentary Transfer Tax - First American Title Company | will avoid delinquent borrowers. Current 2,310.00 | |
| | lender, WM continues to extend credit | |
| **Disbursements Paid:** | | |
| Home Warranty - TO BE ORDERED* to First American Home Buyers Protection | 285.00 | |
| Tax 1st Inst: 2006-2007 w/Penalty to Santa Clara County Tax Collector | 4,320.84 | |
| Tax 2nd Inst: 2006-2007 w/Penalty to Santa Clara County Tax Collector | 4,320.84 | |
| Natural Hazard Report to TerraCheck Attn: Accounting Department | 130.00 | |
| Termite Work - EST to To Be Determined | 3,500.00 | |
| | Amount does not include prepayment penalty of approximately $20,000 | |
| **Cash ( To) (X From) Seller** | | 60,957.26 |
| | | |
| **Totals** | 761,621.40 | 761,621.40 |

Total interest only payment is **$4,153.63   $1,963.92**
This payment does not include:
equity line payment  (Exhibit H)     $823.76     $823.76
Property Taxes (listed below)     $720.14     $720.14
Insurance     $100.00     $100.00

Total payment differences     **$5,797.53   $3,607.82**

Borrower's income is     **$6,952.54**
Borrower's payments are 83% of GROSS INCOME

Borrower's minimum payments is 52% of GROSS INCOME

After 5 years it is very likely the borrower's minimum interest payment will triple.

**This is NOT a subprime loan!**

**(Exhibits G&H)**

Borrower obtained loans with no income verification (NIV)

This scenario is not a rare example. Fraudulent NIV loans and deceptive option ARMS have become an industry standard, especially in California and Santa Clara County; the Plaintiff's primary county of business.
(Exhibit E)

Borrower has attempted to mitigate the loss by requesting for a short-sale. As of the date of this esimated settlement statement the loss would be $60,967.26 + pre-payment penalty of approximately $20,000. Real estate commissions are negotiable. This amount is growing by $2,197.71, property values are declining and this assumes a sale of $700,000 when similar, surrounding properties have been selling for less.

Lender's Loss Mitigation Requirements are:
1) Provide income documentation showing you can't afford loans (incriminating?)
2) Sign promissory note for amount of deficiency despite foreclosure erasing debt.
3) Foreclosure or short-sale; the lender will send borrower a 1099 for lender's loss. Depending upon tax laws and time of ownership borrower could have tax liability.

Many borrowers who purchased at the peak with 100% financing, will lose their homes and have tax liability.

Government is bailing out lenders and allowing these unsafe and unsound banking / lending practices to continue while taxing defaulting homeowners.
(Exhibit F)
1 of 1 pages

## HOME LOAN STATEMENT MARCH 2007 *(vertical left margin)*

### ⬤ **Washington Mutual**

Page 1 of 4

Customer Service: Toll free 1.866.926.8937 Se habla español
TDD: Dial 7-1-1 for relay assistance
www.wamu.com

# Home Loan Statement
## March 2007

| | |
|---|---|
| Statement Date: | March 12, 2007 |
| Activity Since: | February 12, 2007 |
| Your Loan Number: | |

### Your Property and Loan Information

Property Address:

| | | |
|---|---|---|
| Principal Balance: | $ | 595,719.58 |
| Interest Rate: | | 8.37500% |
| Escrow Balance: | $ | 0.00 |
| Unpaid Interest, Loan to Date: | $ | 29,073.16 |

**Loan was originated September 2005**

### Did You Know?

Please refer to your mortgage interest statement (IRS Form 1098) for more detailed year-end information. If you need a duplicate copy of your mortgage interest statement for 2006, please visit us at www.wamu.com or call us toll-free at 1-866-926-8937.

For details about your home loan, visit us at www.wamu.com. Check recent transactions, order copies of your loan documents, view your current principal balance, or use one of the many helpful loan calculators. If you're a first time user, simply click on "My Home Loan" and follow the prompts to register by selecting a User ID and Password.

### Your Next Payment

| | | |
|---|---|---|
| Next Payment Due: | | April 01, 2007 |
| Minimum Payment: | $ | 1,963.92 |
| Escrow: | $ | 0.00 |
| Current Payment: | $ | 1,963.92 |
| **Total Minimum Due:*** | $ | 1,963.92 |

**Additional Payment Options:**
Each of the following payment options will include an Escrow Payment and/or Late Charges, when applicable.

| | | |
|---|---|---|
| 1. Minimum Due: | $ | 1,963.92 |
| 2. Interest Only Payment: | $ | 4,157.63 |
| 3. Full Principal and Interest Payment: (based on the remaining scheduled term of your loan) | $ | 4,579.08 |
| 4. Full Principal and Interest Payment: (based on a 15-year term) | $ | 6,130.88 |

### Important Messages

* To avoid a late charge of $98.20, we must receive at least the Total Minimum Due, and any escrow deposits and/or past-due payments by 04/16/07 during our business hours. If this date falls on a weekend or holiday, your payment must be received by the next business day.

**Paying only the Minimum Payment may cause your outstanding principal balance to increase. Explanations of your payment options and Recent Account Activity are on the reverse of this statement.**

**Difference $2,193.71 negative amortization**

### Adjustable Rate Mortgage Information

| | |
|---|---|
| Index Value: | 4.98333 |
| Margin: | 3.45000 |
| For Payment Due: | April 01, 2007 |
| Interest Rate: | 8.37500% |

### Year to Date Account Activity

| | | |
|---|---|---|
| Principal Paid: | $ | 6,429.35- |
| Interest Paid: | $ | 12,321.11 |
| Property Taxes Paid: | $ | 0.00 |
| Insurance Paid: | $ | 0.00 |

Washington Mutual Bank

 

---

### ⬤ **Washington Mutual**
#### HOME LOANS

908-B

Loan Number:
Statement Date:  March 12, 2007

⬤ Please write your loan number on your check. Make check payable to Washington Mutual.

☐ Please check here if change of address or telephone number is indicated on the reverse side of this form.

WASHINGTON MUTUAL
PO BOX 78148
PHOENIX AZ 85062-8148

Please allow 7-10 days for postal delivery.

| | | |
|---|---|---|
| Payment Due Date: | | April 01, 2007 |
| Current Payment: | $ | 1,963.92 |
| **Total Minimum Due:** | $ | 1,963.92 |
| If Received After: | | April 16, 2007 |
| Total Minimum Plus Late Charges: | $ | 2,062.12 |

**Making Your Payment**
Please include in your payment amount --- either the Total Minimum Due or one of the Additional Payment Options selected from the "Your Next Payment" section above --- and indicate how to apply any additional funds. If you include additional funds and do not indicate how to apply them, we will apply them first to applicable advances, then to any fees due and then to principal.

| | | |
|---|---|---|
| Payment Amount | | |
| Late Charges | + | _____ |
| Additional Principal | + | _____ |
| Additional Escrow | + | _____ |
| Future Payments | + | _____ |
| **Total Amount Enclosed** | = | _____ |

**(Exhibit G)**
**1 of 1 page**

**Washington Mutual**

Date: 06/28/07

Re:

# Loan Status

| | |
|---|---|
| Loan status as of: | 06/28/07 |
| Account Status : | OPEN |
| Principal balance: | $96,000.00 |
| Loan description: | REVOLVING CRED |
| Interest rate: | 10.44% |
| Loan origination date: | 03/21/2007 |
| Next due date: | 07/01/2007 |
| Next due amount: | $823.76 |
| Available Credit: | $0.00 |
| Credit Line: | $0.00 |

We appreciate your business and thank you for the opportunity to serve you. If you have further questions or need additional assistance, please contact one of our friendly Consumer Loan Services Bankers at 1-888-800-8738. We're here for you Monday through Friday from 5 a.m. to 6 p.m. and Saturday from 5 a.m. to 2 p.m. (Pacific Time).

Washington Mutual
Consumer Loan Services

**(Exhibit H)**
**1 of 1 page**



STATE FARM INSURANCE COMPANIES

State Farm General Insurance Company

6400 State Farm Drive
Rohnert Park, CA  94926-0001

**NOTICE OF CANCELLATION**

| POLICY NUMBER | |
| --- | --- |
| Homeowners Policy DATE CANCELED | MAR 31 2007 |

| DATE DUE | PLEASE PAY THIS AMOUNT |
| --- | --- |
| MAR 01 2007 | $927.00 |

Payer - Insured

## Borrower is in default if insurance is not current.

## Lender denies loss mitigation (Exhibit J) because borrower is "current" on payments.

Mortgagee:
WASHINGTON MUTUAL BANK
ITS SUCCESSORS AND/OR ASSIGNS
PO BOX 100590
FLORENCE SC 29501-0590

## Forced place insurance is considerably more expensive.

Location:   Same as Mailing Address

Payer - Insured
Loan No:

Important Message(s)

As of the "Date Prepared" shown below, we have not received the premium required to keep this policy in force.  Therefore, this policy is canceled effective 12:01 a.m. (or NOON if required by state law) on the "Date Canceled" shown hereon.  Upon your written request, we shall then furnish the facts on which this cancellation is based.  If full premium payment has been made and/or is received and accepted prior to or on the date of cancellation, you will receive a Notice of Reinstatement, verifying continuous and uninterrupted coverage under this policy.

**(Exhibit I)**
**1 of 1 page**

 **WaMu**®

**(Exhibit J)**
**1 of 2 pages**

7255 Baymeadows Wy.
Jacksonville, FL 32256

June 27, 2007

███████████
███████████
███████████                                    ██████

WE ARE A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT,
AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

WE HAVE TOLD A CREDIT BUREAU ABOUT A LATE PAYMENT, MISSED PAYMENT
OR OTHER DEFAULT ON YOUR ACCOUNT. THIS INFORMATION MAY BE
REFLECTED IN YOUR CREDIT REPORT.                                 **?**

IF YOU ARE IN BANKRUPTCY OR YOU HAVE BEEN DISCHARGED IN BANKRUPTCY,
THIS LETTER IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT INTENDED
AS AN ATTEMPT TO COLLECT A DEBT OR AS AN ACT TO COLLECT, ASSESS
OR RECOVER ALL OR ANY PORTION OF THE DEBT FROM YOU PERSONALLY.

RE: Loan Number: ██████████

Dear ████████████

At Washington Mutual, we are committed to keeping you informed about
issues that affect your account. That is why we are writing today
with important information about your request for a workout solution
on the home loan referenced above.

Unfortunately, after reviewing your situation, we have determined
that we are canceling your request for a loan workout because
ACCOUNT CURRENT.

As a result of this decision, we have no choice but to continue with
the normal default servicing activities commenced on this loan
before your workout request was submitted.

If you have any questions or if your situation changes, please call us
toll free at 1-866-288-7383 between 8 a.m. and 5 p.m., Eastern Time.

Sincerely,

D TAYLOR
Loan Workout Specialist
Loss Mitigation Department
Washington Mutual Bank

██████████████████████

**Borrower elected not to proceed with loss mitigation because
of the following requirements:**
**1) Supply of incriminating income documentation showing he
could not afford the loan.  (Single and only borrower)**
**2) Promissory note**
**(foreclosure will not require $80,000+ to be repaid)**

**Some borrowers could have tax liability.  This borrower has
owned the home since 2004; so he is eligible for the $250,000
exemption.  Many other borrowers are not.**

**Lenders should be more cooperative with loss mitigation and
forced to return to proven underwriting guidelines.**

**Executives, defendants and loan agents receiving bonuses
and commissions for these loans are criminals.  This is loan
fraud and has temporarily and artificially increased property
values.**

⌂ Equal Housing Lender

---

 **WaMu**®

**(Exhibit J)**
**page 2 of 2**

7255 Baymeadows Wy.
Jacksonville, FL 32256

██████████

Page 2
Loan Number: ██████████

Our credit decision was based in whole or in part on information
obtained in a report from the consumer reporting agency listed
below. You have a right under the Fair Credit Reporting Act to know
the information contained in your credit file at the consumer
reporting agency. The reporting agency played no part in our
decision and is unable to supply specific reasons why we have denied
credit to you. You also have a right to a free copy of your report
from the reporting agency, if you request it no later than 60 days
after you receive this notice. In addition, if you find that any
information contained in the report you receive is inaccurate or
incomplete, you have the right to dispute the matter with the
reporting agency.

Equifax Credit Information Services, Inc.
P.O. Box 105851
Atlanta, GA 30348
Toll-free number 1-800-685-1111

The Federal Equal Credit Opportunity Act prohibits creditors from
discriminating against credit applicants on the basis of color,
religion, national origin, sex, marital status, age (provided that
the applicant has the capacity to enter into a binding contract);
because all or part of the applicant's income derives from any
public assistance program; or because the applicant has in good
faith exercised any right under the Consumer Credit Protection Act.
The federal agency that administers compliance with this law
concerning Washington Mutual Bank is the Office of Thrift Supervision
Regional Director, P.O. Box 7165, San Francisco, California 94120.

LO-LM753-010-CCO.4373.021306

Source: Federal Reserve Z.1

## L.218 Home Mortgages (1)

Billions of dollars

| | | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Total liabilities | 3459.2 | 3682.8 | 3917.6 | 4274.3 | 4699.6 | 5118.6 | 5649.5 | 6381.8 | 7183.1 | 8257.2 | 9387.0 | 10288.1 | 1 |
| 2 | Household sector | 3332.7 | 3538.2 | 3754.3 | 4055.9 | 4432.9 | 4810.5 | 5296.4 | 5978.6 | 6837.6 | 7824.5 | 8876.3 | 9704.7 | 2 |
| 3 | Nonfinancial corporate business | 7.2 | 8.3 | 8.6 | 10.0 | 12.1 | 14.1 | 16.2 | 16.9 | 18.8 | 23.5 | 31.1 | 39.4 | 3 |
| 4 | Nonfarm noncorporate business | 119.3 | 136.3 | 154.7 | 208.4 | 254.6 | 294.1 | 336.9 | 386.4 | 326.6 | 409.3 | 479.6 | 544.1 | 4 |

 **WORLD SAVINGS**

March 29, 2006

Office of Thrift Supervision
regs.comments@ots.treas.gov
Docket Number 2005-56

### Re: Proposed Guidance Concerning Alternative Mortgage Products

Ladies and Gentlemen:

World Savings appreciates the opportunity to comment on the proposed guidance on alternative mortgage products. As discussed further below, we are in a rather unique position to offer a real-world perspective on these issues since we have had success and minimal risk originating adjustable rate mortgages with payment options (Option ARMs) for a quarter of a century. We hope that our perspective will be of value to the agencies as discussions about the guidance proceed.

As you know, we have long supported a regulatory regime that encourages lenders to provide full and fair disclosures to customers and to prudently manage their lending practices. Given our reputation as a conservative residential mortgage portfolio lender, it should come as no surprise that we fully support the guidance insofar as it reminds banks and thrifts to:

- Maintain strong underwriting, appraisal, compliance and risk management functions;
- Actively measure, monitor, and control risks, including through the use of stress testing, early warning systems and appropriate loss mitigation strategies;
- Maintain appropriate capital levels and allowances for loan losses;
- Avoid diluting underwriting standards to stimulate volume or otherwise ceding underwriting standards to third parties;
- Avoid lending practices that could be predatory or abusive; and
- Provide consumers with clear and timely disclosures.

Of course these sound practices are relevant to any loan a bank might offer, whether it has a fixed or adjustable rate and whether it is for residential or commercial purposes. We certainly support the reemphasis of these principles in the proposed guidance.

We do offer a few suggestions based on our long experience with ARM lending. As discussed in greater detail below, in some instances we think the guidance may not have gone far enough in addressing recent practices in the industry, and in a few other areas we believe specific changes to the proposed guidance are warranted.

1901 Harrison Street
Oakland, California 94612-3587
510.446.6000

1

(Exhibit L)
1 of 9 pages

**Enron & WorldCom touted similar statistics.**

**About World Savings**

World Savings is one of the nation's 15 largest financial institutions with $125 billion in assets, and we currently make residential loans in 39 states. Our parent company, Golden West Financial Corporation, was originally incorporated in 1963 to acquire a small, $34 million institution headquartered in Oakland, California. Golden West has been publicly held since 1969, and our earnings per share have compounded at 19% annually during the past 39 years, a record that, to the best of our knowledge, is unequalled by any other American company, with the possible exception of Berkshire Hathaway. For all that time, we have remained a residential mortgage portfolio lender and we engage in no other business activity. World Savings is also the only independent thrift that has ever been awarded a "Double A" rating from Moody's and S & P.

**Moody's & S&P are no longer credible companies**

Much of our senior management has been in place for 25 years or more and has been actively involved in mortgage lending before, during and after the savings and loan debacle of the late 1970s and 1980s that resulted in the failure of thousands of institutions and cost taxpayers in excess of $150 billion before interest (and an estimated $500 billion-plus after interest). Both before and after that crisis, we spoke repeatedly with regulators, members of Congress and their staffs, Administration officials and others of the risks associated with borrowing short and lending long and the importance for banks to maintain sufficient capital. Working with other major portfolio lenders, we were instrumental in obtaining federal authority to make ARMs to protect against the systemic risks inherent in portfolio fixed-rate mortgage lending.

**Products that have over inflated the market and concealed defaults**

We are among the few management groups still around that has been originating, maintaining in portfolio, and servicing Option ARMs for the past 25 years. Option ARMs have been our core product ever since ARMs were first authorized in 1981, and they now comprise 99% of our portfolio. We have been originating these loans, and with extremely low losses, throughout interest rate cycles, recessions and home price declines. Our annual chargeoffs have averaged less than 5 basis points since 1981, which is lower than that of virtually every other depository institution of size, including institutions that have made only fixed-rate residential mortgage loans. We believe that our low chargeoff levels have been equal to or superior to that of Fannie Mae and Freddie Mac, even though our core product has been the Option ARM while the GSEs have essentially held fixed-rate loans and have had the benefit of being more widely diversified geographically.

During the past quarter century, we have not identified a single delinquent loan in our portfolio, much less a foreclosure or loss, due to the structure of our Option ARM product.

**It is alleged that the use of Option ARM loans and NIV guidelines have over-inflated home prices. The access to credit from appreciation versus affordability has been the catalyst behind low loan defaults with the Option ARM.**

**World Savings' business is highly concentrated in California, which has experienced the most appreciation. Exhibit M defines the true performance of these loans. experienced**

**A Brief History of the Option ARM**

We want to offer some additional background on the history of the Option ARM in the United States because it will help put our subsequent comments in context.

Late in the first phase of the savings and loan debacle in May 1981, Federal Home Loan Bank Board Chairman Richard Pratt authorized federal thrifts to originate a mortgage product other than a fixed-rate mortgage for the first time, namely the ARM. The decision was based on a desire to help lenders, most of which were portfolio lenders, avoid the significant interest rate risks associated with borrowing short and lending long. Indeed, in the wake of the savings and loan crisis, bank regulators aggressively discouraged fixed-rate lending and strongly encouraged the industry to shift to originating ARMs.

For some time before 1981, we and other major financial institutions in California and throughout the country, together with trade groups and others, began to study the various forms of ARMs. The research took us to Great Britain and other parts of Europe where adjustable rate residential mortgages had been in use for many years. At the end of the day, there were essentially two alternate structures: the Option ARM that includes protections against payment shock such as annual payment caps and a borrower's ability to defer interest, and the "No Neg" ARM that is more likely to result in payment shock as interest rates rise.

Major U.S. financial institutions heavily involved in mortgage lending did an enormous amount of analysis and ran innumerable simulations. Our company alone ran several thousand simulations, analyzing the various alternative forms of ARMs under a large variety of stress situations. The No Neg ARM was adopted by many companies in the East, primarily smaller institutions. All the major thrifts on the West Coast, and various others throughout the country, chose the Option ARM. Our simulations demonstrated that the No Neg ARM posed significant concerns about early, and continuing, payment shock to the borrower as rates increase. Experienced lenders were concerned that by using the No Neg ARM, they might be exchanging interest rate risk protection for serious potential credit risk problems. Since we were all portfolio lenders – that is, we originated loans and held them in our portfolios – it was imperative that the loan work for borrowers and at the same time not present inappropriate risks to portfolio lenders.

For the first two-plus decades after the Option ARM was authorized, the loan was originated principally by portfolio lenders who needed a loan product they could keep in portfolio without significant interest rate or credit risk. During that time, the Option ARM had little appeal to lenders who were not going to hold it in portfolio because the Option ARM was only a small portion of the total mortgage market, and the loans required a significant investment in personnel and sophisticated systems to service the loans effectively. We and other portfolio lenders all understood the dangers of sacrificing quality for volume, and we knew that effective underwriting, appraisal and other risk management practices were critical to managing a portfolio of Option ARM loans.

The traditional Option ARM product is essentially unchanged since 1981. What has changed in the last few years, particularly since the emergence of a securitization market willing to acquire greater numbers of Option ARMs, are more aggressive practices by new Option ARM originators, many of whom lack a sophisticated understanding of the loan and appear focused principally on generating volume. These aggressive practices include deeper discounts between the loan's fully-indexed rate and the starting payment rate (referred to as the "payment discount"), diluted underwriting standards, and shortcut appraisal practices. It is these emerging practices that have increased the visibility, and we believe the risks, associated with the Option ARM product and that have lead, ultimately, to the proposed guidance.

**Strengthening the Guidance**

We applaud the regulators for issuing the proposed guidance to highlight practices that can be risky to both consumers and lenders. As discussed below, we think the guidance needs to more fully address the emerging practices referenced above, including in particular Option ARMs that are offered with deep payment discounts, which has been facilitated by a growing secondary market.

Deep Payment Discounts

Those of us experienced in Option ARM lending have long known that a critical issue, arguably *the* critical issue (assuming high-quality underwriting and appraisals), affecting the risk level of the Option ARM loan is the payment discount. As a result, we and other residential mortgage portfolio lenders traditionally limited the payment discount to a range of 150-300 basis points in a rising rate environment and 250-400 basis points in a declining rate environment. In recent years, however, some lenders have boosted their Option ARM production volumes by promoting very low initial payment rates, generally 1% or less. These lenders have maintained their low payment rates despite the 375 basis point increase in the Federal Funds rate since mid-2004, which has resulted in payment discounts of 550 basis points today. Simulations show that payment discounts at these high levels present greater risks than the lower payment discounts that had traditionally been used by portfolio lenders. We think the practice of deep payment discounts deserves greater regulatory scrutiny than the passing reference in the proposed guidance.

Some might claim we raise this point about payment discounts because we are concerned about competing against new Option ARM lenders. Our concern has nothing to do with remaining competitive, and we have long outlasted and outperformed past competitors who acted irrationally. We could certainly increase our Option ARM production, and short-term financial results, by offering deeply discounted loans with starting payment rates of 1% or lower. After all, our sales force and back-office support systems are oriented toward Option ARM production. The sole reason we have been willing to forego volume and raise our starting payment rates as market rates have increased is because Option ARMs with deep payment discounts present inappropriate levels of risks to borrowers and to lenders. We have been originating this loan long enough, and have run enough simulations, to recognize fool's gold when we see it. Our concern is that

Despite all the lip service World was originating deep payment discount option ARMs with start rates of approximately 1.5%. Even today August 16, 2007 World is advertising 1.95% start rates. Sandler must have been concerned about competition and this is the gravamen behind the antitrust cause.

4

(Exhibit L)
4 of 9 pages

**See Exhibit M**

foolish lenders who eventually stumble under the weight of their missteps will bring down innocent borrowers with them and leave the rest of us to clean up the mess, as we have done before.

**This is an extremely arrogant statement considering the current condition of his Savings and Loan.**

Given the importance of this issue, we suggest the agencies consider adding more discussion in the guidance of the risks of inappropriately steep payment discounts. One suggestion might be to add the following or similar language on page 19 of the proposed guidance, at the end of the subsection headed Introductory Interest Rates:[1]

> "Among other things, where discounted initial payments are offered, simulations should first be run that analyze the impact of various starting payment rates over the long term. Introductory payments that are deeply discounted are of particular supervisory concern, absent other mitigating factors such as lower LTV ratios."

Secondary Market Transactions

The other significant development in recent years is a growing secondary market for Option ARMs, which has facilitated, and even stimulated, the origination of Option ARMs with deep payment discounts. Greater volumes of Option ARM loans have been originated in the market in the past few years primarily by aggressively promoting loans with very low payment rates that lenders then pool into securities, slice into multiple tranches with varying risk characteristics, and sell to investors.

Lenders who sell Option ARMs in the secondary market typically either have a mortgage banking business model requiring the production and sale of a large volume of loans to generate sufficient income, or they are portfolio lenders who sell Option ARM loans because of capital or funding constraints. In either case, continued demand from the secondary market is critical for the business model to succeed, and the sellers' Option ARMs are often structured to the standards investors will accept, which may differ from the standards used by lenders who keep their Option ARM production in portfolio. Although the secondary market has been receptive in the last two years to securities collateralized by Option ARMs, investor interest could wane for reasons ranging from higher-than-expected default rates in Option ARM pools to a global financial crisis such as occurred in 1998 that depresses capital market funding and securitization activity and triggers a revaluation of collateral.

The proposed guidance appropriately cautions against other risks that also can occur with secondary market sales, including reputational risk and implicit recourse. Sellers into the secondary market are not immune from the risks of losses from loan delinquencies and foreclosures. If there are a large number of problem loans in a securitization structure, the originator may repurchase troubled loans for a variety of reasons, including the originator's reputation and franchise value, inaccurate disclosures or representations, or the constraints on being able to offer flexible loan workouts when the loans are in a trust. A repurchase would trigger a capital charge for the affected loans. In addition, under the

---

[1] The references to "introductory interest rates" on page 19 of the guidance should more accurately be referred to as "introductory payment discounts."

Portfolio lenders are much more dependant upon depositors' money, which are insured by the FDIC.
The FDIC has approximately 1% of insured deposits available in the deposit insurance fund (DIF)

implicit recourse regulations, a bank could be required to hold capital on its entire sold portfolio or securitization if its repurchases expose the bank's earnings and capital to potential risk of loss, such as could occur if delinquent loans are repurchased at par (as is contemplated by most pooling and servicing agreements), even if the loans' fair value is less than par, or if the bank provides other support beyond its contractual obligations.

We do not mean to suggest that all securitizations of Option ARMs are problematic or that Option ARMs should only be made by portfolio lenders. However, portfolio lenders have very strong economic and reputational incentives to make high-quality loans and to manage credit risk through appropriate starting payment rates, underwriting and appraisal practices, and consumer disclosures. In addition, portfolio lenders are not dependent on the availability of the securitization market. Time will tell if new Option ARM lenders who hold minimal capital and rely on the secondary market fare as well when they sell pools of loans, including loans with deep payment discounts. We think the potential risks are certainly worthy of greater regulatory scrutiny.

Loans originated for sale increased by 57% for the 3 months ending June 30, 2006 from June 30, 2005.
Loan originations declined 13% during this time.

In light of these concerns, we suggest that the agencies consider adding the following or similar language on page 25 of the proposed guidance, at the end of the subsection headed Secondary Market Activity:

"In cases where there have been secondary market sales of alternative mortgages, examiners will review the quality of the collateral and the terms of the pooling and servicing agreements, including representations and warranties and other provisions allowing or requiring repurchases of loans. Examiners will also evaluate if repurchases are likely in order to facilitate loan workouts, preserve reputation and franchise value, and address similar issues. Examiners will review the institution's servicing practices and ensure that the institution has adequate capital and other resources to handle potential repurchases and workouts, including capital levels required under implicit recourse regulations."

**Suggestions for Specific Revisions to the Guidance**

There are a few other specific areas where we suggest the guidance should be revised to more accurately reflect the history of the Option ARM loan.

*Alternative* Mortgages

We submit that "alternative" is a more accurate term to describe these loan products than "nontraditional." Although the guidance states that these loans are "often referred to as nontraditional mortgage loans," (pp. 8, 13) the first time we ever heard the term "nontraditional" was in the proposed guidance itself. Congress used the term "alternative" mortgages when it passed the Alternative Mortgage Transactions Parity Act of 1982 in response to the crisis caused largely by the interest rate risk of "traditional" fixed-rate lending, and "alternative" is also the term currently used by several banking agencies in existing regulations governing these exact types of loans. We are not aware of any historical basis for the term "nontraditional," and it strikes us as having a

Portfolio lenders are much more dependant upon depositors' money, which are insured by the FDIC. The FDIC has approximately 1% of insured deposits available in the deposit insurance fund (DIF)

implicit recourse regulations, a bank could be required to hold capital on its entire sold portfolio or securitization if its repurchases expose the bank's earnings and capital to potential risk of loss, such as could occur if delinquent loans are repurchased at par (as is contemplated by most pooling and servicing agreements), even if the loans' fair value is less than par, or if the bank provides other support beyond its contractual obligations.

We do not mean to suggest that all securitizations of Option ARMs are problematic or that Option ARMs should only be made by portfolio lenders. However, portfolio lenders have very strong economic and reputational incentives to make high-quality loans and to manage credit risk through appropriate starting payment rates, underwriting and appraisal practices, and consumer disclosures. In addition, portfolio lenders are not dependent on the availability of the securitization market. Time will tell if new Option ARM lenders who hold minimal capital and rely on the secondary market fare as well when they sell pools of loans, including loans with deep payment discounts. We think the potential risks are certainly worthy of greater regulatory scrutiny.

Loans originated for sale increased by 57% for the 3 months ending June 30, 2006 from June 30, 2005. Loan originations declined 13% during this time.

In light of these concerns, we suggest that the agencies consider adding the following or similar language on page 25 of the proposed guidance, at the end of the subsection headed Secondary Market Activity:

"In cases where there have been secondary market sales of alternative mortgages, examiners will review the quality of the collateral and the terms of the pooling and servicing agreements, including representations and warranties and other provisions allowing or requiring repurchases of loans. Examiners will also evaluate if repurchases are likely in order to facilitate loan workouts, preserve reputation and franchise value, and address similar issues. Examiners will review the institution's servicing practices and ensure that the institution has adequate capital and other resources to handle potential repurchases and workouts, including capital levels required under implicit recourse regulations."

**Suggestions for Specific Revisions to the Guidance**

There are a few other specific areas where we suggest the guidance should be revised to more accurately reflect the history of the Option ARM loan.

*Alternative* Mortgages

We submit that "alternative" is a more accurate term to describe these loan products than "nontraditional." Although the guidance states that these loans are "often referred to as nontraditional mortgage loans," (pp. 8, 13) the first time we ever heard the term "nontraditional" was in the proposed guidance itself. Congress used the term "alternative" mortgages when it passed the Alternative Mortgage Transactions Parity Act of 1982 in response to the crisis caused largely by the interest rate risk of "traditional" fixed-rate lending, and "alternative" is also the term currently used by several banking agencies in existing regulations governing these exact types of loans. We are not aware of any historical basis for the term "nontraditional," and it strikes us as having a

6

(Exhibit L)
6 of 9 pages

**Why does our government continue to promote and rely upon extremely biased opinions?**

misleading and inappropriately pejorative connotation given the country's successful 25-year history with ARM lending and the recurring problems associated with portfolios of fixed-rate loans.

## Option ARMs *Are* Stress Tested

The guidance inaccurately states that alternative mortgages are "untested in a stress environment" (pp. 14 and 20) and that "the limited performance history of these products, particularly in a stressed environment, increases performance uncertainty" (p. 26).   In fact, we have run literally thousands of scenarios to test for potential risks associated with individual Option ARM loans or a portfolio of Option ARM loans, and other experienced lenders have similarly run their own simulations.

Moreover, since we and other lenders have been originating Option ARMs, there have been periods in which the mortgage market has experienced extreme stress.  As an example, Southern California went through a severe and sustained real estate depression in the late 1980s and early 1990s, caused largely by deep cutbacks in the defense industry.  This real estate depression followed several years of extremely rapid price appreciation and, even worse, was accompanied by unemployment between 9% and 10%, a concurrent decline in real estate prices of approximately 20%, and a 300 basis point increase in interest rates.  A perfect storm.  In the worst year in our Company's history, 1994, which coincided with the worst point in the Southern California real estate depression, we experienced only 18 basis points of chargeoffs.

We think it would be more appropriate for the guidance to emphasize that lenders who originate alternative mortgages should run stress simulations to understand the relevant risks, including those related to offering deep payment discounts and other structural features of the Option ARM loan, and they need to be prepared and able to take appropriate action to mitigate and address those risks.

## Concentrations Are Not Inherently Risky

As our 25-year history with Option ARMs shows, a conservative lender can achieve outstanding returns and have very low losses even when fully concentrated in Option ARM loans.  It bears repeating that we have not identified a single delinquent loan in our portfolio, much less a foreclosure or loss, due to the structure of the Option ARM product.

That is not to say that managing a portfolio of Option ARMs is easy; it can be very complicated, and it is ultimately what we as a company have been focused on every day for decades.  In many ways, our concentration in Option ARMs has been a source of great strength because we have been able to mitigate interest rate risk and also control credit risk by focusing management and Company resources on developing personnel and systems that are attuned to the specific needs of managing an Option ARM portfolio. Servicing Option ARMs involves various skills, which lenders who are new to the product may have a tendency to underestimate.

**A comparison of the late 1980s real estate boom and the recent boom is like comparing raisins and watermelons.  Price appreciation through the proliferation of Option ARMs, NIV guidelines and extreme leverage is unprecedented.  The perfect storm Mr. Sandler spoke of was only a spring shower relative to the current debacle**

7

(Exhibit L)
7 of 9 pages

We suggest that the discussion of "concentrations" in the guidance (pp. 21-22) should recognize there are a number of traditional mortgage portfolio lenders who have been making alternative mortgage loans since 1981, and that a concentration in these loans is not *per se* of supervisory concern. At least for thrifts, the Congressionally-imposed QTL ("qualified thrift lender") tests mandate these concentrations. As we have noted, 99% of our portfolio consists of ARMs, and a similar focus on ARMs exists at other traditional mortgage portfolio institutions. Other depository institutions specialize exclusively or nearly exclusively in credit cards, trusts and other bank products and services. They, too, are able to achieve efficiency and develop customer service expertise while still assuring high safety and soundness.

<u>There is a Not a Wider Spectrum of Option ARM Borrowers</u>

In a few places (pp. 8 and 13), the proposed guidance states that Option ARM products are only recently "being offered to a wider spectrum of borrowers." In fact, the Option ARM has been offered since 1981 to a full spectrum of borrowers seeking low-cost and flexible financing. Contrary to some beliefs, the Option ARM loan was never offered only to high income, wealthy professionals. We and other residential mortgage portfolio lenders have been offering the Option ARM since 1981 to the exact same types of borrowers to whom we were offering fixed-rate mortgages prior to 1981.

What has changed in recent years is that the Option ARM is being offered to a greater *number of borrowers* and by a much *wider spectrum of lenders*. The greater volume of Option ARMs has been facilitated by the new securitization market and technological developments, including automated underwriting systems, automated appraisal valuation models, and credit scoring methods. These new technological tools may not be fully tested, especially with alternative mortgages. As our prior discussion notes, many new lenders may not fully appreciate the history of the Option ARM loan or the critical role that underwriting, appraisals, disclosures and other mortgage practices play in mitigating risks. In addition, as we have already noted, some lenders appear to be generating greater volumes of loans by continuing to offer very low initial payment rates despite the red flag of ever deeper payment discounts.

<u>Qualification Standards</u>     **see Exhibit E**
**Lenders use NIV guidelines so the borrowers are encouraged to inflated their incomes higher.**

The proposed guidance asks for specific comments on appropriate qualification standards. Our practice has always been to require borrowers to qualify at the fully-indexed rate, rather than only the loan's starting payment rate. We believe the fully-indexed rate is the appropriate standard. We would caution against being overly prescriptive in the guidance with specific qualification criteria. Instead, we suggest that the guidance reiterate the importance of maintaining appropriate underwriting practices and remind lenders that these practices, including those that are automated, will be closely reviewed during supervisory examinations. Underwriting of Option ARMs with deep payment discounts should be subject to close regulatory scrutiny, particularly since these loans are totally untested in stress scenarios and, as simulations demonstrate, could have a greater potential for payment shock, particularly if interest rates rise.

8

(Exhibit L)
8 of 9 pages

The guidance also asks for specific comments on the use of "stated income." We share many of the agencies' concerns about relying exclusively on stated income to determine a borrower's ability to pay. On a related note, we agree with the statement in the guidance that "the analysis of repayment capacity should avoid over-reliance on credit scores as a substitute for income verification in the underwriting process" (p. 17). Credit scores have been used broadly for mortgages only during the last decade or so, which has been a benign economic period with strong housing price appreciation and low consumer credit losses. Credit scoring methods have therefore not been tested in a stressed mortgage environment. More important, credit scores can change quickly, and they differ widely from one credit agency to the next, in many cases by as much as 100 points or more.

## Conclusion

We commend the agencies for the time and attention they have devoted to the proposed guidance. We support the inter-agency effort to remind lenders about sound mortgage lending practices, and we hope that the background and comments we have offered in this letter will be of value.

As stated above, we have had great success with the Option ARM product for 25 years. It is an outstanding loan for both borrowers and lenders when properly underwritten, appraised and managed. Borrowers benefit from payment flexibility, and Option ARM portfolio lenders avoid the interest rate risks associated with fixed-rate portfolios.

While guidance geared toward specific products is sometimes appropriate, we think it is also important to remind all banks about prudent lending practices for all products. In our experience, it is the quality of the loan that matters more than the type of loan. In other words, whether lenders allow borrowers to manage and access their home equity through Option ARMs, equity lines of credit or other products is ultimately less important than the strength of the lender's culture, underwriting, risk management, disclosure and other lending practices.

Few if any products are inherently bad, nor are concentrations in these products inherently risky. Rather, it is a combination of multiple factors that could be inappropriate for particular borrowers and/or lenders. Assuring that consumers can choose among competitive and suitable alternatives, while avoiding transactions that are likely to harm consumers and financial institutions, presents challenges. The proposed guidance is designed to achieve that objective, and with modifications along the lines set forth in this letter, we believe the agencies will help address potential problems.

Sincerely,

Herbert M. Sandler
Chairman and Chief Executive Officer

9

(Exhibit L)
9 of 9 pages

# Exhibit M

**World Savings 2005 10-K** & **Wachovia Bank's 2006 10-K**

TABLE 51
**Deferred Interest** in the Loan Portfolio
by LTV/CLTV Bands and Year of Origination
As of December 31, 2005
(Dollars in Thousands)

| Deferred interest balance by LTV/CLTV [b] | 2005 | 2004 | 2003 & prior | Total | |
|---|---|---|---|---|---|
| At or below 80.00% | | | | | |
| 60.00% or less | $ 22,543 | $ 27,031 | $ 8,897 | 58,471 | |
| 60.01% to 70.00% | 31,848 | 35,809 | 9,980 | 77,736 | |
| 70.01% to 80.00% | 71,853 | 84,477 | 23,068 | 179,398 | |
| Subtotal | 126,244 | 147,317 | 41,945 | 315,506 | 315,506 |
| 80.01% to 85.00% | 46,938 | 54,903 | 12,996 | 114,837 | 114,837 |
| 85.01% to 90.00% | 2,146 | 3,223 | 1,190 | 6,559 | |
| Greater than 90.00% [c] | 4,839 | 5,684 | 1,391 | 11,914 | 11,914 |
| Total deferred interest | $ 180,167 | $ 211,127 | $ 57,522 | $448,816 | 448,816 |

[a]    The first lien's origination year is used in this table if a second lien has a different origination year from the associated first lien.

[b]    First mortgage LTVs and first and second mortgage CLTVs are both included in this table. These calculations rarely take into account any changes in property value since the time of origination.

[c]    Approximately 99% of this deferred interest is on loans covered by mortgage or pool insurance

The aggregate amount of deferred interest in the loan portfolio amounted to $449 million, $55 million, and $21 million at December 31, 2005, 2004, and 2003, respectively. Deferred interest amounted to less than .39% of the total loan portfolio on those dates.
Deferred interest levels increased primarily because the balance of ARM loans in our portfolio increased by $41 billion since 2003, the indexes on our ARMs increased, the minimum payment on most new and many existing loans was less than the interest due, and many borrowers made monthly payments that were lower than the amount of interest due. We do not believe the aggregate amount of deferred interest in the portfolio is a principal indicator of credit risk exposure.
Nonetheless, we carefully monitor the payment behavior and performance of all loans with deferred interest.

Based on our 25-year track record with ARM loans that have the potential for deferred interest, together with our underwriting and appraisal processes, we believe we can manage incremental credit risk that may be associated with loans with deferred interest. We continually analyze the portfolio and market trends to try to detect issues early enough so we can minimize future credit losses. As short-term interest rates have risen, we have begun increasing the minimum payment allowable on many of our new originations because the discount between the minimum payment and the fully-indexed payment affects the amount of deferred interest loans incur and could affect the loans' potential credit risk.

As of December 31, 2005, 2004, and 2003, we had assets of $124.6 billion, $106.9 billion, and $82.5 billion, respectively.
For the years ended December 31, 2005, 2004, and 2003, we had net income of $1.5 billion, $1.3 billion, and $1.1 billion, respectively.

# Wachovia Bank's 2006 10-K

The amount of deferred interest related to all Option ARMs was $1.6 billion at December 31, 2006;
(Wachovia was only including GDW/World's deferred interest; it did not appear that Wachovia was originating or purchasing Option ARMs from prior 10-ks)

| World Savings (in thousands) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Assets | Unknown | $124,600,000 | $106,900,000 | $82,500,000 | |
| Net Income | | $1,486,164 | $1,279,721 | $1,106,099 | $958,279 |
| Net Income % of Assets | | 1.19% | 1.20% | 1.34% | |
| Deferred Interest | $1,600,000* | $448,816 | $55,000 | $21,000 | |
| Deferred Interest % of Assest | | .36% | .05% | .03% | |
| Increased Deferred Interest as a % of Prior Years | | | | | |
| Net Income | *77.46% | 30.77% | 3.07% | | |
| % Increase of Deferred Int. form prior | **256.49% | 716.03% | 161.90% | | |

* Huge increase from 2005 following substantial increase from 2004.
** Huge percentage increase 2004-2005.  Although percentage increase was smaller 2005-2006; relative to net income it was another huge step towards insolvency.
World's financials are now diluted with Wachovia's.

Clearly these increases are not sustainable given the need for increased allowance for loan losses ("ALL") and interest payments to depositors and MBS investors.  Option ARMs are predatory pricing products (in more ways than one)

TABLE 1
Loans Receivable and MBS with Recourse by Type of Security
2001 - 2005
(Dollars in Thousands)
Loans collateralized by primarily first deeds of trust

| | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| One-to four-family units | | | | | |
| 290% increase 2001-2005 | $111,394,353 | $94,449,233 | $69,586,604 | $54,934,357 | $38,326,759 |
| Over four-family units | $4,794,359 | $4,748,335 | $3,554,715 | $3,257,389 | $2,766,888 |
| Commercial real estate | $10,205 | $15,220 | $18,598 | $20,465 | $29,117 |
| Land | $0 | $0 | $0 | $114 | $199 |
| Loans on deposits | $10,509 | $10,734 | $11,780 | $13,240 | $16,672 |
| Other(a) | $1,672,539 | $1,335,657 | $1,033,881 | $717,751 | $451,084 |
| Total loans receivable | $117,881,965 | $100,559,179 | $74,205,578 | $58,943,316 | $41,590,719 |
| | | | | | |
| MBS with recourse collateralized by: | | | | | |
| One-to four-family units | $1,168,480 | $1,719,982 | $2,579,288 | $4,458,582 | $11,821,868 |
| Over four-family units | $0 | $0 | $1,070,760 | $1,412,487 | $1,747,751 |

Exhibit M 2 of 3

| | | | | | |
|---|---|---|---|---|---|
| Total MBS with recourse | | $1,168,480 | $1,719,982 | $3,650,048 | $5,871,069 | $13,569,619 |
| Loans receivable and MBS with recourse | | $119,050,445 | | $102,279,161 | $77,855,626 | $64,814,385 | $55,160,338 |

(a) Includes loans in process, net deferred loan costs, allowance for loan losses, and other miscellaneous discounts and reserves.
At December 31, 2005, 99.8% of loans receivable and MBS with recourse had remaining terms to maturity in excess of 10 years.

| | Single Family 1-4 Units | 5+ Units | Commercial | Total Loans | % of Portfolio |
|---|---|---|---|---|---|
| Northern California | $38,415,784 | $1,751,342 | $8,136 | $40,175,262 | 34 |
| Southern California | $30,566,045 | $1,502,523 | $901 | $32,069,469 | 27 |
| Total California | $68,981,829 | $3,253,865 | $9,037 | $72,244,731 | 62 |
| Florida | $8,133,373 | $83,976 | $120 | $8,217,469 | 7 |
| New Jersey | $5,392,039 | -0- | $256 | $5,392,295 | 5 |
| Texas | $3,256,839 | $155,631 | $39 | $3,412,509 | 3 |
| Illinois | $2,824,643 | $142,322 | -0- | $2,966,965 | 3 |
| Virginia | $2,610,051 | $2,972 | -0- | $2,613,023 | 2 |
| Washington | $1,803,743 | $726,347 | -0- | $2,530,090 | 2 |
| Other states (a) | $19,560,316 | $429,246 | $753 | $19,990,315 | 17 |
| Totals | $112,562,833 | $4,794,359 | $10,205 | $117,367,397 | 100 |

| | | |
|---|---|---|
| Loans on Deposit | | $10,509 |
| other (b) | | $1,672,539 |
| Total Receivables and MBS with Recourse | | $119,050,445 |
| Loans with Recourse | | $1,168,480 (c) |

(a) Each state included in Other states has a total loan balance that is less than 2% of total loans as of December 31, 2005.
(b) Includes loans in process, net deferred loan costs, allowance for loan losses, and other miscellaneous discounts.
(c) The above schedule includes the balances of loans that were securitized and retained as MBS with recourse.

Exhibit M 3 of 3



**Federal Deposit Insurance Corporation**
550 17th Street NW, Washington, D.C. 20429-9990

**Financial Institution Letter**
**FIL-66-2007**
**August 7, 2007**

# LETTER TO STAKEHOLDERS
## Second Quarter 2007 Edition of FDIC's Letter to Stakeholders

**Summary:**  The FDIC has issued the attached Letter to Stakeholders, which reports on the FDIC's priorities and activities for the second quarter of 2007.

**Distribution:**
FDIC-Insured Institutions

**Suggested Routing:**
Chief Executive Officer

**Related Topics:**
FDIC Key Indices

**Attachment:**
Letter to Stakeholders

**Contact:**
Senior Accountant Karen Flynn at kflynn@fdic.gov
(703) 562-6188

**Note:**
FDIC financial institution letters (FILs) may be accessed from the FDIC's Web site at www.fdic.gov/news/news/financial/2007/index.html.

To receive FILs electronically, please visit http://www.fdic.gov/about/subscriptions/fil.html.

Paper copies of FDIC financial institution letters may be obtained through the FDIC's Public Information Center, 3501 Fairfax Drive, E-1002, Arlington, VA  22226 (1-877-275-3342 or 703-562-2200).

**Highlights:**

Among the significant activities reported in the Letter to Stakeholders for the second quarter of 2007 are the following:

- FDIC-insured commercial banks and savings institutions reported net income of $36.0 billion in the first quarter of 2007, slightly below the $36.9 billion earned in the first quarter of 2006.

- Estimated insured deposits increased by $84.4 billion in the first quarter, the second largest quarterly increase in the past five years.

- The Deposit Insurance Fund (DIF) balance increased by $580 million (1.2%), bringing the fund balance to $50.7 billion at the end of the first quarter.

- The DIF earned assessment income of $94 million in the first quarter of 2007. The FDIC anticipates the DIF will reach its designated reserve ratio of 1.25% in 2009.

- The federal bank, thrift and credit union regulatory agencies issued the *Statement on Subprime Mortgage Lending* to address issues relating to certain adjustable-rate mortgage products that may result in payment shock.

- The FDIC released a new publication, *FDIC Quarterly,* which provides a single source for industry data, analysis and research.

Your feedback to the Letter to Stakeholders is encouraged, as are suggestions for improvement.  For more information, visit the FDIC's Web site at www.fdic.gov.

Exhibit N