Michael Blomquist
18234 Daves Avenue
Los Gatos, CA 95030
(408) 399-0590 (ph & fax)
michaelsblomquist@gmail.com
Pro se plaintiff

**E-Filed /08**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| Michael Blomquist,<br><br>        Plaintiff,<br><br>    vs.<br><br>WASHINGTON MUTUAL, a Washington corporation; KERRY K. KILLINGER; JOSEPH W. SAUNDERS; COUNTRYWIDE HOME LOANS, INC. a Delaware corporation; ANGELO MOZILLO; WACHOVIA CORPORATION, a North Carolina corporation; KEN THOMPSON CITIGROUP, a Delaware corporation; SANFORD WEILL; CHARLES PRINCE; GOLDMAN SACHS GROUP, INC., a Delaware corporation; HENRY PAULSON; BEAR STERNS COMPANIES,INC., a Delaware corporation; JAMES CAYNE; THE MCGRAW HILL COMPANY, INC., a Delaware corporation; HAROLD MCGRAW III; WELLS FARGO & COMPANY, a Delaware corporation; PATRICIA R. CALLAHAN; HERBERT M. SANDLER; ROCK HOLDINGS,INC., a Delaware corporation; EXPERIAN CORPORATION, a Delaware corporation; FIMALAC, INC., a Delaware corporation; MOODYS CORPORATION, a Delaware corporation; JAMES E. GILLERAN; JOHN M. REICH; JOHN D. HAWKE JR.; JOHN C. DUGAN; SUSAN SCHMIDT BIES;DONALD E. POWELL; SHEILA C. BAIR;<br>        Defendants. | Case No.: C07-04108 JF<br><br>**OPPOSITION TO DEFENDANTS'(THE MCGRAW HILL COMPANIES, INC., HAROLD MCGRAW III, FIMALAC, INC., MOODYS CORPORATION) MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: July 11, 2008<br>Time: 9:00 a.m.<br>Before: Hon. Jeremy Fogel |

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS
AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**

1

# TABLE OF CONTENTS



TABLE OF AUTHORITIES………………………………………………………………………..3

STATEMENT OF ISSUES (CIVIL L.R. 7-4)...............................................................................4

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 4

MOTIONS TO DISMISS AND HEARING……………………………………………………...4

PRELIMINARY STATEMENT ON ANTI-TRUST CLAIMS ….........................................6

CONSUMER PRICES...................................................................................................7

INJURY TO COMPETITION.......................................................................................12

CONCENTRATION OF WEALTH……………………………………………………………...13

SPECIFIC INJURY……………………………………………………………………………….13

CONCLUSION……………………………………………………………………………………20

## **TABLE OF AUTHORITIES**

The majority of defendants' authorities are off point involving breaches of oral contracts or addressing relatively benign issues. On the rare occasion of citing a remotely persuasive argument the defendants' authorities were equally if not more supportive than dismissive to plaintiff's claims.  Plaintiff is still addressing each issue and will continue to update

http://michaelblomquist.com/authorities/motions-to-dismiss/

Plaintiff admits these citations are not procedurally correct, but still posses merit.

Aiello v Lehman available at

http://www.michaelblomquist.com/Authorities/AiellovLehman.pdf

Wilk v American Medical Association

http://michaelblomquist.com/Authorities/Antitrust/WilkvAMA.htm

Hughes v Rowe

Conley v Gibson

http://michaelblomquist.com/Authorities/Standing/ConleyvGibson.htm

## STATEMENT OF ISSUES TO BE DECIDED

(N.D. Cal. Civ. L.R. 7-4)

1. Whether a court should recognize and provide leniency to a devastated pro se plaintiff, who was one of the few who did not exploit and attempted to save the American Dream of Homeownership.
    a. Specific leniency for the obvious, manipulated setting of a hearing date and responsive pleading.
    b. Additional or equal time to respond to multiple motions as a professional attorney is granted to respond to one pleading.
    c. Grant one leave to amend

2. Whether Defendants should have motioned for a more definite statement pursuant to Fed. R. Civ. P. 12(e) prior to filing motion to dismiss.

3. Whether a Constitutional right to petition includes a fair trial.

4. Whether pro se Plaintiff can cure deficiencies in an amended complaint.

5. Whether a case of first impression involving unprecedented fraud, deception and destruction deserves leniency and thorough investigation.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Michael Blomquist respectfully submits this brief in support of plaintiffs response to McGraw Hill Defendants', Moodys Corporation's and Fimalac, Inc's.; collectively ("CRAs") motions to dismiss. Plaintiff acknowledges the deficiencies in his original complaint and is certain they can be addressed in an amended complaint. Plaintiff, Michael Blomquist respectfully requests 25 minutes for oral argument pertaining to CRAs motions to dismiss. Five minutes of 25 total minutes to be used for rebuttal.

## MOTIONS TO DISMISS & HEARING

Michael Blomquist, pro se plaintiff acknowledges and agrees with McGraw-Hill Defendants and other CRAs by proxy that plaintiff's active complaint is deficient in regards to Fed. R. Civ. P. 9(b). Plaintiff maintains that the deficiencies in his pleadings of special matters and any other issues involving Fed. R. Civ. P. 8 can be easily corrected in an amended complaint

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**

4

which will also clarify Fed. R. Civ. P. 12(b)(6).

Plaintiff was not provided ample time to draft a proposed amended complaint that would properly address the heightened standard of pleading special matters, but will request to do so during the July 11, 2008 hearing. Plaintiff is confident the arguments provided in this and other oppositions will be sufficient to provide justifiable leave to amend.

Prior to filing the original complaint, plaintiff was extremely concerned about any possible time statutes for his claims and was most concerned with timing issues. Plaintiff's lack of legal training and very limited resources should not preclude or prejudice his right to petition.

Plaintiff previously stipulated to an enlargement of time for defendants' responsive pleadings. Plaintiff did not agree to July 11, 2008 hearing and believes it is unjust that the hearing was not confirmed by plaintiff and involved an reasonably short period of time. Plaintiff is thankful to all parties that did agree to postpone hearing date and response deadline. Let it be noted that McGraw-Hill Defendants were the only defendants opposing plaintiff's request and it is evident that McGraw-Hill's counsel set an unreasonably early court date. "The Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *See Conley v. Gibson 355 U.S. 41,42*

Plaintiff affirms that he would be subject to irreparable and unjust damage [emphasis added] if his complaint was dismissed when an amended complaint removing some defendants and unwarranted claims can easily address all defendants' issues. Plaintiff asserts that his claims and documented losses are not a result of ripple effects from the defendants' illegal conduct, but directly connected to the defendants.

### Preliminary Statement on Anti-trust Claims

Defendants knowingly conspired and or combined to exploit the American Dream of Homeownership, myth that banks are too big to fail, Government policies pertaining to an ownership society, human emotions (greed, fear) and past court rulings for their own personal enrichment. Instead of maintaining safety and soundness while funding, securitizing and rating home loans the defendants exploited court decisions in an attempt to shift liability to borrowers and loan originators. Elements of their unconscionable scheme involve "actual malice", deceiving investors into believing that normal stable banking incomes and investment grade ratings were warranted, despite a dramatic and dangerous change in lending practices. Deceiving buyers into believing that rapidly appreciating home prices were substantiated and based on a buyers ability to pay. Despite banking and thrift's margins at approximation 1-2%; these defendants participated in highly leveraged financing that are devastating millions of American families, shareholders, bondholders and depositors. The proliferation of deceptive Option ARMs and their new, deeply discounted payment structures further establishes scienter.

The most unconscionable element of the defendant's horrific scheme is that the borrowers' incomes could have been easily [emphasis added] verified by any or all via the mandatory IRS form 4506 and 4506-T. Plaintiff submits that upon receipt of a limited sample of option ARM loan files and verification of incomes through the enclosed 4506 forms he can substantiate his allegations of rampant fraud against all defendants. Discovery will not [emphasis added] be costly for the defendants. Plaintiff submits that this is a case and crisis of first impression. Antitrust claims should be viewed under the rule of reason. Due to the magnitude of fraud and obvious evidence of scienter, plaintiff suggests that claims of securities fraud should also be thoroughly investigated. Plaintiff alleges that all real estate securities involving option ARMs during relevant times, in relevant markets rated by credit rating agencies

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**
6

are tainted with fraud.  The defendants' actions have restrained trade, unjustly enriched defendants, aided and abetted fraud.

In order to fully understand the plaintiff's claims against the McGraw Hill defendants and debt rating agencies it is imperative to understand the dramatic changes in lending guidelines and products during relevant times.  Despite these dangerous changes the debt rating agencies continued to provide investment grade ratings.  The investment grade ratings were an essential element to this giant Ponzi scheme and the plaintiff's claims.  Plaintiff's claims are at the foundation of antitrust laws and this court can provide proper and just relief.

### **Consumer Prices**

Consumer/home prices have skyrocketed to unsustainable levels as a direct result of defendants' illegal scheme. Interest rates have also spiked despite numerous interest rate cuts by the Federal Reserve.  Rampant inflation and countless city bankruptcies (Vallejo) are clearly connected to defendants' criminal behavior.  The deterioration of financial and social services is just beginning to surface which will require additional tax revenues.  Further attempts to maintain unsustainable prices will further enrich the criminals, enslave borrowers and continue a concentration of wealth within a limited few.  Plaintiff directs the court's attention to the following bankruptcy proceeding National City Bank v Cecilia Ann Hill.  "This adversary proceeding is a poster child for some of the practices that have led to the current crisis in our housing market." available at,

http://michaelblomquist.com/Authorities/Bankruptcy/07BK04106/Document24.pdf

National City was founded in 1863 and is clearly guilty of loan fraud.  The ripe age of National City and current troubles are a testament to recent changes in lending practices and a willingness for all players to participate.  A cursory glance at the stock performance of the lender defendants

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**
**7**

and Bear Stearns, substantiates these allegations.  National City like many other banks are in dire straits and now boycotting brokers, available at http://ml-implode.com/imploded/lender_NationalCityCorp.(Wholesale)_2007-12-31.html  (last viewed June 27, 2008) Additional, information about defendants are listed below.  The National City Bank case resulted in a $250,000 loss.  It was highly possible that plaintiff could have been held liable for such a loss from a loan originated by his agents.

Similar to the McGraw Hill defendants National City Bank seeks to shift the liability to others when it was clearly an active participant in the crime.  See McGraw Hill and CRA defendants motion to dismiss, "Unlike other Defendants in this case, credit rating agencies, like S&P, have repeatedly been held to receive significant First Amendment protection, because its opinions on creditworthiness are, by their very nature, protected speech." (MTD Pg. 3¶3).  The foreseeable consequences, actual malice, clear and present danger obviously strip the McGraw Hill defendants and other CRAs of their first amendment protections.  McGraw-Hill and other defendants were essential to plaintiff's claims and the obvious existence of this epic crisis also substantiates plaintiff's claims.  See e.g. County of Orange v. McGraw-Hill Cos., 245 B.R. 151, 158 (C.D. Cal. 1999),  also available at http://www.michaelblomquist.com/Authorities/Defendants/CountyofOrangevMcGrawHill.htm. ("[a] publisher will not incur liability for a false statement of fact unless the statement is made with ""actual malice,"" i.e., ""with knowledge that the statement was false or with reckless disregard for whether or not it was true."")  Clearly "reckless disregard" applies to McGraw Hill and other CRAs. Loans with stated income guidelines were dramatically altered during relevant times and this was well known by all defendants.  All loan files possessed a form 4506 which could have easily provided verification of the borrowers' income by all defendants, except Experian and Rock Holdings. The most unconscionable fact is that the lenders, investment banks and CRAs all had the

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**
**8**

opportunity to verify the borrowers' income, but elected the combination of "reckless disregard" and self enriching schemes instead. It is alleged that the McGraw Hill defendants and other CRAs were the motivating factor behind the dramatic changes in lending guidelines based on prior court rulings. See report below as required by Sarbanes-Oxley.

Plaintiff respectfully submits the following. On May 23, 2007 John Duggan, Chairman of the Office of Comptroller of the Currency quoted a study by the Mortgage Asset Research Institute ("MARI"), "examined a sample of stated income loans and found that 90 percent of borrowers reported incomes higher than those in IRS files. Even more disturbing, almost 60 percent of the stated income amounts were exaggerated by more than 50 percent." Previously in the same speech Chairman Duggan questioned why 50% of subprime borrowers relied on stated income loans when the majority were employees who received W-2 incomes, available at http://www.michaelblomquist.com/Papers/OCC/Duggan2007MARI.pdf (last visited June 27, 2008). The statistics quoted from Chairman Duggan were provided from a random sample of loans throughout the United States. It is alleged that loan originations in the relevant markets during relevant times are equally or more tainted with fraud. Even more alarming is the magnitude of over-stated incomes as with the National City Bank v Hill case. Plaintiff alleges that it is/was not uncommon for borrowers to overstate their incomes by 300%. Clearly, the Hills would have been forced to sell or foreclosed upon many years ago creating more supply, lower prices, [emphasis added] less risk to our financial markets and eliminated or greatly reduced moral hazard.

Plaintiff also offers the following comments from Sylvain Raynes, a former Moody's [emphasis added] analyst, "None of this could have happened without the participation of Wall Street's three biggest arbiters of credit -- Moody's Investors Service, S&P and Fitch Ratings. About 80 percent of the securities carried AAA ratings, the same designation given to U.S. Treasury

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**
**9**

bonds." Available at

http://www.michaelblomquist.com/News/Bloomberg/20071220RatingSubprimeMadeJokeofCreditExpert.pdf

The following is a deceiving, but also informative study by Standard and Poors which deceptively states that, "Delinquencies And Foreclosures Track Jobs, Not Mortgage Types." (pg 11). Current mortgage types are nothing similar to historic mortgage types, furthermore fraud of this magnitude never existed.  This is an extremely misleading or deceptive statement.  The study also illustrates the unprecedented amount of cash out and origination of equity lines, (pg 8) but rarely if ever discusses the effects this additional, mostly adjustable rate debt may have on "creditworthiness" or "simulated cash flows" in debt offerings.  (pg 13).  On page 14 you will find the dramatic drop in agency originations and the dramatic increase in non-agency originations. available at

http://michaelblomquist.com/Papers/20070329SPSubprimeMortgageMarket.pdf



Exhibit A

Plaintiff submits that the dramatic increase in McGraw Hill's Financial Services operating profit during the relevant times is not [emphasis added] a coincidence.

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**

10

A favorable ruling for the plaintiff can provide redress and also provide viable remedies in the public's best interest.  We need to stop corporate welfare and unlawful restraints to commerce if our "free markets" and capitalism are going to survive.   Clearly, the importance of a stable real estate market to our economy and American families is second to none.

The defendants have created a crisis that demands government bail outs and relied on this backstop to unjustly enrich themselves at an enormous cost to plaintiff and America.  The result is not just increased prices in the relevant markets, but in every market.  The Bear Stearns bail out cost tax payers at least $29 billion.  It is rumored that a last minute change from a $2 offer to a $10 offer was from wealthy shareholders stating that they would rather see the truth unfold in bankruptcy court than accept the $2 offer.   The "Stimulus Act" was a $600 bribe to open the portfolios and increase loan limits at Fannie Mae, Freddie Mac and the FHA to accept loans that they would have rejected.  James Lockhart the chairman of the Office of Federal Housing Enterprise Oversight ("OFHEO") is charged with oversight of the Government Sponsored Entities ("GSEs") and he originally opposed with this change, available at http://www.michaelblomquist.com/Papers/20080207Lockharttestimony.pdf
The Federal Reserve is now accepting illiquid, toxic securities in exchange for highly liquid treasures under the T.S.L.F.  This dollar figure of toxic securities is currently above $500 billion dollars and rapidly rising.  Home mortgage debt has increased from $4.82 trillion in 2000 to over $10.53 trillion in 2007; much of this toxic debt is being shifted to American taxpayers and our posterity through increases in government debt and inflation.  Plaintiff's claims are at the foundation of antitrust laws and this court can provide proper and just relief.

## Injury to Competition

The Clayton Act seeks to capture anticompetitive practices in their incipiency by prohibiting particular types of conduct, not deemed in the best interest of a competitive market. Competition has been intentionally destroyed.  Mortgage brokers who have historically originated approximately 70% of originations have been boycotted available at http://www.michaelblomquist.com/News/WAMU/WholesaleGone.pdf.   Lending defendants including WAMU, Wells Fargo, BofA (Countrywide) have closed wholesale operations and others are rapidly headed in that direction.  Although during relevant times an unsavory breed of broker was recruited by defendants, the traditional, ethical broker has provided an invaluable service to consumers through their ability to shop interest rates and terms.  Mortgage brokers and their clients are not restricted to a particular banks' products.  Wages and commissions for loans offices will plummet and restrict choices for consumers.

Walmart has provided consumers with numerous choices and extremely low prices. Walmart's low wages and lack of health care are of concern, but their market dominance was not created by illegal and highly disruptive activities, as is clearly evidenced in this case.  As a mortgage and real estate broker, plaintiff is well aware of the banking industries attempts to enter the real estate sales industry.  NAR has thus far successfully lobbied to keep the banks out of their territory, but this crisis could create a change to policy.  NARs memberships dues are dropping fast and the once largest PAC could eventually be toast.  Plaintiff recognizes the threat that the banks could pose to the stability of the real estate market by their reckless decisions. The increased competition would not outweigh the risk of the banks willingness to inflate and enslave consumers available http://www.usdoj.gov/atr/public/workshops/rewcom/212859.htm.  Plaintiff does not allege that other defendants conspired or combined to perpetrate a scheme against REALTORS.  This

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**
**12**

information was provided to further substantiate the banks desire to dominate the real estate industry and destroy competition. Plaintiff's claims are at the foundation of antitrust laws and this court can provide proper and just relief.

### Concentration of Wealth

Plaintiff submits that consumers will be restricted to limited choices from rapidly increasing mergers and acquisitions ("M&A") in the banking industry. In addition to the limited consumer choices there will be further suppression of wages by the extinction of traditional mortgage brokers. This M&A activity is very reminiscent to the S&L crisis and supervisory mergers, which were a well documented mistake. Plaintiff's claims are at the foundation of antitrust laws and this court can provide proper and just relief.

### Specific Injury

Plaintiff affirms that fraud became the industry standard instead of the exception, especially in the relevant market [emphasis added]. Plaintiff could not properly supervise agents when fraud was so easily perpetrated. see case National City Bank v. Hill. Regardless, if the borrower or agents was providing false information the underwriting department easily meets the actual malice threshold, especially on the second refinance transaction.

The National Association of REALTORS provides the following; median home prices in the San Francisco Metro recently peaked in the third quarter of 2007 at $819,900. Miami Metro peaked in the fourth quarter of 2005 at $395,940 and Boston peaked during the third quarter of 2005 at $415,390. Again, it is alleged that frequency and especially magnitude of loan fraud in the Bay Area is second to none. Prices were not a function of affordability, but limited supplies being sucked up by unqualified buyers. High rates of appreciation, easy access to debt for existing payments and a high concentration of Option ARMs have temporarily masked local foreclosure rates, but the highly foreseeable train wreck is about to begin. The correlation of

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**
**13**

local real estate appreciation and proliferation of deceptive option ARMs are more than a coincidence.  (see exhibit B)

**Exhibit B: San Jose 35.2% of originations in 2006 were option ARMs**



**(Exhibit B: San Jose 35.2% of originations in 2006 were option ARMs)**

Loan Performance states that 88% of Option ARMs originated in 2006 (Exhibit E of D.E. #8) were originated under stated or no documentation guidelines.  The delinquency rates of option ARMs are rapidly approaching those of subprime loans.  The most alarming fact is that option ARMs have a minimum payment feature that allows borrowers to make payments which are 40% of interest only payments.   Let it be noted that all listed lender defendants have formally stated that they will no longer originate option ARMs.  The most recent was Wachovia Bank on June 30, 2008.  The existing lending defendants were the largest originators of option ARMs and other deceptive products during relevant times in relevant markets.

Unfortunately, the severity of losses for borrowers, investors, lenders and our entire economy will be unlike any economic downturn we have ever experienced.  Relevant markets which are heavily concentrated with option ARMs will be devastated.  Plaintiff is appalled by the defendants' willingness to promote these extremely deceptive products knowing the

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**

consequences to their customers as well as our financial markets. Promotion applies to all defendants.

Plaintiff directs the courts attention to potential liability from fiduciary breaches and repurchase agreements such as those at the heart of PHH Mortgage Corporation v. Landmark Real Estate Investments, Inc. et al, 5:07- cv-00369-JF and the Nation City Bank proceedings. Cases like PHH will soon represent a much larger percentage of the court's workload. The court will most likely only review similar blatant cases of bogus or missing social security numbers. Plaintiff alleges the existing government bail outs will most likely purchase simple elements of fraud such as over-stated incomes. Sample of bail outs: "Stimulus Act", T.S.L.F., loan modifications, bankruptcy proceedings, etc. The effects of these bail outs will be unprecedented inflation and unconscionalbe moral hazard.

Plaintiff submits that the defendants knew the desire to obtain and maintain homeownership was so great that the borrowers and originators would readily commit fraud provided the opportunity. Greed of home appreciation and fear of even higher, more unaffordable prices coerced consumers to commit loan fraud. Plaintiff admits that does not sound logical, but neither are most home buying decisions. Prior court rulings have falsely led the defendants to believe that they could continue to shift liability to others while exponentially increasing their "actual malice" and reckless disregard for the truth.

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**

**(Exhibit C: Option ARM resets…ticking time bombs)**



**(Exhibit C: Option ARM resets…ticking time bombs)**

As previously stated these loans will devastate the local housing market and should have never been originated under current guidelines.

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**
16

**Current and Projected CA NODs**



After 20 years of experience in Silicon Valley plaintiff submits that borrowers stretching or inflating their incomes to obtain loans is not [emphasis added] limited to lower income or uneducated borrowers, especially in a rapidly appreciating market.

### Supporting Evidence against McGraw Hill Defendants and CRAs

In the wake of the Enron Crisis the CRAs became the subjects of numerous hearings.

"On March 20, 2002, the Senate Committee held a hearing – entitled "Rating the Raters: Enron and the Credit Rating Agencies" – that focused on the role of credit rating agencies in the Enron collapse. That hearing sought to elicit information on why the credit rating agencies continued to rate Enron a good credit risk until four days before the firm declared bankruptcy,..."

"Development of Ancillary Businesses.
In recent years, the large rating agencies have begun developing ancillary businesses to

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**
17

complement their core ratings business. These businesses include ratings assessment services where, for an additional fee, issuers present hypothetical scenarios to the rating agencies to determine how their ratings would be affected by a proposed corporate action (e.g., a merger, asset sale, or stock repurchase).115 They also include risk management and consulting services."

"…Furthermore, in the case of ratings assessment services, there are concerns that, to the extent a rating agency has already "promised" a certain rating to an issuer's hypothetical scenario, pressure to match the actual rating to the promised rating is likely to be forceful, even if the ultimate analysis otherwise might not have supported the rating."

Report is available at

http://www.michaelblomquist.com/Papers/ReportontheRoleandFunctionofCRAs.pdf

Plaintiff submits that the defendants' unconscionable commissions of epic deception and malicious mind demands close attention. Plaintiff affirms that McGraw Hill Defendants and CRAs were arguably the most essential element [emphasis added] behind plaintiff's claims. As demonstrated in the Enron and countless other cases The McGraw Hill and CRA defendants have exhibited a pattern of deception and fraud. It is further alleged that they have encouraged other defendants to engage in their scheme based on the past legal proceedings.

Plaintiff submits that since his original complaint was filed most of his allegations of rampant fraud have been substantiated by; market activities, FBI investigations, indictments, congressional hearings and similar pleaded allegations. The majority of the defendants' stocks have cratered to or near historic lows. Executives at Bear Stearns have been indicted. Angelo Mozilo and Charles Prince have testified before congress regarding their lavish pay packages.

Plaintiff recognizes that the following are pending cases, but again affirms the magnitude and frequency of fraud in his pleadings have never [emphasis added] been seen before in a court of law. Plaintiff submits that his case is one of first impression and these devastating consequences were highly foreseeable.

On June 24, 2008 The State of California filed suit against Countrywide for untrue or

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**
**18**

misleading statements and unfair competition, available at http://www.michaelblomquist.com/casespending/CAvCFC.pdf.  The State's complaint lists similar allegations regarding deceptive marketing practices, unfair competition, untrue or misleading statements. "THE PRIMARY PURPOSE OF DEFENDANTS' DECEPTIVE BUSINESS PRACTICES WAS TO MAXIMIZE PROFITS FROM THE SALE OF LOANS TO THE SECONDARY MARKET." The sale of these loans required the participation and deceptive ratings of the CRAs.

The State of Illinois' complaint is available at http://michaelblomquist.com/casespending/IllvCFC.pdf  The city of Cleveland like plaintiff is in a more dire situation and is not "holding any punches" complaint is available at http://michaelblomquist.com/casespending/Clevelandcomplaint.pdf.  The Bear Stearns indictment is available at http://www.michaelblomquist.com/casespending/bear_stearns_indict.pdf

Last, but clearly not least is a pending case brought by numerous pension funds claiming billions in damages, collectively as Arkansas Teacher Retirement System, Fire & Police Pension Association of Colorado et al v. Angelo R Mozilo et al.  Plaintiff recognizes that this responsive pleading is an opposition to McGraw-Hill Defendants , (Moody's and Fitch by proxy), but again stresses the essential combination of all defendants to perpetrate horrific losses to plaintiff and others listed above.  .

Prior to relevant times standards for safety and soundness were followed, available at http://michaelblomquist.com/complaint/CFR/12/570SafetySoundness/570SafetySoundness.htm#Loandocumentation

The deciders of fact should consider the effects this fraud would have on the unlawful restraint of commerce, competition and consumer prices.  Beyond consumer prices and

**OPPOSITION TO DEFENDANTS'MOTIONS TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES CASE NO. C-07-04108-JF (HRL)**
**19**

competition the defendants' unlawful restraints and reckless practices have destroyed our economy. The Department of Justice's elements of an antitrust offense, available at; http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title7/ant00007.htm

Plaintiff recognizes the deficiencies in his complaint, but these deficiencies can easily be cured in an amended complaint. There is a highly casual relationship between plaintiff's anticompetitive allegations and the actions of S&P and the other CRAs. In fact, it is alleged the CRAs are the most essential defendants within these allegations. This epic crisis would not have occurred without the participation of Wall Street's three biggest arbiters.

## Conclusion

Plaintiff admits his complaint was a "scattershot" of allegations, but the basis for his claims are founded. During the last 6 months of countless study plaintiff has become better equipped to plead his case. Plaintiff should be provided the opportunity to file an amended complaint removing numerous defendants, statutes and claims; within a reasonable time. Plaintiff has presented factual allegations for his claims of unfair competition, untrue and misleading statements and especially antitrust violations. In fact, Plaintiff's claims are at the foundation of antitrust laws and this court can provide proper and just relief.