Michael Blomquist
18234 Daves Avenue
Los Gatos, CA 95030
(408)399-0590
(408)399-0590 (FAX)
michaelsblomquist@gmail.com
Plaintiffs
Pro Se

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

Michael Blomquist,

                Plaintiff,

vs.

WASHINGTON MUTUAL, a Washington corporation; KERRY K. KILLINGER; JOSEPH W. SAUNDERS; COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC. a New York corporation; ANGELO MOZILLO; BANK OF AMERICA, a Delaware corporation; WACHOVIA CORPORATION, a North Carolina corporation; G. KENNEDY THOMPSON; CITIGROUP INC., a Delaware corporation; SANFORD WEILL; CHARLES PRINCE; GOLDMAN SACHS GROUP, INC., a Delaware corporation; THE BEAR STERNS COMPANIES,INC., a Delaware corporation; JAMES CAYNE; THE MCGRAW HILL COMPANIES, INC., a Delaware corporation; HAROLD MCGRAW III; WELLS FARGO & COMPANY, a Delaware corporation; PATRICIA R. CALLAHAN; HERBERT M. SANDLER; FITCH RATINGS, INC., a Delaware corporation; MOODYS CORPORATION, a Delaware corporation and DOES 1-100 inclusive,

                Defendants,

Case No.: C07-04108-JF

**PROPOSED SECOND AMENDED COMPLAINT:**
ANTITRUST, UNFAIR COMPETITION, RICO, NEGLIGENCE

**DEMAND FOR JURY TRIAL**

**SUMMONS**

**PROPOSED SECOND AMENDED COMPLAINT**    **C07-04108-JF**
(1)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES....…………………………………………..4

JURISDICTION & VENUE………………………………………………5

DEFENDANTS…………………………………………………………6

PLAINTIFF……………………………………………………………11

STATEMENT OF FACTS AND ALLEGATIONS…………………………...13

CHARTS
1. S&P CASE-SHILLER…………………………………………18
2. S.F. METRO PRICES……………………………….....................19
3. SUBPRIME & OPTION ARM RESETS…………………………23
4. OPTION ARM MAP OF MYSERY…………………………………24
5. HIISTORY OF HOME PRICES…………………………………25
6. S&P INCOME……………………………………………………28
7. WAMU STATEMENT……………………………………………40
8. WAMU WORKSHEET……………………………………………41

REPORTS
S&P CASE-SHILLER……………………………………….................19
CA DEPT OF REAL ESTATE AGENCY……………………………….21
NPR AUDIO: GIANT POOLS OF MONEY…………………………26
S.E.C. EXAMINATION OF C.R.A.s JULY 2008……………………………27
ROLE & FUNCTION OF THE CREDIT RATING AGENCIES……………..29
HOUSING AGENCY INTERVIEW………………………………………...33
WELLS FARGO / N.A.H.B……………………………………………36
GOLDMAN SACHS CA MARKET OVER-VALUED BY 35-40%..................36
FITCH OPTION ARM……………………………………………………38
MARI MORTGAGE ASSET RESEARCH INSTITUTE………………………42

SUBPRIME MADE JOKE OF CREDIT EXPERT…………………………………26

CHASE'S ZIPPY PROGRAM……………………………………………34

AUDITOR COVERS UP RISKY LOANS……………………………………34

WHOLESALE BROKER AGREEMENT/COUNTRYWIDE…………………………30

CITIGROUP SAMPLE PROSPECTUS (2001)....…………………………………..44
95% of loans originated using loan underwriting policies that require proof of income

CITIGROUP SAMPLE PROSPECTUS (2006)………………………………………44
20.42% of loans originated were with full income documentation

STATUTES
    FEDERAL

        TITLE 12 § 1831p-1…………………………………………………………

        TITLE 12 § 2607(a)…………………………………………………………

        TITLE 12 § 2607(b)…………………………………………………………

        TITLE 15 § 1…………………………………………………………………

        TITLE 15 § 15………………………………………………………………..

        TITLE 15 § 78j

        TITLE 18 § 2…………………………………………………………………

        TITLE 18 § 1005……………………………………………………………..

        TITLE 18 § 1014……………………………………………………………..

        TITLE 18 § 1964…

        TITLE 18 §………………………………………………………………….

STATE

        CALIFORNIA CIVIL CODE § 1668

        CALIFORNIA CODE OF CIVIL PROCEDURE § 580b………………………

        CALIFORNIA BUSINESS & PROFESSIONS CODE § 17043………………

        CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200………………

        CALIFORNIA BUSINESS & PROFESSIONS CODE § 17500………………

# TABLE OF AUTHORITIES

**CASES**

*Aspen Skiing Co. v Aspen Highlands Skiing Corp.*
        105 S. Ct. 2847……………………………………………………………………….

*Bell Atlantic Corp. v. Twombly*
        127 S. Ct. 1955 (2007)………………………………………………………….,

*Connor v. Great Western Savings & Loan*
        73 Cal. Rptr. 369 (1968)……………………………………………………………

*County of Orange v. McGraw Hill Cos.*
        245 B.R. 151 (C.D. Cal. 1999)………………………………………………...

*In re First Alliance*
        471 F.3d 977 (2006)
        2002 U.S. Dist. LEXIS 5858 (2002)………………………………………..

Kerby v. Mortgage Funding Corporation
        992 F. Supp. 787…………………………………………………………………

*Mutual Life v. Hilton-Green*
        241 U.S. 613, 614 (1906)………………………………………………………

Stoneridge Investment Partners v. Scientific-Atlanta, Inc., et.al.
        128 S. Ct. 761, 767 (2008)………………………………………………………

*Wilks v. A.M.A.*
        671 F. Supp. 1465 (1987)………………………………………………..
        467 U.S. 1210 (1984)

## JURISDICTION AND VENUE

1.     This has jurisdiction of this matter pursuant to 28 U.S.C. §1331 as the claims arise under the laws of the United States.  This Court also has supplemental jurisdiction of the state claims pursuant to 28 U.S.C. §1367 as they are related to the claims in the action within original federal jurisdiction and form part of the same case or controversy. Jurisdiction also exists due to Diversity of citizenship, and the amount in controversy in this action exceeds the jurisdictional amount required under Title U.S.C. 28 § 1332.

2.     This Court also has supplemental jurisdiction of the state claims pursuant to 28 U.S.C. §1367 as they are related to the claims in the action within original federal jurisdiction and form part of the same case or controversy.

3.     Venue is also proper in the U.S. District Court of the Northern District, San Jose as the violations of law alleged in this Second Amended Complaint were committed in the Northern District, as well ass throughout the State of California; in particular the counties of San Mateo and Santa Clara, which were Plaintiffs' primary counties of business and related to the claims alleged herein.

## RELEVANT TIMES AND RELEVANT MARKETS

4.  Relevant times begin on January 1, 2004 and continue through the present. The active promotion of loan fraud is still continuing. Relevant markets consist of San Mateo and Santa Clara County, plaintiff's primary counties of business. Unless otherwise stated the following allegations took place during relevant times in relevant markets

**DEFENDANTS**

**Lenders**

5. Defendants Countrywide Financial Corporation ("CFC") and Countrywide Home Loans, Inc., ("CHL") at all times relevant herein were corporations registered and authorized to conduct business in the State of California. CFC was the parent company of CHL and participated in the sale of company securities. CHL engaged in mortgage lending activities within relevant markets of Santa Clara and San Mateo Counties. CHL was a leading provider of Option ARM and stated or no income documentation lending products in relevant markets.

6. Defendant Washington Mutual, Inc. ("Wamu") at all times relevant herein was a corporation registered and authorized to conduct business in the State of California. Wamu engaged in mortgage lending activities within relevant markets of Santa Clara and San Mateo Counties. Wamu was a leading provider of Option ARM and stated or no income documentation lending products in relevant markets.

7. Defendant Wachovia Corporation ("WB") at all times relevant herein was a corporation registered and authorized to conduct business in the State of California. During relevant times WB purchased Golden West Financial("GDW")/World Savings Bank. WB engaged in mortgage lending activities within relevant markets of Santa Clara and San Mateo Counties. WB through its purchase of GDW became a leading provider of Option ARM and stated or no income documentation lending products in relevant markets.

8. Defendant Wells Fargo & Company ("Wells") at all times relevant herein was a corporation registered and authorized to conduct business in the State of California. Wells engaged in mortgage lending activities within relevant markets of Santa Clara and San Mateo Counties. Wells also provided business banking and stock trading accounts.

9.  Defendant Bank of America ("BofA") at all times relevant herein was a corporation registered and authorized to conduct business in the State of California.  B of A engaged in mortgage lending activities within relevant markets of Santa Clara and San Mateo Counties. B of A purchased Defendant CHL after these legal proceedings had initiated and was not named in the original complaint.  B of A's counsel is aware of this pending litigation.

10.  Defendant Bear Stearns Companies, Inc.,("BSC") dba EMC Mortgage,("EMC") at all times relevant herein was a corporation registered and authorized to conduct business in the State of California.  EMC engaged in mortgage lending activities within relevant markets of Santa Clara and San Mateo Counties.

11.  Defendant JP Morgan Chase, Inc ("JPM") at all times relevant herein was a corporation registered and authorized to conduct business in the State of California.  JPM engaged in mortgage lending activities within relevant markets of Santa Clara and San Mateo Counties.  JP Morgan Chase purchased ("BSC") after the legal proceedings had initiated and was not named in the original complaint.  JPM's counsel is aware of this pending litigation.

12.  The Defendants listed in paragraphs 5-11 are collectively referred hereafter as "Lenders".

**Investment Banks**

13.  Defendant Citigroup, Inc. ("Citigroup") is the parent company of Citigroup Global Markets, Inc. ("CGM") at all times relevant herein Citigroup and CGM were corporations registered and authorized to conduct business in the United States of America.  Citigroup engaged in numerous financial services including, but not limited to investment banking, book running, underwriting and advisory services.

14. Defendant Goldman Sachs Group, Inc. ("GS") at all times relevant herein was a corporation registered and authorized to conduct business in the United States of America. GS engaged in numerous financial services including, but not limited to investment banking, book running, underwriting and advisory services.

15. Defendant Bear Stearns Companies, Inc. ("BSC") at all times relevant herein was a corporation registered and authorized to conduct business in the United States of America. GS engaged in numerous financial services including, but not limited to investment banking, book running, underwriting and advisory services.

16. The Defendants listed in paragraphs 13-15 are collectively referred hereafter as "I-banks".

**Credit Rating Agencies**

17. Defendant The McGraw Hill Companies ("MHP") is the parent company of Standard and Poors ("S&P") at all times relevant herein was a corporation registered and authorized to conduct business in the United States of America. S&P provides independent credit ratings for a variety of entities, transactions, and securities; specifically mortgage related securities.

18. Defendant Moody's Corporation ("MCO") at all times relevant herein was a corporation registered and authorized to conduct business in the United States of America. MCO provides independent credit ratings for a variety of entities, transactions, and securities; specifically mortgage related securities.

19. Defendant Fitch Ratings Inc. ("Fitch") at all times relevant herein was a corporation registered and authorized to conduct business in the United States of America. Fitch provides

independent credit ratings for a variety of entities, transactions, and securities; specifically mortgage related securities.

20.  The Defendants listed in paragraphs 17-19 are collectively referred hereafter as "CRAs".

**Executives**

21.  Defendant Angelo Mozilo ("Mozilo") during most of relevant times was Chairman and Chief Executive Officer of CFC. Defendant Mozilo directed, authorized, and ratified the conduct of Countrywide employees, lending guidelines, lending products, lending practices and related affiliate compensation .

22.  Defendant Kerry Killinger ("Killinger") at all relevant times was Chief Executive Officer of Wamu.  Defendant Killinger directed, authorized, and ratified the conduct of Wamu employees, lending guidelines, lending products, lending practices and related affiliate compensation. Killinger was responsible and compensated for *inter alia* establishing and maintaining internal controls for Wamu

23.  Defendant Joseph Saunders ("Saunders") during some of relevant times was Chief Executive Officer of Providian Financial Corporation ("PVN").  PVN was purchased by WAMU at the end of the Q3 2005.  Saunders was responsible and compensated for *inter alia* establishing and maintaining internal controls for PVN.

24.  Defendant G. Kennedy Thompson ("Thompson") during most of relevant times was Chief Executive Officer of WB.  While Thompson was CEO he presided over the purchase of World Savings/Golden West Financial.  Thompson was responsible and compensated for *inter alia* establishing and maintaining internal controls for WB.

25.  Defendant Herbert M. Sandler ("Sandler") during most of relevant times was Chief Executive Officer of Golden West Financial which was purchased by WB.  Defendant Sandler directed, authorized, and ratified the conduct of GDW employees, lending guidelines, lending products, lending practices and related affiliate compensation. Sandler was responsible and compensated for *inter alia* establishing and maintaining internal controls for GDW.

26.  Defendant Patricia R. Callahan ("Callahan") during most of relevant times was the Vice President of compliance and risk management.  Callahan was responsible and compensated for *inter alia* establishing and maintaining internal controls for Wells.

27.  Defendant Sanford Weill ("Weill") during most of relevant times was Chairman of Citigroup.  Weill was responsible and compensated for *inter alia* establishing and maintaining internal controls for Citigroup.

28.  Defendant Charles Prince ("Prince") during most of relevant times was Chief Executive Officer of Citigroup.  Prince was responsible and compensated for *inter alia* establishing and maintaining internal controls for Citigroup.  Plaintiff wanted to make sure to include this classic quote from Charles Prince on July 9, 2007 in his pleadings. "When the music stops, in terms of liquidity, things will be complicated. But as long as the music is playing, you've got to get up and dance. We're still dancing,"…"The depth of the pools of liquidity is so much larger than it used to be that a disruptive event now needs to be much more disruptive than it used to be," available at, http://www.michaelblomquist.com/News/20070709PrinceDancing.pdf.  Only weeks after Prince's statements the giant Ponzi scheme was disrupted.

29.  Defendant James Cayne ("Cayne") during most of relevant times was Chief Executive Officer of BSC.  Cayne was responsible and compensated for *inter alia* establishing and maintaining internal controls for BSC.

30.  Defendant Harold McGraw III ("McGraw") at all relevant times was the Chief Executive Officer of MHP.  McGraw was responsible and compensated for *inter alia* establishing and maintaining internal controls for McGraw.

31.  The Defendants listed in paragraphs 21-31 are collectively referred hereafter as "Executives".

32.  All Defendants except for Saunders were actively involved in and essential to the proliferation of rampant loan fraud and deceptive business practices.  In an attempt to simplify pleadings, Saunders will be excluded from the collection of all other Defendants referred hereafter as "Defendants".

## PLAINTIFF

33.  Michael Blomquist, ("Plaintiff") at all relevant times herein is and was a resident of Santa Clara County, California. During most relevant times herein Plaintiff was a licensed mortgage and real estate agent. Plaintiff is/was the sole owner and president of Michael Scott Properties, Inc.  Michael Scott Properties, Inc. was licensed with the CA Department of Real Estate ("DRE") from 4/6/2000 – 4/30/2007.

34.  Prior to owning and operating Michael Scott Properties, Inc. Plaintiff owned and operated real estate franchise; Realty World Selective Properties & Finance.  Plaintiff has owned and/or operated offices in Campbell, Los Altos, Los Gatos, Mountain View, & San Jose.

35.  During Plaintiff's career he attended numerous underwriting workshops which were established to analyze incomes, recognize loan fraud and promote safe and sound lending practices.

36.  Plaintiff started his mortgage and real estate career during the aftermath of the S&L crisis and 1991 recession.

37.  Plaintiff at all relevant times herein owed a fiduciary relationship to his clients in performance of his mortgage and real estate business and services.

38.  Plaintiff at all relevant times herein was liable for the actions of loan originators "LOs" and real estate agents working under his broker's license.

39.  Plaintiff at all relevant times herein was liable for loan repurchases of loans that were originated under fraudulent pretenses.

40.  As part of his fiduciary duties Plaintiff actively participated in warning Congress, regulators, clients, media, Defendants and countless others about the rampant fraud and other unlawful activities in relevant markets.  These unlawful activities and reckless lending practices were placing the public at substantial risk.

## STATEMENT OF FACTS & ALLEGATIONS

41.  Free market capitalism, safe and sound financial markets, Justice and the American Dream of Homeownership were/are at the foundation of our Nation's success.  Despite the

importance of these defining principles and foreseeable devastation; the Defendants have manipulated each and everyone in order to turn the American Dream of Homeownership into a giant Ponzi scheme.  Millions of borrowers, brokers, investors, etc, were enticed to aid and abet the scheme and most did it enthusiastically with little investigation or moral guidance.  Some are victims of money managers, deception, irrational exuberance or despair, but regardless of how they became involved they did.

42.  The deciders of fact should take into consideration the trillions of dollars and legal backgrounds of the Defendants.  This is not a scheme that sprung up overnight; this is a full-fledged criminal enterprise that has left millions of families homeless, millions more to follow and our financial system on the brink of disaster.  The willingness of so many unscrupulous loan originators ("LOs") to aid and abet such a horrific scheme will provide few tears when we are gone, but the Defendants were the real masterminds and the ones to be watched.

43.  Plaintiff agrees that there are/were many criminal independent Brokers and loan originators ("LOs"), but the Defendants and their LOs were worse.  The Defendants set the guidelines and made liar loans, 100% financing, subprime and Option ARMs the industry standards.  A LO can only originate under the guidelines available.

44.  The Defendants scheme originated with the I-Banks and CRAs.  Decades of prudent, safe and sound lending practices were recklessly altered for no possible benefit other than self enrichment, imputation of liability and the eventual destruction of the mortgage broker industry.  To further their scheme the Defendants unlawfully enticed Plaintiff's LOs with unwarranted referral fees knowing that the Plaintiff would be responsible for their actions. Title 12 § 2607 (a).

45.  The I-banks and CRAs scheme was very similar to their previous scheme, the tech wreck.  Entice stock brokers to trade clients' accounts and invest in risky stocks, entice mortgage

brokers to continually refinance client's unaffordable mortgages.  The long term interests of clients were of no consideration.  Huge commissions were generated and everything was fine as long as prices continued to increase.  The big differences between the Tech wreck and the current housing scheme is that the current scheme is exponentially larger and literally encouraged consumers to bet the house.

46.  The current housing scheme was much more heinous because it involved consumers' largest lifetime investment, was completely foreseeable and involved families' home, shelter, sense of security and the American Dream.   In the tech wreck giant pools of money; pension, mutual and insurance funds were legally restrained from participating because the high flying tech stocks did not have investment grade ratings.  Incomes for most dot.coms were completely unknown or non-existent and this is how the I-banks and CRAs avoided liability.  This was also how the CRAs and I-banks avoided most of the liability from Enron; over reliance upon the CEO, CFO statements.  Not surprisingly this was the same theme they recommended for the current crisis; purposely avoid the truth of borrowers' incomes.  As soon as the I-banks became active in loan originations the I-banks and CRAs agreed that avoiding incomes is the best way to create and destroy making huge money in both directions; disaster capitalism.

47.  After the tech wreck Sarbanes Oxley was promulgated to provide more transparency and much more severe penalties against CEOs, CFOs, accountants, auditors, etc. for fraudulently reporting financial data.   In the housing scheme guidelines were recklessly changed by I-banks and CRAs to encourage fraudulent reporting of income.  The I-banks and CRAs knew that given the opportunity; borrowers and Brokers would inflate incomes.  The masterminds of these horrific crimes should not be dismissed because they had a thoughtful scheme.  In fact, the evidence against them is quite damning.

48. The housing crisis is the same scheme, same perpetrators, same enticements, but much more transparent, foreseeable and exponentially larger. The reckless and dramatic alterations to decades of prudent, safe and sound lending practices were originated by the I-banks and CRAs in order to provide investment grade ratings to loans that were widely known to be extremely risky and mostly fraudulent.

49. In order to recognize standing the deciders of fact, must understand the evolution of the mortgage industry as the I-banks and CRAs became more involved. The mortgage industry and related guidelines mimicked the dot.com days where highly leveraged financing, exotic financing products (Option ARMs/Convertibles) and liar loans became the industry standard.

50. The CRAs recommended the changes to underwriting guidelines and the I-banks paid for the CRAs fees. The Lenders did not step up to defend the reputation of their industry because they knew they could impute liability and were very interested in the long term destruction of the mortgage broker industry; an industry that traditionally represents about 70% of all loan originations. Once the mortgage brokers' reputations are damaged upon repair than millions of jobs could be shipped overseas or completed by a computer.

51. Once brokers are gone the Lenders and I-banks will continue their boiler room bait and switch and/or predatory practices. A lack of relationship unnecessarily exposes borrowers to these schemes which are easily perpetrated against borrowers, especially when they never meet face to face. The problem is not the LO it was the reckless changes to lending guidelines that enticed the criminal element. Instead of more LOs recognizing what was going on they all eagerly helped destroy their industry.

52. The I-banks and CRAs reckless changes dramatically increased potential liability to Plaintiff from loan fraud, loan repurchases and fiduciary breeches.  Plaintiff had already seen the devastation from the S&L crisis and that was a blip compared to what we are now facing.

53.  A home is most consumers' largest purchase and can be easily influenced and manipulated by emotions rather than logic.  Unfortunately, most California buyers are misled to believe that they can walk away from their homes with no consequences.  Under California Code of Civil Procedure § 580b deficiency protection is revoked once a purchase money is refinanced.  This is not disclosed to borrowers, but it is disclosed as a benefit to investors in prospectuses (emphasis added).  CRAs also use 580b for their rating decisions.  Many borrowers obtained financing via stated income loans.  Most of these borrowers were economically challenged and forced to a life of refinancing; so soon after the purchase they would revoke their deficiency protection.  Now that foreclosures are through the roof investors will start demanding judiciary foreclosures and deficiency judgments.  This could get ugly; most of the investors are still not doing the loan work outs and despite the propaganda prices will continue to fall for many years, especially in relevant markets.

54.  In addition to the liability above borrowers can be liable for taxable income as a result of loan losses from a foreclosure, short sale, etc.  This tax code has been temporarily changed to exclude tax liability under H.R.3648 from a borrower's primary residence until the end of 2009, but prices in relevant markets will not stabilize until after 2012 once the Option ARMs have reset and those borrowers go through foreclosure.

55.  Unfortunately, most LOs were unaware or didn't care about these huge liabilities to their clients: loss of life savings, deficiency judgment, tax liability.  Plaintiff was very concerned

about these liabilities and there are many pending cases involving these issues to substantiate his claims.

56.    The I-banks and CRAs *inter alia* interfered in existing contracts between Brokers and Lenders and Brokers and borrowers by recklessly changing guidelines so they could generate more business.  In addition they had a duty of care not only to the investors, but to the industries they represent.  The magnitude of fraud and deception could not have occurred without the I-banks and CRAs participation and changes to guidelines.

57.    As fraud became the industry standard many good LOs aided and abetted either because they were too lazy to fight the good fight or wanted to believe that helping an unqualified borrower obtain financing would be in their best interest.  Similar to the dot.com days this was true as long as prices were going up, but irrational exuberance is different than loan fraud.  The housing bubble is much more transparent, exponentially larger and illegal.

58.    As Plaintiff tried to warn others about the foreseeable dangers his highly valuable reputation was damaged.  Plaintiff upheld his fiduciary duty by recommending that dozens of buyers wait knowing that prices were predicated on fraud.  As potential clients watched prices escalate they no longer waited and many were persuaded to purchase more expensive homes than they could afford.  A majority of these potential clients were referrals from past clients and these events negatively affected those relationships.  Plaintiff has dozens of witnesses to confirm these allegations; some never purchased, some experienced substantial loss including foreclosure and others were just victims of fiduciary breeches.

59.    Loan fraud is still widely prevalent and many Defendants are issuing false and misleading statements by stating that prices have bottomed.  S&P's chief economist David Wyss is constantly issuing such rubbish in an attempt to deceive others into helping conceal their

crimes and recklessness. On April 17, 2007 Chief S&P economist David Wyss released a report titled "For The U.S. Housing Slump, The Bottom May Be In Sight", these reports are incredibly deceptive to consumers and full of misleading statements that are contrary to well known facts.

60.  Over one year later on August 26, 2008 S&P and economist Robert Shiller released chart 1 which clearly indicates Mr. Wyss was incorrect.  Per relevant markets everything is pointing until at least 2012 before the market stabilizes

**Chart 1**



61.  The full report is available at,

http://www.michaelblomquist.com/Papers/20080825SPCSHomePrice.pdf

**Chart 2**

**PROPOSED SECOND AMENDED COMPLAINT        C07-04108-JF**
**(18)**

| Metro Area | 2008 Q2 / 2008 Q1 % | 2008 Q1 / 2007 Q4 % | 1 year change % |
|---|---|---|---|
| San Francisco | -1.8% | -1.2% | -23.7% |

62.  The following case is presented as further support of fraud and active participation by Defendant Wells Fargo; Plaintiff's loan originator ("LO") intentionally misled the Lender (Washington Mutual) as to the financial position of Plaintiff by adding Plaintiff to LO's Wells Fargo account.  Plaintiff questioned LO about the account and was told it had to be on the application or he would be denied.  The fraud became known to Wells Fargo when Plaintiff transferred the funds into a different account.  Instead of reporting the crime Wells Fargo helped conceal it and acted as though it was perfectly legal to add people on to accounts in order to influence the decisions of a Lender.    LO's Broker was named in the complaint.  Complaint is available at,  http://michaelblomquist.com/casespending/08CV03385/Complaint.pdf

63.  In California mortgage brokers have a fiduciary duty to their clients.  If Lenders or I-banks originate loans they assume the fiduciary duty, but "As a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money" see *Nymark v Heart Federal Savings,* 231 Cal. App. 3d 1089, 1096.  This citation is provided to illustrate Defendants attempts to impute liability to Plaintiff; in addition the broker agreement with CHL is provided below.

64.  *Mutual Life Insurance v. Hilton-Green* 241 U.S. 613;623 (1906). "The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party knows there is no foundation for the ordinary presumption -- when he is acquainted

with circumstances plainly indicating that the agent will not advise his principal." *Id., 623* **"**there is no foundation for the ordinary presumption -- when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. The rule is intended to protect those who exercise good faith and not as a shield for unfair dealing.  The Defendants cannot utilize this defense when they were the ones who replaced decades of safe and sound lending practices. This practice and law have been in existence for over 100 years, but Plaintiff was unwilling to test it out.

65.  *Connor v Great Western* 73 Cal. Rptr. 369 Privity of contract is not necessary to establish the existence of a duty to exercise ordinary care not to injure another, but such duty may arise out of a voluntarily assumed relationship if public policy dictates the existence of such a duty. The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to him, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. Clearly the I-banks and CRAs reckless changes to decades of prudent lending guidelines has greatly damaged Plaintiff and seriously violated the duty of care.  The I-banks interests to originate loans did not give them the right to make these devastating changes.  The CRAs were paid by I-banks and were the ones who recommended and ratified changes in order to obtain access to giant pools of money.

66. An agency relationship creates a fiduciary duty owed by the agent to the principal within the course and scope of the agency and the authority granted by the principal. The fiduciary duties include: loyalty; confidentiality; the exercise of utmost care (and in certain fact situations, reasonable care); full and complete disclosure of all material facts; the obligation to account to the principal; the obligation to act fairly and honestly and **without fraud** or deceit; and the **duty to "explain" and "counsel"** about that which has been disclosed, thereby helping the principal make an informed and considered decision to buy, sell, lease, exchange, borrow or lend.

67. A salesperson owes a duty to the principal equivalent to the duty owed by the real estate broker for whom the salesperson acts. Paragraph 63 & 64 were taken from the California Department of Real Estate available at, http://www.dre.ca.gov/pdf_docs/ref10.pdf last viewed on August 16, 2008.

68. By the conclusion of these allegations it will be apparent that all Defendants were essential in designing and perpetrating the heinous enterprise that unlawfully restrained Plaintiff from commerce and directly caused all of Plaintiff's damages. The defective loans would have never been allowed to proliferate if the I-banks and CRAs had not become actively involved. Regulators and investors would have caught the fraudulent and deceptive practices long ago.

69. Pertaining to securities fraud; "Courts have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price

relies upon the statement. *Stoneridge v Scientific-Atlanta, Inc* 128 S. Ct. 761, 769 (2008). The Securities Act does not require Plaintiffs to blindly follow Defendants' statements in order to have standing or a claim. Securities fraud claims have been dismissed and are on appeal. Plaintiff has the allegations stated in particularity pending the outcome of the appeal. Securities Fraud claims involve: Countrywide, WAMU, Goldman Sachs, Citigroup, Wells Fargo, Mozilo, Killinger, Saunders, Prince, Weill, Callahan.

### Destruction of Proven, Safe and Sound Lending Guidelines

**Resulting Growth in ARMs and Pending Loan Resets**

70. The destruction of proven, safe and sound lending practices are the primary catalysts for temporary (emphasis added) price appreciation and relatively permanent (emphasis added) loan growth. Subprime loans have grown from $35 billion in 1994 to $625 billion in 2005. During the same time frame total outstanding mortgages have grown from $4.4 trillion to $12.1 trillion. (emphasis added).

71. It is important to note that in addition to the enormous growth in outstanding mortgages; per year turn-over of loans has also greatly increased. Now more than ever many borrowers refinance every 12 months or more frequently because they need to cash out in order to survive or have exploding ARMs.. As property values continued to increase this was a possibility, but no more. There are an estimated 10 million families approximately 40 million people living in homes with no or negative equity. Many of these borrowers will be foreclosed upon or walk realizing that their payments are much higher than available rents. Prices will crash, investors will be burned and the properties will end up in the control of the perpetrators of these horrific crimes.

72. Subprime loans were spread throughout the United States, but Option ARMs were

highly concentrated in relevant markets.  Option ARMs are extremely more deceptive and

dangerous than subprime loans.  Chart 3 reflects the pending resets for subprime and Option

ARMs.  Although subprime loans have received most of the media attention; the effects for

Option ARMs will be much more catastrophic, especially since they are concentrated in relevant

markets and the loan amounts are considerably larger than any other type of loan.

### Chart 3



73.  "Barclays Capital estimates that as many as 45% of option ARMs, as they are often

called, originated in 2006 and 2007 could wind up in default. Another analysis, by UBS AG,

suggests that defaults on option ARMs originated in 2006 could be as high as 48%, slightly

higher than its estimate for defaults on subprime loans." available at,

http://www.michaelblomquist.com/News/20080806FirstFedOptionARMs.pdf  Another except

from the same article

> Babette Heimbuch, FirstFed's chief executive, says that option ARMs were "a very good
> loan for the borrower and the bank" for more than 20 years. But that changed, she said,
> **when investment-banking firms entered the industry and set lower lending
> standards, which FirstFed and others followed.**
>
> FirstFed was initially reluctant to follow the crowd. But as mortgage brokers took their
> business to other lenders with easier terms, FirstFed's mortgage originations declined to
> $366 million in the second quarter of 2003, from $389 million a quarter earlier. At the
> same time, its existing borrowers refinanced into new loans at other banks that offered
> easier terms. "The fear was that at the rate loans were paying off we were going

to have to close the company down," says FirstFed President James Giraldin. Rather than shut its doors, FirstFed joined the crowd and business boomed.

74. Chart 4 reflects the heavy concentration of Option ARMs, particularly in relevant markets. During 2006 Option ARMs represented 35.2% of all loan originations in San Jose. Millions of borrowers obtained Option ARMs with 1% start rates where most were unable to afford the initial rate. Option ARMs were widely used in affluent areas where many borrowers were hopeful stock options or continued appreciation could save them from foreclosure.



75. During relevant times outstanding mortgages grew from $9.4 trillion in 2004 to to $14.6 trillion at the end of 2007. Essentially it took 10 years to grow the first $5 trillion and then only 4 years to grow the next $5 trillion. These are extremely troubling statistics since the majority of increases were in California, especially in relevant markets. In addition, the most recent increases were achieved amidst stagnant or declining real wages, relatively benign inflation and slower rates of population growth.

76. Chart 5 reflects the magnitude of the current bubble which is directly correlated with the I-banks and CRAs move from Enron and Dot.com catastrophes to the American Dream of

**PROPOSED SECOND AMENDED COMPLAINT          C07-04108-JF**
**(24)**

Homeownership.  The Chart is based on national statistics so timing is not properly reflected.
Relevant market prices started increasing before the rest of California and the nation.  Now that
prices have risen so far so fast everyone is pulling out the stops trying to keep borrowers
enslaved, but it is impossible.

### Chart 5



**I-banks and CRAs Directed Reckless Changes Behind Mortgage Growth and Fraud**

77.  Plaintiff alleges that there are many violators who ultimately aided and abetted the
Defendants' scheme, but they are too numerous to pursue.  The only Defendants (emphasis
added) capable of perpetrating this grotesque crime are the I-banks and CRAs.  The I-banks and
CRAs essentially controlled the secondary markets outside of the GSEs boundaries; which were
subprime loans and loans above $417,000.  95% of Plaintiff's business was loans above

$417,000.  In 15 years Plaintiff never once originated a subprime loan; only a few originated in the office by other LOs.

78.  Plaintiff's claims involve companies that essentially manufacture and originate loans. Brokers, Lenders and I-banks were all competing to originate and the CRAs dictated what the loans needed to be in order to obtain investment grade rating.  Instead of the CRAs maintaining safe and sound credit ratings and lending guidelines they were paid by the I-banks to encourage fraud .

79.  The I-banks and CRAs started with the subprime market, but as the subprime market grew investors became more difficult to find.  It is important to realize that subprime loans did not just consist of borrowers with bad credit, but also included borrowers whose incomes do not meet normal guidelines. (emphasis added) Once I-banks and CRAs recklessly altered guidelines to favor stated income loans; millions of borrowers with insufficient incomes magically became prime or Alt-a borrowers.  The giant pools of money in pension, mutual and investment funds were now legally available to aid and abet the world's biggest Ponzi scheme.  NPR co-produced a great summary of this scheme available at,

http://www.thislife.org/Radio_Episode.aspx?sched=1242.

80.  Plaintiff and many industry experts affirm that the CRAs were the most essential Defendants in perpetrating this enormous Ponzi scheme.

http://michaelblomquist.com/News/Bloomberg/20071220RatingSubprimeMadeJokeofCreditExpert.pdf

None of this could have happened without the participation of Wall Street's three biggest arbiters of credit -- Moody's Investors Service, S&P and Fitch Ratings. About 80 percent of the securities carried AAA ratings, the same designation given to U.S. Treasury bonds. This implied the investments couldn't fail, says Sylvain Raynes, 50, a former Moody's analyst who now is a principal at R&R Consulting, a structured securities valuation firm in New York.

Many institutional investors' own rules, in addition to state or national laws, bar them from buying securities that don't carry investment-grade ratings.  Issuers got guidance from rating companies on how to shape their subprime securities to win the ratings, says Joshua Rosner, managing director of the New York-based research firm Graham Fisher & Co. Investment banks used software distributed by the ratings companies to show them how to meet the requirements, then paid the companies to have the securities rated, he says.

81.  The CRAs' primary responsibility is to rate the "likelihood that debt will be repaid in a timely manner."  This does not necessarily mean that the original borrower will pay it back, but through enhancements, foreclosure, etc. it will be paid back.  If market prices are predicated on fraud and borrowers are allowed to obtain 100% financing on liar loans how can you assess the likelihood that debt will be repaid in a timely manner, especially when existing models were based on loans originated under much more strict guidelines.  The CRAs and I-banks knew they were creating an enormous Ponzi scheme, but believed they could avoid substantial liability based on the structure of the scheme involving millions of borrower and past legal rulings.

82.  The SEC released a study in July of 2008 that investigated the role of the CRAs in the current crisis.  Resulting from the investigation, an unnamed CRA audited 45 loan files and found evidence of fraud in nearly every file.  Given the dramatic changes to guidelines it was evident then as it is now that the CRAs should have audited a few files before providing ratings available at,

http://www.michaelblomquist.com/Papers/20080708CRAexamination.pdf .  In addition, even when the reckless guidelines were not enough to provide investment grade ratings; "[R]ating agencies made "out of model adjustments" and did not document the rationale for the adjustment. In certain instances, the loss level that was returned by application of the rating agency's quantitative model was not used, and another loss level was used instead. These decisions to deviate from the model were approved by ratings committees but in many cases the

**PROPOSED SECOND AMENDED COMPLAINT          C07-04108-JF**
**(27)**

rating agency did not have documentation explaining the rationale for the adjustments, making it difficult or impossible to identify the factors that led to the decision to deviate from the model. Two rating agencies frequently used "out of model" adjustments in issuing ratings.

One rating agency regularly reduced loss expectations on subprime second lien mortgages from the loss expectations output by its RMBS model, in some cases reducing the expected loss. While the rating agency's analysts might have discussed the adjustment with issuers in the course of rating a deal, it appears that the firm did not publicly disclose the practice of overriding model outputs regarding loss expectations on subprime second liens."

83. Making money is not a crime, but the obvious correlation between the CRAs recommendation for stated income loans and S&P's income is telling.

**Chart 6**



84. The recent SEC study is not the first time the CRAs came under investigation. S&P, Moody's and Fitch were duly criticized and investigated for their roles in Enron. The deciders

of fact should note that the following Enron study was a requirement of Sarbanes Oxley.  Despite

all the concerns raised and supposedly corrected by the CRAs they have since thumbed their

noses at Congress and went back to doing the exact same thing, but on a much grander scale.

Report on the Role and Function of Credit Rating Agencies
in the Operation of the Securities Markets
As Required by Section 702(b) of the
Sarbanes-Oxley Act of 2002
U.S. Securities and Exchange Commission Dated January 2003

In January 2002, the Senate Committee on Governmental Affairs launched a
broad investigation into the Enron collapse, focusing on the role of government and
private sector watchdogs, and the steps, if any, that could have been taken to detect
Enron's problems or prevent its failure. On March 20, 2002, the Senate Committee held
a hearing – entitled "Rating the Raters: Enron and the Credit Rating Agencies" – that
focused on the role of credit rating agencies in the Enron collapse. That hearing sought
to elicit information on why the credit rating agencies continued **to rate Enron a good
credit risk until four days before the firm declared bankruptcy**, and to determine how
future Enron-type calamities could be avoided. Concerns had been expressed regarding
the significant market power of the three NRSROs, their privileged access to nonpublic
issuer information,[43] their apparent lack of care and diligence in the Enron situation, and
their very limited regulatory oversight.

The Staff Report concluded that, in the case of Enron, the credit rating agencies
failed to use their legally-sanctioned power and access[54] to the public's benefit, instead
displaying a lack of diligence in their coverage and assessment of Enron. **The Staff
Report found that the credit rating agencies did not ask sufficiently probing
questions in formulating their ratings, and in many cases merely accepted at face
value what they were told by Enron officials. Further, the rating agencies
apparently ignored or glossed over warning signs, and despite their mission to make
long-term credit assessments, failed to sufficiently consider factors affecting the
long-term health of Enron, particularly accounting irregularities and overly
complex financing structures.**

Rating agencies generally view their role as assessing the creditworthiness of issuers on
an ongoing basis, and the **likelihood that debt will be repaid in a timely manner**. They
emphasized, however, that they do not conduct formal audits of rated companies or
search for fraud, and that the nature of their analysis is largely dependent on the quality
of information provided to them.

Development of Ancillary Businesses. In recent years, the large rating agencies have
begun developing ancillary businesses to complement their core ratings business. These
businesses include ratings assessment services **where, for an additional fee, issuers**

**present hypothetical scenarios to the rating agencies to determine how their ratings would be affected by a proposed corporate action**

Plaintiff has numerous former CRA employees and industry experts who have agreed to provide testimony once the case reaches trial.

85.   In addition to recklessly altering decades of proven guidelines the I-banks and CRAs also began creating "innovative " and "complex" securities to deceive investors into thinking there were adequate enhancements to achieve investment grade risks.  At all times when the ratings were being provided the CRAs could have and should have easily verified incomes via IRS form 4506-T.

**Broker Agreement:**

86.   The following represent clauses from the Plaintiff's agreement with CHL.  Plaintiff submit that these are typical clauses for all agreements.

ARTICLE 1
RESPONSIBILITIES OF BROKER

1.1 **Duties of Broker.**  With respect to each Loan submitted by Broker to CHL for underwriting and funding, Broker shall:

(g) **collect and analyze financial information and related documents and assist Applicant in determining the mortgage that applicant can afford;**

ARTICLE 2
UNDERWRITING

2.1 **Underwriting the Loans.**  Upon receipt from Broker of a complete Mortgage Loan Package, CHL shall evaluate the risk of making such Loan using CHL's underwriting guidelines applicable to the type of loan being sought, as same may be amended by CHL from time to time.  CHL shall notify Broker of any Loan underwriting and documentation deficiencies or problems with respect to any Mortgage Loan Package. CHL and Broker agree that **CHL may rely on the materials contained in the Mortgage Loan Package supplied to it by Broker and the authenticity and accuracy of all signatures and information contained therein**.  CHL's failure to conduct an independent investigation with respect to such materials, signatures and information shall not affect or modify the representations made by Broker under Article 6 below.

ARTICLE 6
WARRANTIES AND REPRESENTATIONS OF BROKER

6.1 **Warranties and Representations Regarding Broker.** Broker represents, warrants and covenants to CHL that, with respect to itself, including each office or location operated by Broker, and any third party originating loans under Broker's license to originate mortgage loans ("Loan Originators"), and the Loans, the following are true and correct during the term of this Agreement:

(a) Broker and each Loan Originator is duly organized, validly existing and in good standing under the laws of the state of its incorporation or organization and is qualified and/or licensed as necessary to transact business in each state where property securing a Loan is located;

(b) **Broker and each Loan Originator is, and shall at all times remain knowledgeable of and in compliance with all federal, state and local laws and regulations applicable to it and the operation of its business** and as an FHA loan correspondent and/or VA authorized agent (if applicable), including, but not limited to, RESPA, the Home Ownership and Equity Protection Act of 1974, the Fair Credit Reporting Act, the Fair Housing Act, the Equal Credit Opportunity Act, the Truth in Lending Act, the Home Mortgage Disclosure Act and all regulations promulgated under each such law;

(c) This Agreement, and all actions provided for herein, have been duly authorized by the Broker's board of directors, if Broker is a corporation, or by such individual(s) empowered and authorized to bind Broker, and Broker shall, upon execution of this Agreement, provide CHL with evidence reasonably satisfactory to CHL for such authorization. Neither the execution of this Agreement nor the consummation of the transactions contemplated herein, nor the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with or result in the breach of any term, condition or provision of Broker's certificate of incorporation or by-laws, any license held by Broker or governing Broker's activities or any agreement to which Broker is a party or by which Broker is bound, or constitute a material default or result in an acceleration under any of the foregoing;

(d) Broker does not know of any suit, action, arbitration, or legal, administrative or other hearing that would affect its ability to perform its obligations hereunder;

(e) Broker and/or Loan Originator has entered into a written services agreement with each Applicant if required by applicable federal or state law;

(f) All Loans have been closed using closing documents prepared by CHL; and

(g) To the best of Broker's and/or Loan Originator's knowledge and belief having exercised reasonable diligence, (i) all documents submitted by Broker or Loan Originator in connection with any Mortgage Loan Package are in every respect valid and genuine, being on their face what they purport to be; (ii) all information (credit or otherwise) submitted in connection with any Mortgage Loan Package is true and accurate; (iii) all signatures on each promissory note and deed of trust or mortgage are the true signatures of the appropriate Applicant; and 9iv) no fraudulent information has been provided to CHL with respect to any Loan submitted to CHL for funding.

**PROPOSED SECOND AMENDED COMPLAINT          C07-04108-JF**

ARTICLE 7
PURCHASE AND INDEMNIFICATION

7.1 **Purchase. In the event any false or fraudulent information is submitted in connection with any Loan and Broker, its officers, employees or agents knew**, or if Broker had complied with its Quality Control Program should have known, of such false or fraudulent information, **CHL shall have the right to require Broker to purchase such Loan from CHL.** Upon receipt of the request for purchase, Broker shall immediately pay to CHL an amount equal to the sum of (a) the amount originally paid to Broker and/or Applicant by CHL in connection with CHL's funding of the Loan, with adjustment for principal payments received by CHL prior to the time of purchase of the Loan by Broker; (b) interest on the unpaid principal balance of the Loan at the mortgage interest rate from the last date through which interest has been paid to the date of purchase of the Loan by Broker; (c) any reimbursed advances made by CHL, or its designee, to protect the investor's interest in the Loan or the related mortgage property; and (d) all costs and expenses, including, but not limited to, reasonable attorneys' fees and costs, incurred by CHL in connection with the Loan. Upon receipt of such payment, CHL shall convey to Broker the Loan or, if the property has been previously acquired through foreclosure or otherwise, the real property that secured the Loan. A request for purchase hereunder shall not be deemed an election of remedies in the event Broker fails to comply with its obligations as required herein, and CHL may concurrently pursue any and all other rights and remedies available to it under law or equity

87. It is not unreasonable to ask loan originators to collect and analyze a borrowers' income and determine the loan the applicant can afford. Furthermore, it is not unreasonable to request a Broker to repurchase loans that were originated under fraudulent pretenses. These have been the industry practices for many decades, but since the I-banks and CRAs recklessly altered lending guidelines and rating analysis it ridiculous to expect brokers to assume this liability given the rampant fraud that can and will knowingly occur when guidelines permit 100% financing, stated income loans and Option ARMs with start rates at 1%.

**Changes to Safe and Sound Lending Practices**

88. Traditional and prudent income to debt ratios required that 28-33% of the borrowers' gross monthly income could be allocated for principal, interest, taxes, insurance ("PITI") and if applicable homeowner association ("HOA") dues. This ratio was considered the front end ratio.

**PROPOSED SECOND AMENDED COMPLAINT        C07-04108-JF**
**(32)**

The back end ratio included PITI and all other payments; credit cards, car payments, alimony, child support, rental property negative income, etc. Back end ratios were usually limited to 36-38% of gross income. If loans maintained these important ratios they had a long, proven history for repayment and would receive investment grade status by S&P, Moody's and Fitch. As time progressed these ratios became more flexible provided there were compensating factors. Subprime DTI ratios would often go up to 50-55%, but subprime borrowers were supposed to have equity. As the CRAs and I-banks became more involved everything changed.

89. During relevant times any loans that did not meet these standards were encouraged to change the program to stated income loans. It became very common for borrowers and/or brokers to inflate incomes by 50% or more. As evidenced in the following interview many borrowers inflated by 400% available at, http://www.youtube.com/watch?v=0oxa5yuC57w. The fraud and corruption ran extremely deep. The following article shows how blatant fraud became available at,

http://michaelblomquist.com/News/AuditorSupervisorsCoveredUpRiskyLoans.pdf

> "I'd see people who were hotel workers saying that they made, in California, making $15,000 a month so that they could qualify for a $500,000 home," Warren says. "If a hotel worker is making $15,000 a month changing sheets at the Days Inn, everybody would want to do it. It just really made no sense."
>
> Warren has worked in the mortgage business for 25 years, the past five in quality control. Most recently, she was a contract worker for a company called Watterson-Prime, which did loan audits for **investment banks**. She says their biggest client was **Bear Stearns**, which recently all but collapsed because of its exposure to bad loans.
>
> Some legal experts say it's a pretty big deal that people like Warren are willing to talk. "This is a smoking gun," says Christopher Peterson, a law professor at the University of Utah who has been studying the subprime mess and meeting with regulators. "It suggests that auditors working for Wall **Street investment bankers** knew how preposterous these loans were, and that could mean Wall Street liability for aiding and abetting fraud." Bear Stearns had no comment.

A bankruptcy examiner in the case of the collapsed subprime lender New Century recently released a 500-page report, and buried inside it is a pretty interesting detail. According to the report, some **investment banks agreed to reject only 2.5 percent of the loans that New Century sent them to package up and sell to investors**.

If that's true, it would be like saying no matter how many bad apples are in the barrel, only a tiny fraction of them will be rejected. "It's amazing if any investment bank agreed to a maximum number of loans they would kick back for defects. That means that they were willing to accept junk. There's no other way to put it," says Kurt Eggert, a law professor at Chapman University.  Meanwhile, the attorney general in New York and other prosecutors are taking a look at all of this. They, too, want to know whether Wall Street firms were covering up bad loans and selling them to investors.

When Plaintiff started his career in 1992 there was $4.1 trillion in outstanding mortgages, excluding equity lines.  At the end of the refinance boom in 2003 this figure had grown to $9.4 trillion and by the end of 2007 to $14.6 trillion.  Obviously the rate of growth is going parabolic despite stagnant wages and annual increases in population of 1%.

90.  The following article and flyer typifies the rampant acceptance and promotion of loan fraud within the industry during relevant times.  Keep an eye on the last line 3)

http://www.michaelblomquist.com/Papers/chasezippy.pdf



# ZiPPY Cheats & Tricks...

**If you get a "refer" or if you DO NOT get
Stated Income / Stated Asset findings....
Never Fear!!  ZiPPY can be adjusted (just ever so slightly)**

**Try these steps next time you use Zippy!
You just might get the findings you need!!**

- **Always select "ALTERNATE DOCS" in the documentation drop down.**
- **Borrower(s) MUST have a mid credit score of 700.**
- **First time homebuyers require a 720 credit score.**
- **NO! BK's OR Foreclosures, EVER!! Regardless of time!**
- **Salaried borrowers must have 2 years time on job with current employer .**

- **Self employed must be in existence for 2 years. (verified with biz license)**
- **NO non-occupant co borrowers.**
- **Max LTV/CLTV is 100%**

### Try these handy steps to get SISA findings . . .

1) In the income section of your 1003, make sure you input all income in base income.  DO NOT break it down by overtime, commissions or bonus.

2) NO GIFT FUNDS!  If your borrower is getting a gift, add it to a bank account along with the rest of the assets.  Be sure to remove any mention of gift funds on the rest of your 1003.

3) If you do not get Stated/Stated, try resubmitting with slightly higher income.
Inch it up $500 to see if you can get the findings you want. Do the same for assets.

**It's super easy!  Give it a try!**

**If you get stuck, call me . . . I am happy to help!**

91.   This blatant promotion of loan fraud became the industry standard and widely accepted by all the Lender and I-bank defendants.  Perhaps not in writing, but verbal promotion was widely accepted.  These last few years in the mortgage business provides some insight into Nazi Germany; obviously not nearly as horrific, but greater complicity.  One should be less concerned about reporting loan fraud.

92.   The promotion of non-traditional mortgage products versus safe and sound lending practices became the standard for relevant markets.  In a perfect world Lenders would be more concerned about fraud in expensive areas, but instead it was encouraged.  Limited supply and rapid appreciation fueled the greed.  Borrowers' ability to repay the debt was no longer a problem because the CRAs could pass off anything as investment grade as long as the borrower had decent credit.

93.   Defendant, Wells Fargo and the National Association of Home Builders ("NAHB")

ranked the San Francisco Metro as the least affordable Metro in the United States from 1991 (beginning of study) -2001. Since 2001 San Francisco, Santa Cruz, Salinas and other California cities had alternated as the least affordable Metros in the U.S available at,

http://www.nahb.org/fileUpload_details.aspx?contentID=34323

94.  In further support of Plaintiff's allegations that Defendants were well aware of the rampant fraud and unsubstantiated prices; Goldman Sachs released a report on October 21, 2007. "Californian Home Prices are over-valued by 35-40%..."Our hitherto highly-predictive model broke in 2004, (emphasis added) when sales of "affordability products" (e.g., subprime, option ARMs, home equity) spiked as a proportion of total mortgage originations."  Not surprising 2004 was also when Goldman Sachs and other investment banks became more actively involved in loan origination process and/or purchased lenders.  Defendants Goldman Sachs and Henry Paulson have both been criticized for purposely creating and profiting from the crisis; GS's report is available at http://www.michaelblomquist.com/Papers/20071021GSCAValuations.pdf .

**Stated Income Guidelines**

95.  Traditionally stated income guidelines were limited to self employed borrowers with 2 years of recent documented self employment via a CPA letter or 2 years of business licenses. These loans helped streamline lending decisions because many self employed borrowers had extensive tax returns.  These guidelines required substantial equity (20-25%), 6 months of stated income in reserves after the close of escrow and excellent credit. Once the I-banks became active in the origination process stated income guidelines basically included anyone with a pulse and a marginal credit history.  W-2 employees were allowed despite the easy verification of their incomes, little reserves and even 100% financing was available.   Clearly, these changes were not made to streamline the lending process.

96. Similar to subprime loans stated income loans removed limited housing supply by granting loans to people who could not afford to repay them, but at least with subprime the investors knew what they were getting.   In addition to providing loans to buyers; new stated income guidelines provided loans to millions of unqualified refinance borrowers whose homes' values were inflated because of these unlawful practices.

**Option ARMs**

97. Option ARMs provided borrowers with payment structures whereby they could make minimum payments that are approximately 40-50% of the accruing interest.  The unpaid interest would be added on to the loan until the balance reached a predetermined amount of 110, 115 or 125% of the original balance.  After the balance exceeded these predetermined amounts or a set number of years elapsed, usually 5 or 10 years the loan would recast into a fully amortized loan and payments could increase by 200-300%.

98. Option ARMs were extremely deceptive in that they advertised start rates of 1-2%. Payments could be any amount as long as they met the minimum payment which was calculated by amortizing the start rate or "teaser" rate for 30 years.  Most lenders would provide options such as minimum, interest only, 30 year or 15 year amortization.  Many borrowers were deceived to believe their rate was the teaser rate, but in reality it was based on an index plus a margin. The index was commonly based on the 12 month treasury average ("MTA"), Cost of Funds Index ("COFI") or London Interbank Offered Rate ("LIBOR").  The margin commonly varied from 2.25% to 3.375%, depending upon borrowers' credit/risk factors and compensation to the Broker/LO.  A Broker/LO could receive a higher commission for selling a higher margin which would increase borrower's interest rate, but not the minimum payment.  The margin would be added to the index to calculate the fully indexed rate ("FIR").  Regardless of minimum payments

based on the teaser rate; the other payment options were based on the higher FIR.   Most Option

ARM borrowers elect or are forced to make minimum payments because they truly cannot afford

the loan; the minimum payment is not an option it is a necessity.  In many cases Option ARM

borrowers cannot afford the minimum payment, but have received equity lines or had reserves to

help maintain payments before default.

99.  Option ARMs were not only deceptive to borrowers, but they were also very

deceptive to investors.  Option ARM borrowers were prevalent across all income and education

levels.  Many borrowers viewed the 5 years as plenty of time for their incomes to increase or the

home to appreciate in order to sell at a profit before loan reset.  Because Option ARMs had

extremely low minimum payments borrowers could maintain much larger loan balances than

they could truly afford under interest only or amortized loans.  S&P, Moody's and Fitch

provided investment grade ratings on these loans, but the deep payment discounts were virtually

untested (emphasis added).  In addition the CRAs provided many misleading reports whereby

they compared current Option ARMs with 65,000 previous Option ARMs; one such report from

Fitch is available at,

http://www.michaelblomquist.com/complaint/PDFs/fitch2006OptionARM.pdf

> "Fitch studied historical payment patterns of Neg Am ARMs originated and securitized
> from 1994–2004 to understand when and for how long borrowers choose to make the
> MMP and incur negative amortization.  Those borrowers that continue to negatively
> amortize by the five-year recast are likely to face a very large payment increase in a
> rising rate environment. Fitch analyzed more than 65,000 loans from LoanPerformance.
> The sample included all Neg Am loans that had an initial seasoning of 12 months or less.
> Because data obtained from LoanPerformance reflects a loan's history from the time it
> was securitized and not originated, loan histories for many loans were not available for
> several months after origination."

These statements were extremely misleading because the loans they were analyzing were

completely different than current Option ARMS

100. Plaintiff has not been alone in his criticisms of the Option ARM and stated income guidelines. Defendant and architect of the Option ARM Herbert Sandler also voiced his concerns about the dramatic and dangerous changes to the monster he helped create. Sandler's comments were contrary to Fitch's use of prior Option ARMs to determine future performance of the new Option ARMs.

> "The traditional Option ARM product is essentially unchanged since 1981. What has changed in the last few years, **particularly since the emergence of a securitization market** willing to acquire greater numbers of Option ARMs, are more aggressive practices by new Option ARM originators, many of whom lack a sophisticated understanding of the loan and appear focused principally on generating volume. These aggressive practices include deeper discounts between the loan's fully-indexed rate and the starting payment rate (referred to as the "payment discount"), diluted underwriting standards, and shortcut appraisal practices. It is these emerging practices that have increased the visibility, and we believe the risks, associated with the Option ARM product and that have lead, ultimately, to the proposed guidance."

Available at, http://www.fdic.gov/regulations/laws/federal/2005/05comguide.html #47

101. After many years of emails, phone calls and other warnings Plaintiff did get the agencies to review non-traditional mortgage products available at, http://www.fdic.gov/regulations/laws/federal/2005/05comguide.html #20

102. The following illustrates an actual Option ARM statement from Defendant WAMU. The minimum payment is only $1,963.92 but the actual interest only payment is $4,157.63. The difference is added to the balance of the loan and also added to the lenders' financials as income. Obviously, most of this income will not be collected.

**Chart 7**



103.  This borrower, borrower #1 was coerced by a WAMU LO to refinance his purchase money loan only 5 months after purchase.  He was a potential client of Plaintiff, but he did not like what Plaintiff told him he was qualified for and went with WAMU.  WAMU allowed the borrower to use a new, higher valued appraisal after 5 months in order to obtain minimal cash out $4,000. Unfortunately, it did eliminate the borrower's anti-deficiency protection which is provided under; [California Code of Civil Procedure § 580b](). The Lenders and I-banks would often entice borrowers to refinance immediately following a purchase to remove the deficiency protection; and this was another practice that came about after the I-banks started originating loans.

104.  Paragraph 103 illustrates more reckless changes to lending guidelines in order to benefit the Defendants.  Traditionally loans needed to be seasoned for 12 months before a borrower could obtain a new loan based on a higher appraisal.  The one exception is that a borrower had to document improvements before a new, higher valued appraisal could be used. Documented improvements would be adjusted dollar for dollar above the recent purchase price.

105.  This was just one of many borrowers who were unwilling to listen to Plaintiff's advice about their true qualifications and later easily obtained financing by one of the

**PROPOSED SECOND AMENDED COMPLAINT          C07-04108-JF**
**(40)**

Defendants. This borrower went on to receive a $96,000 equity line from WAMU and numerous cash out refinances before WAMU agreed to a short sale whereby they accepted less than $150,000 they were owed due to cashouts, negative amortization and depreciation.

106.  Plaintiff knows of numerous homeowners who were enticed to obtain $1,000,000+ Option ARMs on extremely limited incomes.  Essentially they agreed to commit loan fraud. Plaintiff had recommended that they sell because they could not truly afford their homes on their limited incomes.  Many of these borrowers did have substantial equity, but much of it has declined from depreciation and negative amortization.  Some could lose the remaining equity as once their Option ARMs reset and their payments triple.

107.  The Following WAMU Option ARM worksheet was provided as a sales tool for WAMU LOs.  Comments in blue and red are from Plaintiff.  As you can see the loan amount was $1,160,000 and the start rate ("teaser") rate was 1.25%.  The minimum payment was $3,072.20 and the interest only payment was $4,341.90 based on a fully indexed rate ("FIR") of 4.554%.  This worksheet was used by WAMU LOs for many months after interest rates had increased substantially.  The margin was listed at 2.050%; which is extremely low for Option ARMs.

### Chart 8



The steps provide an illustration of the annual payment caps.  What makes this marketing tool extremely deceiving is the omission of the payment shock after 5 years or once the loan balance exceeds the predetermined amount of 110%, 115% or 125% of the original balance.  If the borrower only makes minimum payments the borrower's payments will often increase by 200-300x when the loan resets.

**MARI Annual Reports**

108.  The Mortgage Asset Research Institute ("MARI") is a well-known, respected and widely followed mortgage industry service provider.  MARI provides annual reports primarily focused on fraud.  In June 2004 MARI presented the following report to the Mortgage Banker's Association ("MBA") available at

http://www.marisolutions.com/pdfs/mba/MBA6thCaseRpt.pdf,

"Report Summary
Mortgage originations approached a record $4.0 trillion in 2003. Although the 2003 numbers on residential mortgage fraud and misrepresentation are still preliminary, it appears that there is little change in the incidence and type of fraud lenders are seeing. If there is a significant reduction in originations for 2004, additional cases could surface at a rapid rate as **some originators try to maintain former high origination levels.**

109.  In May 2005 MARI released the following statements, "Mortgage originations approached nearly $3 trillion in 2004, down from a record $4 trillion in 2003."  Obviously an annual decline of 25% is huge.  The report also stated the following available at,

http://www.marisolutions.com/pdfs/MBA7thCaseRpt.pdf

"State Whatever Makes It Work. An officer at a Florida mortgage company applied to a second lender for two stated income loans. The applications were submitted 90 days apart. In the first, the borrower stated his monthly income as $24,000, and in the second he said it was $30,000. When the mortgage company officer was asked about the difference, he said, "I thought that on stated income loans you could claim an income has high as necessary to bring the ratios into compliance." [Even mortgage industry professionals don't understand the rules. Stated income loans are introducing significant risk to many lenders' business.]"

Plaintiff takes a more critical view of this LO because Plaintiff would have been liable for the repurchase of the fraudulent loan.  This is not a violation of a "rule" it is called loan fraud and it is a felony.

110.  April 2006 MARI released the following available at,

http://www.marisolutions.com/pdfs/mba/MBA8thCaseRpt.pdf

"Stated income and reduced documentation loans speed up the approval process, but they are open invitations to fraudsters. **It appears that many members of the industry have little historical appreciation for the havoc created by low-doc/no-doc products that were the rage in the early 1990s. Those loans produced hundreds of millions of dollars in losses for their users.**

One of MARI's customers recently reviewed a sample of 100 stated income loans upon which they had IRS Forms 4506. When the stated incomes were compared to the IRS figures, the resulting differences were dramatic. Ninety percent of the stated incomes were exaggerated by 5% or more. **More disturbingly, almost 60% of the stated amounts were exaggerated by more than 50%.** These results suggest that the stated income loan deserves the nickname used by many in the industry, the "liar's loan."

This study is widely known and has been often cited by the chairman of the Office Comptroller of the Currency ("OCC"), John Duggan.  This study also provides further evidence of Defendant's scienter.  The loan products and guidelines that are at the heart of Plaintiff's claims and Defendants' criminal enterprise were already tested and failed.  The obvious reason for their re-birth was to self-enrich; these fraudulent products were definitely not in the long-term interests of shareholders.

111.  August, 2008 MARI released the following available at,

http://www.marisolutions.com/pdfs/mba/mortgage-fraud-report-2008Q1.pdf

During the first quarter of 2008, MARI experienced a 42 percent increase in received incident reports over the same period in 2007.

"General Application Misrepresentation" continues to take the top spot for incident type, followed closely by "Income" and "Employment."

**Citigroup Sample Prospectuses**

112.  In reviewing countless prospectuses it is obvious that stated income loans became

the industry standard during relevant times, but the risks of possible fraud from stated income

loans were completely avoided.  The following Citigroup prospectuses offer additional evidence

of the dramatic changes to lending guidelines whereby stated and no income documentation

loans became more prevalent than the historically proven loans with documented incomes

available at:

a)  http://michaelblomquist.com/Prospectus/Citicorp2001.htm#Income
    95% of loans originated using loan underwriting policies that require proof of income

b)  http://michaelblomquist.com/Prospectus/CMALT_2006_A6_Prospectus.htm#StatedIncome
    20.42% of loans originated were with full income documentation

Plaintiff alleges that Defendants have purposely and recklessly altered lending guidelines in a

blatant attempt to generate more loans, impute liability and eventually destroy the mortgage

http://michaelblomquist.com/Prospectus/CMALT_2006_A6_Prospectus.htm#LoanUnderwriting

Initially, a prospective borrower **must** provide information about the prospective borrower, the
property to be financed and the type of loan desired. The prospective borrower must also provide
some or all of the following:
· proof of income, such as a paycheck stub or W-2 form, except that some self-employed
prospective borrowers must submit their federal income tax returns for the most recent two
years.
· if the loan is for the purchase of the mortgaged property, proof of liquid assets,
· telephone verification of employment, which may be by a third-party national employment
verification service (except that some high net worth prospective borrowers with ongoing
banking relationships with Citibank's private banking group may be exempted from employment
verification), and
· a credit report.

113.  It is important to note that Citigroup had clearly listed the responsibility of

assessing a borrower's ability to pay the debt on the "affiliated originator".

***"Lending guidelines***

**PROPOSED SECOND AMENDED COMPLAINT        C07-04108-JF**
**(44)**

Once the employment verification and credit reports are received, the affiliated originator decides

- whether the prospective borrower has enough monthly income to meet monthly obligations on the proposed loan and related expenses as well as the prospective borrower's other financial obligations and monthly living expenses, and
- if the loan is for the purchase of the mortgaged property, whether the prospective borrower has enough liquid assets to acquire the mortgaged property and make the initial monthly mortgage payments, taking into account, among other things, proceeds from the sale of a prior residence (required since April 1991). This decision may be made from evidence such as a contract for sale of a prior residence and bank statements supplied by the prospective borrower.
Often, other credit considerations may cause a loan underwriter to depart from the guidelines, and a loan underwriter may require additional information or verification to compensate for the departure."

114.  The preceding prospectuses provided the required investment grade ratings under the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA") available at,

http://michaelblomquist.com/Prospectus/CMALT_2006_A6_Prospectus.htm#SMMEA

**Lenders Duty to Maintain Safe and Sound Lending Guidelines**

115.  At all times each of the Defendants that engaged in Lending, including the I-banks were required by their primary regulators and  Section 39 of the Federal Deposit Insurance Act to establish certain safety and soundness standards by regulation or by guideline for all insured depository institutions. Under section 39, the agencies must establish three types of standards: (1) Operational and managerial standards; (2) compensation standards; and (3) such standards relating to asset quality, earnings, and stock valuation as they determine to be appropriate. Within these standards included loan documentation:

An institution should establish and maintain loan documentation practices that:

a. Enable the institution to make an informed lending decision and to assess risk, as necessary, on an ongoing basis;

b. Identify the purpose of a loan **and the source of repayment**, **and assess the ability of**

**the borrower to repay the indebtedness in a timely manner;**

c. Ensure that any claim against a borrower is legally enforceable;

d. Demonstrate appropriate administration and monitoring of a loan; and

e. Take account of the size and complexity of a loan.

**Conclusion**

115.  Throughout 2002 and 2003 interest rates were at historic lows and as a result a refinance boom had ensued.  Plaintiff and Plaintiff's agents were extremely busy refinancing previous and new clients as well as helping buyers obtain financing.

116.  During 2002 & 2003 stated income loans were becoming very popular along with Option ARMs and 100% financing.  At all times the Wholesale Broker Agreements paragraph #86 and fiduciary duties required that Plaintiff collect and analyze financial information, related documents and assist Applicant in determining the mortgage that applicant can afford.

117.  Despite these obvious and extremely important tasks Defendant's representatives would drop by or call the office and suggest that Plaintiff and Plaintiff's agents remove income documentation form loan files and inflate incomes on applications in order for the borrowers to be approved.  Given the expensive home prices this was a common occurrence. There were many other instances with Countrywide, but Plaintiff specifically recalls these 2 separate events during the 3rd quarter of 2003.

118.  On one occasion Plaintiff overheard a conversation with one of Plaintiff's agents who was later terminated for concerns of liability.  The Countrywide representative ("CR") and Plaintiff's agent were discussing a borrower who was looking to purchase a $350,000 retirement condo in Los Gatos.  The borrower was retired with insufficient income to qualify as indicated

by the tax returns in the file.  As the conversation continued Plaintiff grew concerned because this agent had a pattern of shady activity.  Plaintiff overheard CR's suggestion of removing the tax returns, inflating the income by approximately $2,000 per month and submitting on a different loan program.  The program required a 10% down payment and that was yet another obstacle.  At this time Plaintiff entered the agent's office and asked about the file.  The story was that the borrower was actually buying the property for a girl-friend who was not yet 55, but would be in a few years.  Supposedly she did have sufficient income to qualify, but was not the proper age.  Plaintiff asked both CR and agent if they were aware of the repurchase agreement.  CR stated he was, but not to worry everyone is able to work the system.  Plaintiff stated that that is easy for you to say since your name isn't on the dotted line.  Plaintiff said he did not feel comfortable having that loan go through his office and if that was not acceptable with the agent he needed to find somewhere else to work.  Besides inflating income there was falsifying occupancy and issues regarding down payment.

119.  On the next occasion approximately two months later the Countrywide rep called looking for business and spoke with a different agent in Plaintiff's office discussing a loan file for a borrower in Mountain View.  The borrower had fallen behind on his payments and needed help refinancing.  The loan was in excess of $750,000 and the property had not been appraised, but estimated at $1,000,000.  The comparables were in good condition and the subject property was unknown. It was obvious that any loan was only going to put a band aid on a severed limb.  Plaintiff trusted this particular agent and had already looked at the file.  Borrowers' income fluctuated depending on overtime, but at best was $75,000.  The borrower had maxed out his credit cards and was running late on his car payment as well.  Plaintiff had suggested to his agent that she ask the borrower if he would be interested in a loan provided he

list the property with the office. Plaintiff would extend the credit at a approximately 9% with no fees other than title insurance and escrow.  Agent had already called the borrower and borrower was still only interested in refinancing.  Plaintiff later asked what was the CR's suggestion and she stated it was to inflated the income by 100% and hope they could get a high appraisal value. Upon Plaintiff's suggestion to not run the loan through his office agent gave the file to Countrywide's retail subprime division and received a cash referral fee.

120.  It should also be noted that Plaintiff had a business relationship with Countrywide from 1997 to 2004 and never once received a 1099.  Plaintiff called about 1099 on at least two different occasions and was told that it was not their policy to issue 1099s.  Perhaps fraud and tax evasion is how Countrywide became #1; it definitely was not their pricing.

121. As stated in paragraph #103 it was common for Plaintiff to lose buyers/borrowers to the Defendants because Plaintiff did not want to commit fraud, breach fiduciary duties or help clients commit financial suicide. Besides the borrower/buyer listed in paragraph #103 Plaintiff is aware of 2 additional borrowers who went with WAMU after Plaintiff said they could only afford less.   One borrower ended up cashing out $250,000 to obtain a $1.1 million dollar Option ARM in Los Altos.  The borrower's monthly income was not enough to qualify to make the minimum payment let alone interest only.  The loan will recast in approximately 2 years and the payments will most likely triple if interest rates remain the same.  Most of the money was used to purchase a vacation home out of state and there are not much in other reserves.

122.  Similar to the borrower in paragraph #103 this was another borrower who ended up going with WAMU because they did not like what Plaintiff told them.  Borrowers wanted to cash out of a primary home on an Option ARM turn it into a rental and purchase a new home. Plaintiff said they should sell the first home because the payments on both homes would be too much and

they had two young children to worry about. Borrowers ended up going with WAMU who provided approximately $110k cash out for a $490k 1st Option ARM. Countrywide ended up providing a 1st and a 2nd on the new $995k purchase. Because of excessive car payments borrowers had to inflate their incomes by $1,000 a month to qualify for the WAMU loan. Husband was the sole bread winner. The Countrywide loans had to be inflated considerably more.

123. Wells Fargo became very active with stream line equity lines that did not require any income documentation. After closing my office I found out from an agent that the Wells Fargo Wholesale Representative was constantly recommending that incomes should be inflated in order to obtain a $100,000, $200,000 or more equity line along with a new first during a refinance.

124. Plaintiff was in his assistant's office when a World Savings representative came by to ask for business and if we had any loan files she could review. At the time everything Plaintiff had was submitted and most loans went to Provident Funding because of their superior pricing. Plaintiff made that comment to World Savings rep about their pricing and she said yes, but they don't have Option ARMs nor the amount of stated income products in case your borrowers' income needs help.

125. These are just a few of the constant requests to perpetrate loan fraud by the Lenders' representatives. The rampant fraud and unsubstantiated price increases would have never been a problem if the I-banks and CRAs did not recklessly alter decades of proven, safe and sound lending standards.

126. S&P, Moody's & Fitch were all essential and at the foundation of the crimes listed herein. S&P, Moody's & Fitch provided investment grade ratings so that so that large investment funds could legally invest in securities that were known to be of questionable or terrible quality.

127. S&P, Moody's & Fitch were all competing for business to provide rating services for Defendants and others not named in this complaint. Instead of maintaining their mission statements they all continued to destroy safe and sound lending standards in a series of one-upmanship to gain business.

**Statutes**

128. <u>Loan fraud Title 18 § 1014</u>, "Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the any institution the accounts of which are insured by… the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, any Federal home loan bank, the Federal Housing Finance Board, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation … shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

129. Congress specifically used "security" and "influencing" in this law to incorporate a broad range of offenders; including but not limited to borrowers, Brokers, Lenders, I-banks and CRAs. It is alleged that all Defendants have committed loan fraud either by knowingly making false statements or willfully overvaluing securities. Plaintiff has numerous witnesses who were former employees with S&P, Moody's and Fitch who will support that the companies knew many of the underlying loans were originated under fraudulent terms. Fortunately, many are tired of their shenanigans and realize the serious damage they have done this time around. There are countless stories to reference about criminal activities and cover-ups available at,

http://www.michaelblomquist.com/News/Bloomberg/20080522Moody%27sPlungesforSecondDayAfterCover-UpProbe.pdf

130.  <u>Title 18 § 1341 Frauds and Swindles,</u> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

131.  <u>Fraud by wire, radio, or television Title 18 § 1343</u>

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or

imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

130.  <u>Bank fraud Title 18 § 1344</u>, "Whoever knowingly executes, or attempts to execute, a scheme or artifice--

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent  pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

131.  <u>Antitrust Title 15 § 1</u>, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

132.  <u>Antitrust Title 15 § 15</u> Suits by persons injured (a) Amount of recovery; prejudgment interest except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly

made, simple interest on actual damages for the period beginning on the date of service of such

person's pleading setting forth a claim under the antitrust laws and ending on the date of

judgment, or for any shorter period therein, if the court finds that the award of such interest for

such period is just in the circumstances. In determining whether an award of interest under this

section for any period is just in the circumstances, the court shall consider only— …

133.  <u>Title 12 § 2607 (a)</u> Business referrals: No person shall give and no person shall

accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or

otherwise, that business incident to or a part of a real estate settlement service involving a

federally related mortgage loan shall be referred to any person.   It was very common for Lenders

and I-banks to provide rebates in excess of 3% for stated income loans and or Option ARMs.

134.  <u>Title 12 § 2607 (b)</u> Splitting charges: No person shall give and no person shall

accept any portion, split, or percentage of any charge made or received for the rendering of a real

estate settlement service in connection with a transaction involving a federally related mortgage

loan other than for services actually performed.

<b><u>COUNT I</u></b>

(Racketeer Influenced and Corrupt Organizations ["RICO"]

18 U.S.C. §1960 et seq., as amended)

(Against All Defendants)

135.  Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs

1-134 as though fully alleged herein.

136.  Plaintiff is bringing his RICO claim pursuant to 18 U.S.C.  Section 1962(c), which

makes it a crime to conduct or participate, directly or indirectly, in the conduct of [an]

enterprise's affairs though a pattern of racketeering activity.

137.  DEFENDANTS and each of them, jointly and severally, by and through their officers, managers, agents, representatives and employees constituted an "enterprise" pursuant to 18 U.S.C. §1961(4).

138.  DEFENDANTS, jointly and severally, engaged, combined and/or conspired to engage in two or more acts of "racketeering" pursuant to 18 U.S.C. §1961(4), including but not limited to: (1) mail fraud in violation of 18 U.S.C. §1341; (2) wire fraud in violation of 18 U.S.C. §1343; (3) loan fraud in violation 18 U.S.C. §1014; (4) bank fraud in violation of 18 U.S.C. §1344 (5)interference with commerce by threats in violation of 18 U.S.C. §1951 and in violation of California State law.

139.  The racketeering predicates stated above, are related in the perpetration of the fraudulent mortgage scheme and they amount to or pose a threat of continued criminal activity. As a result of DEFENDANTS' wrongful conduct, Plaintiff was unwittingly exposed by way of agents to be made a party to Defendants' fraudulent scheme to present deceptive and false information in preparation of financing, refinancing, loan, mortgage and security values.

140.  Eventually, Plaintiff as a result of DEFENDANTS' racketing activities, including but not limited to mail fraud, wire fraud, loan fraud and bank fraud, was forced out of business all to his damage and loss.

141.  DEFENDANTS' pattern of racketeering activities has enlisted millions of other aiders and abettors of mortgage fraud for many years.  Several of the present Defendants have been investigated in the past for fraudulent lending and mortgage schemes and presently Plaintiff is aware of other victims of DEFENDANTS racketeering activities in mortgage transactions,

related litigation and reported litigation cases. In addition, there is a real likelihood the racketeering activities will continue in the future.

142. Defendants' unlawful conduct in this action is in violation of 18 U.S.C. §§1962(c) and (d).

### DEFENDANTS Misconduct Which Is The Basis Of Each Defendants' Liability

143. DEFENDANTS are a liable enterprise under the Racketeer Influenced and Corrupt Organizations Act ("RICO") for conspiracy to violate, and for repeated violations of 18 U.S.C. §1341(fraud scheme involving mail and interstate commerce), 18 U.S.C. §1343 (fraud scheme utilizing wire, computer e-mails and interstate commerce), in communicating with Plaintiff and engaging in the fraudulent scheme with other DEFENDANTS.

144. In addition, DEFENDANTS engaged in false representations to federal banks, willfully overvaluing securities, verification of deposits in violation of 18 U.S.C. §1014. and Truth and Lending Act, 15 U.S.C. §1601 *et seq*. (12 C.F.R. Part 226)

145. DEFENDANTS are liable enterprises under RICO for conspiracy to violate, and for repeated violations of 18 U.S.C. §1341(fraud scheme involving mail and interstate commerce), 18 U.S.C. §1343 (fraud scheme utilizing wire, computer e-mails and interstate commerce), in communicating with Plaintiff and engaging in the fraudulent scheme with DEFENDANTS.

### Additional Wrongdoers Other Than DEFENDANTS Are Involved

146. DEFNDANTS had various owners, officers, agents and other associated executive decision makers who were involved in setting lending and financing and refinancing, loan, income and credit policies, including the non-corporate defendants in this case who were an

enterprise and or conspired with the DEFENDANTS enterprises in a pattern of racketerring

activities and or aided and abetted the racketeering activities of the enterprises.

### Victims of the Pattern of Racketeering Activities

147.  In addition to Plaintiff being a victim of the racketeering activities of

DEFENDANTS, Plaintiff believes that there are 100's of victims to the fraudulent RICO scheme

alleged herein based on other litigation by consumers and pending investigations into predatory

lending schemes that involve these DEFENDANTS.

As a direct result of DEFENDANTS racketeering activities Plaintiff has incurred the following

damages:

a.      Forced to close Plaintiff's business.

b.      Loss of income approximately $150,000.00 -$200,000 a year.

c.      Loss of reputation.

d.      Exposure to liability for mortgage fraud.

e.      Unfair trade practice of shifting the risk of loan default onto Plaintiff/Broker.

f.      Losses relating to securities fraud

### The Pattern of Racketeering Activities Involving Predicate Acts and Violation of Statutes

148.  Mail fraud in Defendants' association with an enterprise engaged in, or the

activities of which affect, interstate commerce, directly and indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity in under 18 U.S.C. §1962(c), in

violation of 18 U.S.C. §1341

149.  Mail fraud in Defendants' conspiracy to associate with an enterprise engaged in, or

the activities of which affect, interstate commerce, directly and indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1341.

150.  Wire fraud in Defendants' association with an enterprise engaged in, or the activities of which affect, interstate commerce, directly and indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in under 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1343

151.  Wire fraud in Defendants' conspiracy to associate with an enterprise engaged in, or the activities of which affect, interstate commerce, directly and indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1341, in violation of 18 U.S.C. §1343.

152.  Bank fraud in Defendants' association with an enterprise engaged in, or the activities of which affect, interstate commerce, directly and indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in under 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1041.

153.  Bank fraud in Defendants' conspiracy to associate with an enterprise engaged in, or the activities of which affect, interstate commerce, directly and indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1341, in violation of 18 U.S.C. §1041.

154.  Defendants' association with an enterprise engaged in, or the activities of which affect, interstate commerce, directly and indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in under 18 U.S.C. §1962(c), in violation of the Truth and Lending Act, 15 U.S.C. §1601 *et seq*. (12 C.F.R. Part 226).

155.  Defendants' conspiracy to associate with an enterprise engaged in, or the activities of which affect, interstate commerce, directly and indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1341, in violation of the Truth and Lending Act, 15 U.S.C. §1601 *et seq*. (12 C.F.R. Part 226).

156.  DEFENDANTS activities also involved Unfair and Deceptive Trade Practices in Violation of 15 U.S.C. § 45(a)(1).

**Circumstances Involving Mail And Wire Fraud.**

157.  The DEFENDANTS policies, instructions, statements and refinanced loan packages and related documents were mailed to Plaintiff and involved many phone and e-mail conversations.

**Predicate Acts Form A "Pattern Of Racketeering Activity"**

158.  The RICO Act defines a pattern as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." There are multiple wire, mail and bank fraud in this case within 2007, which provides a pattern of racketeering activity.  In addition, under *H.J. Inc v. Northwestern Bell Tele. Co.*, 409 U.S.299 (1989), the standard for "pattern of racketeering activity is also met as the factors of "continuity" plus "relationship" combine to form a pattern, as the predicate acts lasted for Plaintiff for a substantial period of time and the predatory lending practices of DEFENDANTS have been going on for years, but are just recently realized by the housing market and investigative bodies of the government.

159.  Each of the predicate acts relates to each other a part of a common plan.  **As** noted above the use of mail, wire, bank fraud, including, but not limited to, misrepresentations relating to Plaintiff's  income, assets, income and bank deposits, rates, and values all relate to a common

RICO plan and pattern relating to predatory and oppressive lending practices to the benefit of DEFENDANTS and damage to Plaintiff and to the public and economy at large.

**Alleged "Enterprise" for Each RICO Claim.**

160.  Plaintiff alleges that DEFENDANTS are each enterprises engaging in legitimate banking, mortgage and credit services.  The DEFENDANTS enterprises conduct lawful activity unrelated to the pattern of racketeering activity and are separate from the pattern of racketeering.

161.  The pattern of racketeering activity alleged by Plaintiff is completely distinct from the usual activities of the DEFENDANTS enterprises.  The enterprises serve proper and legal purposes.  The enterprises were simply the vehicles through which DEFENDANTS committed their pattern of racketeering activity.

162. Due to the pattern of racketeering, DEFENDANTS caused millions of consumers to obtain loans, refinancing and equity lines of credit, among other types of financing, which they could not afford which resulted in additional income, commissions, kick-backs, financing interest, potential foreclosures and collection of deficiency judgments in foreclosure, unjust enrichment, among other benefits to DEFENDANTS.

163. The racketeering activities alleged by Plaintiff interfered and affected interstate commerce in particular banking and mortgage business and a substantial part of the economy of California and the United States which relies on the housing industry and the value of land and truthful loan servicing. In addition, the fraud and predatory lending activities have devalued land and other entities (pensions, funds), which have purchased loan packages, have had substantial losses.  The loses in the bank and mortgage lending have affected the entire economy of the United States, caused many mortgage firms to sell or go out of business, including Plaintiff's, and played a role in the devaluation of the U.S. dollar.

164.  Plaintiff has sustained special, compensatory, consequential and general damages. Plaintiff is also entitled to treble statutory damages and punitive damages. DEFENDANTS as co-conspirators are jointly and severally liable for Plaintiff's damages, the amount and allocation of these damages are uncertain at this time pending further discovery.

## COUNT II

(RICO Civil Conspiracy, 18 U.S.C. §1962(d), as amended)

(Against All Defendants)

165.  Plaintiff  realleges and incorporates herein the allegations contained in paragraphs 1 through 164 as though fully alleged herein.

166.  As the fraudulent scheme involved obtaining mortgages and or loan for victims that they may not have received otherwise or by incurring additional fees, costs and charges, the scheme depended on several entities and their employees who participate in the process of obtaining financing to conspire and be in on the scheme for it to be successful.  DEFENDANTS had policies and encouraged lending institutions to provide documents and information for loans, which did not support the loan or risk undertaken by the borrower, including Plaintiff. The entire scheme necessary involved the all the professionals to servicing a loan, CRAs, I-banks, Lenders, escrow holder and borrowers to participate in the scheme. As a conspiracy under 18 U.S.C. §1962(d), The alleged pattern of racketeering activity by the enterprises and their agents are the sole and proximate cause of Plaintiff's alleged emotional distress, resulting financial loss , including loss of business, income and loss of personal reputation in the mortgage community and among  his clients.  Plaintiff has sustained special, compensatory, consequential and general damages.  Plaintiff is also entitled to treble statutory damages and punitive damages.

DEFENDANTS as co-conspirators are jointly and severally liable for Plaintiff's damages, the amount and allocation of these damages are uncertain at this time pending further discovery.

## COUNT III

(Antitrust: Unlawful Restraint of Commerce)

167.  Plaintiff  realleges and incorporates herein the allegations contained in paragraphs 1 through 166 as though fully alleged herein.

168.  DEFENDANTS sought to manipulate broker agreements, legal precedence and lending guidelines to unlawfully entice Plaintiff and  Plaintiff's agents with excessive rebates and or referral fees in direct violation of Title 12 § 2607 (a)

169.  DEFENDANTS' objectives were to fund as many loans as possible regardless of quality.  In fact, it was preferable that borrowers could not afford their loans so they would be trapped in constant refinancing activity.  DEFENDANTS  encouraged violation of Title 12 § 1014 loan fraud by recklessly altering lending guidelines and purposely avoiding the truth of loan fraud.  Unqualified borrowers who agreed to over-state incomes would be restrained from legal remedies under the unclean hands doctrine.

170.  Relevant markets were extremely susceptible to DEFENDANTS scheme because of limited supply and high demand.  Thousands of borrowers were provided loans they could not afford which created elevated prices to extremely dangerous and unsustainable levels.

171.  Plaintiff was unlawfully restrained from commerce in violation of Title 15 § 1 and Title 15 § 15 because of excessive and unnecessary liability from loan fraud, loan repurchases, fiduciary breeches and duty of care.

172.  As a direct result of DEFENDANTS unfair business practices

a.        Forced to close Plaintiff's business.

b.      Loss of income approximately $150,000.00 -$200,000 a year.

c.      Loss of reputation.

d.      Exposure to liability for mortgage fraud.

e.      Unfair trade practice of shifting the risk of loan default onto Plaintiff/Broker.

f.      Losses relating to securities fraud

## COUNT IV

(Antitrust Violation: Boycotting)

(LENDER & I-BANK DEFENDANTS)

173.  Plaintiff  realleges and incorporates herein the allegations contained in paragraphs 1 through 172 as though fully alleged herein.

174.  DEFENDANTS sought to manipulate broker agreements, legal precedence and lending guidelines to unlawfully entice Plaintiff and  Plaintiff's agents with excessive rebates and or referral fees in direct violation of Title 12 § 2607 (a)

175.  DEFENDANTS were very successful with their scheme to entice others as well as the Lenders and I-banks retail loan divisions were also actively originating fraudulent and deceptive loans.

176.  CRAs were directly compensated by I-banks and worked in concert.  I-banks and Lenders recognized early on that their scheme would end in disaster.  Millions of Brokers and borrowers were enticed to aid and abet their scheme and did so eagerly.  As a major objective of the criminal enterprise Defendants sought to impute all blame and liability upon the Brokers and borrowers.

177.  As of September 4, 2008 all Lenders and I-banks previously working with brokers have closed their wholesale operations in violation of Title 15 § 1 and Title 15 § 15.

## COUNT V

(Unfair Competition)

178.  Plaintiff  realleges and incorporates herein the allegations contained in paragraphs 1 through 177 as though fully alleged herein.

179. DEFENDANTS, engaged in unlawful, unfair, deceptive and fraudulent business and advertising practices by enticing borrowers to obtain loans and purchase home they could not truly afford.  The rampant fraud in the market created an extremely dangerous business environment.

180.  As a result of DEFENDANT's unfair business practices Plaintiff suffered loss to his business

a.      Forced to close Plaintiff's business.

b.      Loss of income approximately $150,000.00 -$200,000 a year.

c.      Loss of reputation.

d.      Exposure to liability for mortgage fraud.

e.      Unfair trade practice of shifting the risk of loan default onto Plaintiff/Broker.

f.      Losses relating to securities fraud

## COUNT VI

(Negligent and Intentional Actions)

(All Defendants)

181.  Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 though 180 as though fully alleged herein.

182.  DEFENDANTS individually and jointly, owe Plaintiff a duty of due care and the wrongful acts, omissions and statutory violations by Defendants, as noted  above, are a negligent

wanton, grossly negligent, egregious, oppressive and or intentional breach of DEFENDANTS

duty of due care that they owe to Plaintiff.

183.  As a direct and proximate result of DEFENDANTS' breach of duty of due care,

Plaintiff has suffered and continues to suffer general and special damages, and punitive damages,

as will be established and determined at trial herein.

## COUNT VI

### (Negligent and Intentional Infliction of Emotional Distress)

### (All Defendants)

184.  Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1

though 183 as though fully alleged herein.

185.  As a result of the DEFENDANTS wrongful acts, omissions and statutory

violations, as noted  above, Plaintiff suffered and continues to suffer emotional distress and

damages, as will be established and determined at trial herein.

## PRAYER

186.  WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants,

jointly and severally, as joint –venturers, co –conspirators and agents, as follows:

a. General damages in an amount to be determined at a trial or hearing hereof;

b. Special damages in an amount to be determined at a trial or hearing hereof;

c. Compensatory damages in an amount to be determined at a trial or hearing hereof;

d. That the contracts between Plaintiff and DEFENDANTS be declared void and or voidable and

all monies paid by Plaintiff or provided to DEFENDANTS through the financing and refinancing

transactions involving Plaintiff be refunded to Plaintiff.

e. Punitive and exemplary damages in an amount to be determined at a trial or hearing hereof;

**PROPOSED SECOND AMENDED COMPLAINT        C07-04108-JF**
**(64)**

f. Statutory and treble damages allowed by law.

g. Pre and post judgment interest.

h. Permanent Injunctive relief against the unfair trade practices or DEFENDANTS.

i. Any and all other relief as may be deemed just and equitable by the Court.

Dated:  September 4, 2008
_____

/s/Michael Blomquist
Plaintiff Pro Se

DEMAND FOR JURY TRIAL